**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x
                                                :

**LEONID ROZHETSKIN,**                   :

                                                :

                          **Plaintiff,**     :    **ECF CASE**

                                                :

                     - against -       :    **06 CV 7119 (LAK)**

                                                :

**LEONID REIMAN,**                      :    **Electronically Filed**

                                                :

                                                :

                          **Defendant.**     :
------------------------------------------------------------------ x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Douglas W. Baruch, *pro hac vice*
Richard A. Sauber, *pro hac vice*
FRIED FRANK HARRIS SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, NW
Washington, D.C.  20004
(202) 639-7000
richard.sauber@friedfrank.com
douglas.baruch@friedfrank.com

*Attorneys for Plaintiff Leonid Rozhetskin*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................. 1

ARGUMENT ..................................................................................... 4

I.      LEGAL STANDARD .................................................................... 4

II.     THE ACT OF STATE DOCTRINE AND BASIC PRINCIPLES OF
        INTERNATIONAL COMITY ARE INAPPLICABLE ................................. 5

        A.      The Allegations Of The Amended Complaint Implicate No Act
                of State ...................................................................... 5

        B.      The "Russian" Documents Submitted by Reiman Do Not Implicate
                Act of State And Are Not Subject to Judicial Notice In Any Event ...... 8

        C.      "International Comity" Principles Do Not Apply ................................. 10

III.    COUNT ONE STAES A CLAIM UNDER RICO § 1961 ................................ 10

        A.      Count One Alleges Multiple Predicate Acts ......................................... 11

                1.      Rozhetskin Has Stated a Claim for Mail and Wire Fraud .......... 11

                2.      Rozhetskin Has Adequately Pled Both Federal and State
                        Extortion ...................................................................... 14

        B.      Mr. Rozhetskin Has RICO Standing ................................................. 17

                1.      Mr. Rozhetskin Alleges Injury to His Business or Property ....... 18

                2.      Mr. Rozhetskin Has Alleged Causation .................................... 19

                3.      The Alleged RICO Damages are Neither Speculative Nor
                        Derivative .................................................................... 21

        C.      The Amended Complaint Properly Alleges Subject Matter
                Jurisdiction ........................................................................... 22

        D.      Count One Alleges an Open-Ended Pattern of Racketeering Activity ... 26

E.  Count One Alleges a RICO Enterprise.................................................28

1.  Count One Alleges An Association-in-Fact Enterprise.............29

2.  Count One Identifies a "Person" Distinct From the Alleged RICO Enterprise.....................................................31

IV.  COUNT TWO STATES A VALID RICO CONSPIRACY CLAIM UNDER 18 U.S.C. § 2962(d)................................................................32

V.  THE TORT CAUSES OF ACTION IN COUNTS THREE THROUGH ELEVEN STATE CLAIMS UNDER NEW YORK LAW............................33

A.  Counts Three Through Five State Claims for Defamation....................33

B.  Counts Six and Seven State Claims for Tortious Interference..............36

C.  Counts Eight and Nine State Claims for Abuse of Process...................38

D.  Count Ten States a Claim for Intentional Infliction of Emotional Distress.........................................................40

E.  Count Eleven States a Claim for Prima Facie Tort..............................41

VI.  THE COURT HAS PERSONAL JURISDICTION OVER REIMAN..............42

VII.  IN THE EVENT THAT ANY ASPECT OF REIMAN'S MOTION IS GRANTED PLAINTIFF SEEKS LEAVE TO AMEND HIS COMPLAINT....44

CONCLUSION..................................................................45

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

## <u>CASES</u>

*Acampora v. Boise Cascade Corp.*, 635 F. Supp. 66 (D.N.J. 1986) ............................................ 19

*A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378 (S.D.N.Y. 1996) ...................................................................................................................... 10

*Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 96 S. Ct. 1854 (1976)............................ 5

*All State Ins. Co. v. Valley Physical and Med. Rehab.*, 475 F. Supp. 2d 213 (E.D.N.Y. 2007)........................................................................................................ 15-16

*Am. Buying Ins. Servs., Inc. v. S. Kornreich*, 944 F. Supp 240 (S.D.N.Y. 1996) ........................ 33

*Amerol Corp v. Am. Chemie-Pharma, Inc.*, No. CV 04-0940, 2006 WL 721319 (E.D.N.Y. Mar. 17, 2006)........................................................................................................................ 37-38

*Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494 (S.D.N.Y. 2000) ............................ 43

*Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006)....................................................19, 20

*Ascione v. Pfizer, Inc.*, 312 F. Supp. 2d 572 (S.D.N.Y. 2004)..................................................... 13

*Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp. 2d 1291 (M.D. Ala. 1998) .................................. 12

*Azurite Corp. Ltd. V. Amster & Co.*, 730 F. Supp. 571 (S.D.N.Y. 1990).................................. 4-5

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S. Ct. 923 (1964) ............................... 5

*Bankers Trust Co. v. Nordheimer*, 746 F. Supp. 363 (S.D.N.Y. 1990)....................................... 44

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)............................................................... 4

*Belsky v. Lowenthal*, 62 A.D.2d 319, 405 N.Y.S.2d 62 (1st Dep't 1978)................................... 41

*Benedict v. Amaducci*, No. 92 Civ. 5239, 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995)............. 14

*Best Van Lines, Inc., v. Walker*, --- F.3d ----, No. 04-3924, 2007 WL 1815511 (2d Cir. Jun. 26, 2007) ........................................................................................................................ 43-44

*Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995)............................................................................... 16

*Bd. of Ed. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assoc., Inc., Local 1889, AFT, AFL-CIO,* 38 N.Y.2d 397, 380 N.Y.S.2d 635 (1975)............38, 41

*Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390 (E.D.N.Y. 2005)........................ 31

*Brown v. Mack*, 185 Misc. 368, 56 N.Y.S.2d 910 (Kings County Ct. 1945) .............................. 34

*Burns v. Stento,* 9 N.Y.S.2d 736 (Broome County Ct. 1939) ..................................................... 37

*Calabrese v. CSC Holdings, Inc.*, No. 2:02 - DV - 5171, 2004 WL 3186787 (E.D.N.Y.
      July 19, 2004) ...................................................................................................................... 17

*Caplan v. Winslett*, 218 A.D.2d 148, 637 N.Y.S.2d 967 (1st Dep't 1996) ................................. 34

*Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444 (S.D.N.Y. 2007) .................... 4, 30

*Cerberus Capital Mgmt, L.P. v. Snelling & Snelling, Inc.*, 2005 N.Y. Slip Op. 52312 (U), 2005
      WL 4441899 (N.Y. Sup. Ct. 2005) ................................................................................... 43

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..................................................... 9

*China Trust Bank of N.Y. v. Standard Chartered Bank*, 981 F.Supp. 282 (S.D.N.Y. 1997)........ 27

*Coakley v. Jaffe*, 49 F. Supp. 2d 615 (S.D.N.Y. 1999) ............................................................... 39

*Cordell-Reeh v. Nannies of St. James, Inc.*, 13 A.D. 3d 140, 785 N.Y.S.2d 694 (N.Y. 2004)..... 36

*Cruden v. Bank of N.Y.*, 957 F.2d 961 (2d Cir. 1992) ................................................................ 15

*Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466 (1984).................................................... 42

*Dana Corp. v. Blue Cross & Blue Shield Mut. Of Northern Ohio*, 900 F.2d 882
      (6th Cir. 1990) .................................................................................................................... 45

*Dean v. Kochendorfer*, 237 N.Y. 384 (1924) ............................................................................. 38

*DeSilva v. DiLeonardi*, 181 F.3d 865 (7th Cir. 1999) ............................................................... 16

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) ............................................................................... 4

*Executive Photo, Inc., v. Norrell*, 756 F.Supp. 798 (S.D.N.Y. 1991) ......................................... 45

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002)...... 27

*First Capital Asset Mgmt., Inc. v. Satinwood*, 385 F.3d 159 (2d Cir. 2004) .................... 26, 30-31

*Frey v. Maloney*, 476 F. Supp. 2d 141 (D. Conn. 2007) ............................................................ 18

*Gee Chan Choi v. Jeong-Wha Kim*, No. 04-CV-4693, 2006 WL 3535931
      (E.D.N.Y. Dec. 7, 2006)...................................................................................................12, 18

*GICC Capital Corp. V. Tech. Fin. Group, Inc.*, 67 F.3d 463 (2d Cir. 1995) .............................. 27

*Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794 (2d Cir. 1999)................................................... 45

*Green v. Fischbein, Olivieri, Rozenholc & Badillo*, 135 A.D.2d 415, 522 N.Y.S.2d 529 (1st Dep't 1987)................................................................................................................. 40

*Giuliano v. Everything Yogurt, Inc.*, 819 F. Supp. 240 (S.D.N.Y. 1993)................................... 18

*Hauser v. Bartow*, 273 N.Y. 370 (1937)...................................................................................... 38

*Hernandez v. Wells*, No. 01 Civ. 4376MBM , 2003 WL 22771982 (S.D.N.Y. Nov. 24, 2003) ........................................................................................38, 39

*H.J. Inc. V. NW. Bell Tel. Co.*, 492 U.S. 229, 109 S. Ct. 2893 (1989)..................................26, 28

*Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 112 S. Ct. 1311 (1992) ................19, 20

*Hughes Training, Inc. Link Div. v. Pegasus Real-Time Inc.*, 255 A.D.2d 729, 680 N.Y.S. 2d 721 (3rd Dep't 1998)................................................................................................ 36

*In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56 (2d Cir. 1998) ........................................... 16

*In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332 (S.D.N.Y. 2007)............................................. 32

*Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd.*, 956 F. Supp. 1131 (S.D.N.Y. 1997) .............. 44

*Lerner v. Fleet Bank, N.A.*, 318 F. 3d 113 (2d Cir. 2003) ....................................................19, 20

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277 (S.D.N.Y. 2001) ............................................................................................................................. 10

*Levine v. Gurney*, 149 A.D.2d 473, 539 N.Y.S.2d 967 (2nd Dep't 1989) .................................. 41

*Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384 (2d Cir. 1992) ............ 9-10

*Mahoney v. Staffa*, 256 A.D.2d 827, 681 N.Y.S.2d 816 (3rd Dep't 1998) ................................. 34

*Mahoney v. Temporary Com'n of Investigation of State of N.Y.*, 165 A.D.2d 233, 565 N.Y.S.2d 870 (3rd Dep't 1991)................................................................................................... 42

*Manson v. Stacescu*, 11 F.3d 1127 (2d. Cir. 1993) ................................................................... 21

*Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806 (7th Cir. 1987) ........................................... 18

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)................................................................ 4

*McNulty v. Borden, Inc.*, 474 F. Supp. 1111 (D. Pa. 1979)........................................................ 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994)............................................................................................. 13

*Mitchell v. Giambruno*, 35 A.D.3d 1040, 826 N.Y.S.2d 788 (3rd Dep't 2006) ........................ 41

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ............................................................ 32

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983) .......................................................... 31

*Moy v. Terranova*, No. 87-Cv-1578, 1999 WL 118773 (E.D.N.Y. Mar. 2, 1999) ..................... 32

*Nakahara v. Bal*, No. 97-CV-2027, 1998 WL 35123 (S.D.N.Y. Jan. 30, 1998) ........................ 12

*Nasser v. Andersen Worldwide Soceite Coop.*, No 02-Civ-6832, 2003 WL 22179008 (S.D.N.Y. Sept. 23, 2003) ....................................................................................................................... 25

*Nat'l Council of Young Israel v. Wolf*, 963 F. Supp. 276 (S.D.N.Y. 1997) ................................ 45

*Nat'l Group for Comm. v. Lucent Tech.*, 420 F. Supp. 2d 253 (2d Cir. 2006) ........................... 15

*NBT Bancorp v. Fleet/Norstar Fin. Group Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581 (1996) ...................................................................................................................................... 37

*North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046 (2d Cir. 1996) ......................................24, 25

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449 (2d Cir. 1987) ..... 8

*OSRecovery, Inc., v. One Groupe Int'l Inc.*, 354 F. Supp. 2d 357 (S.D.N.Y. 2005) ................... 19

*Parkin v. Cornell Univ.*, 78 N.Y.2d 523, 577 N.Y.S.2d 227 (1991).......................................... 38

*PDK Labs, Inc., v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997).................................................. 44

*People v. Slocum*, 97 Misc. 2d 728, 412 N.Y.S.2d 321 (Albany County Ct. 1979) ................... 16

*Pereira v. United States*, 347 U.S. 1 (1954) .............................................................................. 14

*Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.*, 262 F.3d 260 (4th Cir. 2001).......... 22

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001)..........................12, 13, 14

*Procter & Gamble Co. v. Quality King Distrib.*, 974 F. Supp. 190 (E.D.N.Y. 1997) ................ 35

*R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630 (S.D.N.Y. 1995) .......... 45

*Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003)  .... 37

*Schiffels v. Kemper Fin. Servs.*, No. 91 C 1735, 1993 WL 153850, (D. Ill. May 11, 1993), *rev'd and remanded on other grounds*, *Schiffels v. Kemper Fin. Servs.*, 978 F.2d 344 (7th Cir. 1992) ...................................................................................................................................... 19

*Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992 (E.D.N.Y. 2006) *appeal docketed as McLaughlin v. American Tobacco Co.*, No. 06-4666-cv (2d Cir. 2006) .................22, 25

*Selman v. Harvard Med. Sch.¸* 494 F. Supp. 603 (S.D.N.Y. 1980) ........................... 43

*Sharp v. Bivona*, 304 F. Supp. 2d 357 (E.D.N.Y. 2004) ........................................ 13

*Shaw v. Rolex Watch*, 726 F. Supp. 969 (S.D.N.Y. 1989)........................................ 13

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ...................................................... 9

*SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68 (E.D.N.Y. 2006)............................. 29

*Sovik v. Healing Network*, 244 A.D.2d 985, 665 N.Y.S.2d 997 (4th Dep't 1997) ..................... 44

*Sprague & Rhodes Commodity Corp.* v. *Instituto Mexicano Del Cafe,* 566 F.2d 861 (2d Cir. 1977) .................................................................................... 9

*Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94 Civ. 9216, 1996 WL 537482 (S.D.N.Y. Sept. 23, 1996).......................................................................... 14

*Town of West Hartford v. Operation Rescue*, 915 F.2d 92 (2d Cir. 1990)................................ 11

*Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134 (S.D.N.Y. 1995) ................................................................ 28

*Tsipouras v. W&M Props. Inc.*, 9 F. Supp. 2d 365 (S.D.N.Y. 1998)......................................... 18

*United States v. Auliciano*, 44 F.3d 1102 (2d Cir. 1995) ........................................ 27

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000)........................................... 12

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ............................... 13

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ........................................ 29

*United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006) ........................................ 30

*United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992)........................................... 12

*United States v. Indelicato*, 865 F.3d 1370 (2d Cir. 1989)...........................27, 28, 30

*United States v. Mazzei*, 700 F.2d 85 (2d Cir. 1983) .........................................30, 31

*United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002)................................... 12

*United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524 (1981) ................................ 29

*Vasarhelyi v. New Sch. for Soc. Research*, 230 A.D.2d 658, 646 N.Y.S.2d 795 (1st Dep't 1996) ................................................................................................................ 40

*von Bulow by Auersperg v. von Bulow*, 657 F. Supp. 1134 (S.D.N.Y. 1987) ............................ 12

*Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ....................................................................................................................... 9

*World Wide Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484 (S.D.N.Y. 2006) ................................................................................................... 31

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400 (1990) ........................ 7, 8

## STATUTES

*18 U.S.C. § 1961(4)* ........................................................................................................ 28

*18 U.S.C. § 1961(5)* ........................................................................................................ 26

*18 U.S.C.§ 1962* ............................................................................................................ 28

*18 US.C. § 1962(d)* ........................................................................................................ 32

*18 US.C. § 1964(c)* ........................................................................................................ 15

*18 U.S.C. § 1965(a)* ........................................................................................................ 43

*N.Y. Civ. Rights Law § 74* .............................................................................................. 35

*N.Y. Penal Law § 155.05* ................................................................................................ 17

## RULES

*Fed. R. Civ. P. 8* ........................................................................................... 4, 12, 18, 28

*Fed. R. Civ. P. 9(b)* ...................................................................................................... 4, 13

*Fed. R. Evid. 201(b)* ...................................................................................................... 8, 9

*N.Y. C.P.L.R. §§ 302(a)* .............................................................................................. 42-43

## MISCELLANEOUS

Black's Law Dictionary (7th ed. 1999) .............................................................................. 37

Plaintiff Leonid Rozhetskin ("Rozhetskin") respectfully submits this memorandum of law in opposition to Defendant Leonid Reiman's ("Reiman") Motion to Dismiss ("Motion" or "MTD") Mr. Rozhetskin's Amended Complaint ("Amended Complaint" or "AC").  For the reasons set forth below, Mr. Rozhetskin requests that the Motion be denied.

## INTRODUCTION

In his Amended Complaint, Mr. Rozhetskin alleges a classic, and straightforward, racketeering case.  Reiman, a corrupt businessman, directed an enterprise that employed strong-arm tactics to accumulate personal wealth while hiding behind henchmen and layers of front companies to conceal his identity.  Mr. Rozhetskin has been and continues to be victimized by Reiman and the Reiman Group's schemes.

 As alleged in the Amended Complaint, the Reiman racketeering that targeted Mr. Rozhetskin began when Reiman's enterprise set its sights on Mr. Rozhetskin's stake in MegaFon (the "MegaFon Stake") to add to its growing collection of telecommunications assets.  In 2001, Reiman ordered Mr. Rozhetskin to hand over control of the MegaFon Stake (now worth several billion dollars) to IPOC, one of Reiman's secretly-held companies incorporated in Bermuda, or else Reiman would have Mr. Rozhetskin killed.  In fear for his life, Mr. Rozhetskin gave in to the extortion by signing two option agreements which, if valid, gave IPOC (owned by Reiman) a right to buy the MegaFon Stake from LV Finance (Mr. Rozhetskin's company), for a nominal price far below its actual value.

Two years later Reiman came back for more, this time threatening to seize all of LV Finance from Mr. Rozhetskin.  In fear, but anxious to realize some value for his property, Mr. Rozhetskin crossed Reiman by selling his interest in LV Finance for pennies on the dollar in a fire sale transaction.  The subsequent owners of LV Finance rejected the validity of the

extortionately obtained options.  Thwarted in his efforts to obtain the MegaFon Stake, Reiman and his enterprise have gone to extraordinary lengths to threaten, defame, and intimidate Mr. Rozhetskin and others in order to achieve the goals of the original, unfulfilled extortion.  These extraordinary efforts continue to this day and are on full display in Reiman's Motion papers.

Reiman and his enterprise have pursued Mr. Rozhetskin (and others) across Russia, Europe, the Caribbean, and the United States using classic racketeering tactics to enforce their original extortion efforts.  They have perpetrated identify theft in the United States to support and fund their quest to obtain the MegaFon Stake.  They have resorted to mail and wire fraud, and state and federal extortion, all in their unrelenting efforts to gain the fruits of the original extortion of the MegaFon Stake.  They have used every brute tool imaginable to pressure, defame, and intimidate Mr. Rozhetskin, in this District and elsewhere, causing him immense damage far in excess of Mr. Rozhetskin's LV Finance fire sale losses.

These allegations are the foundation for the eleven causes of action in the Amended Complaint: Two RICO counts for which there is federal question jurisdiction and nine common law counts for which there is diversity jurisdiction.  Each count sets forth the claim and describes the requisite elements under Fed. R. Civ. P. 8 and 9 (as applicable), and each count demonstrates the direct nexus between the illicit conduct and the United States and this district.

Reiman's response to these factual allegations is to impugn Mr. Rozhetskin's integrity and motives and to defiantly protest – ignoring massive evidence to the contrary – that he has "*nothing* to do" with IPOC, and that he did not threaten to kill Mr. Rozhetskin.[1]  Yet, Reiman's factual assertions are both demonstrably false and irrelevant to this Motion.

---

[1] As if simply saying so were sufficient and pertinent, Reiman's Motion proclaims that "Reiman has nothing to do with" IPOC (MTD at 2) and that IPOC, not Reiman, is the alleged bad actor.  Reiman's self-serving proclamation notwithstanding, Reiman's denial rings hollow.  First, the Amended Complaint expressly alleges that Reiman

**Footnote continued**

Reiman then maintains that Mr. Rozhetskin's Amended Complaint should be dismissed because it amounts to an attack on his official position as Russian Minister of Communications and on Russian judicial decisions.  Of course, the Amended Complaint explicitly states that Reiman is being sued in his *personal* capacity and not in his official capacity or for any official acts and describes personal – not official conduct – as the bases for the causes of action.  The Amended Complaint clearly alleges that Reiman is nothing more than a corrupt businessman who runs an illicit enterprise and who also happens to be a Minister of Communications.

Neither does Mr. Rozhetskin's Amended Complaint seek to have this Court interfere with any foreign proceedings.  Mr. Rozhetskin seeks only the opportunity to prove factual allegations about an individual named Reiman in connection with a wide-ranging scheme properly within this Court's purview.  Reiman's attempts to distract this Court with documents that purport to describe the charging decisions of Russian prosecutors – none of which as discussed below are properly before this Court on a Motion to Dismiss – is entirely irrelevant to the limited legal inquiry applicable to Reiman's Motion.

Beyond Reiman's mischaracterizations of the Amended Complaint, and the unreliable and extraneous evidence he has deposited with his Motion, the task before this Court on the Motion to Dismiss is straightforward and limited.  The question is whether each alleged cause of

---

**Footnote continued from previous page**

admitted his connection with IPOC when he personally ordered Mr. Rozhetskin to give IPOC options to the MegaFon Stake.  Second, in a May 2006 award decision by an esteemed Zurich arbitration panel ("Zurich Tribunal"), the Tribunal expressly found that Reiman was the "sole beneficial owner of IPOC."  AC ¶ 14; *see* Declaration of Douglas W. Baruch ("Baruch Decl.") at Ex. A, ¶ 231 (excerpts from 350 page Zurich Tribunal report).  Third, Reiman's ownership of IPOC is one of the worst kept secrets in the business world.  Among other well-respected outlets, the *Wall Street Journal* has repeatedly reported on Reiman's connections to IPOC.  *See, e.g.*, Baruch Decl. at Exs. B and C. Finally, Reiman ignores the fact that in 2006, IPOC Director David Hauenstein submitted an affidavit in a British Virgin Islands proceeding in which he disavowed, based on exhibits demonstrably evidencing Reiman's involvement, previous IPOC claims that Reiman lieutenant Jeffrey Galmond was IPOC's sole owner and contended, incredibly, that the IPOC directors did not know who owned it.  Ex. A, ¶ 225-230.

action is properly within the jurisdiction of this Court and, if so, whether the allegations satisfy the requisite pleading standards.

Mr. Rozhetskin's opposition focuses on these points.  As shown below, Mr. Rozhetskin first dispenses with Reiman's implausible "Act of State" and "international comity" arguments. Neither doctrine applies here.  Thereafter, this opposition examines each of the eleven causes of action – RICO and common law – demonstrating that each states a claim and responding to Reiman's arguments about each.  Mr. Rozhetskin respectfully submits that this count by count analysis readily demonstrates that each cause of action is properly stated and that Reiman's Motion to Dismiss must be denied, in full.

## ARGUMENT

I.   **LEGAL STANDARD**

When ruling on a motion to dismiss, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 448 (S.D.N.Y. 2007) (Kaplan, J.). "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (internal quotations omitted).  Therefore, the plaintiff need not provide "detailed factual allegations."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007).   Here, the heightened Rule 9(b) pleading standard only applies to the mail and wire fraud allegations in the RICO counts.[2]  While, in fact, the Amended Complaint

---

[2]  *See, e.g.*, *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (in a RICO extortion claim, the "court should have evaluated the claim against the more lenient pleading standards of Federal Rule of Civil Procedure 8(a)"); *Azurite Corp. Ltd. v. Amster & Co.*, 730 F. Supp. 571, 577 (S.D.N.Y. 1990) ("elements, such as the existence

**Footnote continued**

presents numerous detailed factual allegations describing Reiman's schemes, the legal standard under which the causes of action are tested requires far less.

II.   **THE ACT OF STATE DOCTRINE AND BASIC PRINCIPLES OF INTERNATIONAL COMITY ARE INAPPLICABLE**

    A.   **The Allegations Of The Amended Complaint Implicate No Act of State**

Reiman's Act of State argument has no legal merit.  Nothing in the Amended Complaint takes issue with any act by any Russian prosecutor or judicial body and each cause of action is based on Reiman's private actions in the commercial business world.  No act of state is alleged and none is implicated.  No relief sought herein would interfere with any judicial proceeding in Russia or elsewhere.  This is a RICO and tort case brought by an American victim of a Reiman-led criminal enterprise.  Act of State and international comity principles do not apply and Reiman's Motion does not even come close to demonstrating otherwise.

"The Act of State doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S. Ct. 923, 926 (1964).  The party hoping to use the doctrine as a shield has the burden of proving it applies.  *See Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 694, 96 S. Ct. 1854, 1861 (1976).  Notwithstanding Reiman's twisted rhetoric, he has failed to carry his heavy burden.  The Amended Complaint clearly does not collaterally attack or otherwise seek to have this Court inquire into any Russian public act.

---

**Footnote continued from previous page**

of an enterprise, the existence of a pattern of racketeering, and the existence of continuity . . . do not need to be pled with particularity, and must only meet the requirements of Rule 8").

This case is about Reiman's *private* actions, either personally or through his RICO enterprise, which spanned the globe – including the United States – with its illicit activities. When Reiman personally confronted Mr. Rozhetskin in 2001 and threatened to have Mr. Rozhetskin killed if he did not turn over LV Finance's interest in MegaFon to IPOC (the Bermuda company secretly controlled by Reiman), that was not a public act.  And in 2003, when a Reiman lieutenant ordered Mr. Rozhetskin to relinquish his entire company to Reiman, that most certainly was no ministerial act.  And when Reiman dispatched IPOC as his stalking horse to initiate criminal complaints against Mr. Rozhetskin, Reiman did not do so in any *public* capacity.  And the extortion, mail and wire fraud, identity theft and abuse of process alleged in the Amended Complaint again are dependent only upon Reiman's private, illicit affairs.  While Reiman protests that the Amended Complaint is "a litany of accusations regarding Minister Reiman's purported 'abuse' of his official function" that serve as the "heart of every single claim in his case," (MTD at 8) that rhetoric misrepresents the actual allegations which are controlling at this juncture.[3]

The Amended Complaint on file (not the allegations Reiman invents in his Motion) alleges that Reiman caused IPOC to make a false criminal complaint in Russia, and doggedly pursued that complaint, as well as complaints "around the globe," including in the United States, Geneva, Zurich, Bahamas, British Virgin Islands, Stockholm, and St. Petersburg.  AC ¶¶ 5, 17, 98-102, 117, 132, 185-91, 195, 198, 204.  There is no challenge here to the Russian charges. Instead, the Amended Complaint alleges that the initiation of those proceedings by IPOC

---

[3]  Reiman also claims that Mr. Rozhetskin alleges "that Minister Reiman . . . abused 'his official positions and duties' as government Minister, resulting in criminal charges in Russia and a request by Russian authorities for Plaintiff's extradition."  MTD at 5 (citing AC ¶¶ 5, 17, 99-100, 117, 132, 185-91, 198, 204).  Not so.  The "official positions and duties" "quote" referred to by Reiman appears nowhere in the cited paragraphs.

(controlled by Reiman), and the continued acts of IPOC in support of those proceedings, are part and parcel of the Reiman Group's ongoing extortion.[4]  None of this implicates Reiman's official duties.  Indeed, it demonstrates quite the contrary: that Reiman has a pattern of hiding behind IPOC to accomplish his personal, non-governmental, extortion.  As such, the Act of State does not apply, as the relief sought does not require "a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory."  *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405, 110 S. Ct. 701, 704 (1990).

Even if a decision in this case tangentially addresses or suggests that the Russian prosecutor's investigation is unfounded, the Act of State doctrine does not apply as long as the decision does not turn on the legality of the investigation.  In *Kirkpatrick*, the losing bidder for a Nigerian military procurement contract brought RICO claims based on its competitor's alleged bribery of Nigerian officials.  Although the *Kirkpatrick* Court found that judicial resolution of the case required imputing an "unlawful motivation" to foreign officials, the Court did not apply the Act of State doctrine because plaintiff's cause of action did not technically "turn on" the validity of a sovereign act.  *Id.* at 406, 110 S. Ct. at 705 ("[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit and there is thus no occasion to apply the rule of decision that the Act of State doctrine requires").  Likewise, Mr. Rozhetskin is not "trying to undo or disregard" an act of the government, "but only to obtain damages from private parties who had procured it."  *Id.* at 407, 110 S. Ct at 705.

---

[4]  The Amended Complaint alleges that "[t]o this day, Reiman falsely claims that . . . pursuing Mr. Rozhetskin could lead to his reacquisition of the MegaFon Stake."  AC ¶ 97.

Reiman cites *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 452-53 (2d Cir. 1987), a case that pre-dates the controlling *Kirkpatrick* decision, for the proposition that Mr. Rozhetskin's claims are not "saved by his assertion that the Russian authorities' investigation was 'manipulated.'"  MTD at 9.  The plaintiffs in *O.N.E.* contended that Columbian cargo reservation laws were implemented under the manipulative guidance of the defendant.  *Id.* at 452.  The *O.N.E.* court held that "[w]hen the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims made under the antitrust laws are dismissed."  *Id.* at 453.  No such inquiry into the motivations of Russian prosecutors is sought or required here.

B.    **The "Russian" Documents Submitted By Reiman Do Not Implicate Act of State And Are Not Subject To Judicial Notice In Any Event**

Reiman offers no proof that Russian prosecutorial decisions are at issue or at risk. Instead, Reiman deluges the Court with unauthenticated Russian documents which appear to merely repeat the false allegations generated by IPOC in the first place.  MTD at Exs. E - H. Even if this Court could properly consider this one-sided blast of unauthenticated papers, they have no bearing on Act of State.

Reiman bears the burden of establishing the authenticity of these documents.  Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").  None of the Reiman documents meets these criteria.[5]  For example, one purported

---

[5]  Ex. E is an unsigned Russian language document and a unattributed English translation that purports to be an August 2, 2006 resolution by the Moscow Prosecutor's office regarding Plaintiff; Ex. F is a Russian language document and an accompanying unattributed English translation that purports to be an August 25, 2007 resolution by a junior counselor of justice in the Moscow Prosecutor's office regarding Plaintiff and non-party IPOC; Ex. G is

**Footnote continued**

"original" document is unsigned and for another, no "original" is even proffered.

Further, notwithstanding the lack of authentication or irrelevancy to the Act of State inquiry, the documents are not subject to judicial notice. While Fed. R. Evid. 201 permits a court to take judicial notice of a foreign judgment, *Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe*, 566 F.2d 861, 862 (2d Cir. 1977), documents submitted in a foreign proceeding are not matters of public record that are "capable of accurate and ready determination," *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV 8386, 2002 WL 319887, *17 n.21 (S.D.N.Y. Feb. 28, 2002). Reiman has made no claim that these documents reflect such a foreign judgment, and, indeed, these documents, at best, purportedly reflect merely what Russian prosecutors presented to the courts or how these particular Russian prosecutors view the evidence.

Nor are these documents susceptible to judicial notice on the theory that they are integral to the causes of action in the Amended Complaint. While the documents – if authentic – tend to confirm the allegations that Reiman (through IPOC) is engaging in ongoing extortion, they are not integral to the claims and are not mentioned in the Amended Complaint.[6] Notably, Reiman may not offer the documents for the truth of the matter contained therein.[7] Thus, Reiman may

---

**Footnote continued from previous page**

a Russian language document and an accompanying unattributed English translation that purports to be an October 13, 2006 press release from the Moscow Prosecutor's office regarding Plaintiff; and Ex. H is an unattributed English translation (with no Russian "original" attached) that purports to be a September 12, 2006 letter from the Moscow Prosecutor's Office to non-party IPOC discussing various allegations against Defendant, Plaintiff, and IPOC.

[6] *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited . . . reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[P]laintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.").

[7] *See, e.g.*, *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other

**Footnote continued**

not rely on these documents to support his assertion that "Russian authorities found no basis for [Rozhetskin's] accusations."  MTD at 2-3.

      C.    **"International Comity" Principles Do Not Apply**

     Likewise, Reiman's attempt to dismiss the case based on "basic principles of international comity" fails for many of the same reasons.  Here, where there is no alleged final Russian judgment, Reiman must show "exceptional circumstances."  *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 302 (S.D.N.Y. 2001) ("Because a defendant's appeal to comity asks the Court to abstain from adjudicating an action that otherwise falls within its grant of subject matter jurisdiction, a party making such an application must, in the absence of a final judgment from the foreign court, demonstrate the existence of 'exceptional circumstances' that justify such an abstention.").  In *Leutwyler*, the S.D.N.Y. court denied the motion to dismiss because "the mere possibility that Jordanian law might govern [plaintiff's] . . . claim is anything but exceptional (especially in this District), and is clearly contemplated by the procedures set forth in Fed. R. Civ. P. 44.1."  *Id.* at 303.  In addition to all of the other arguments – including the irrelevance of the purported Russian prosecutor statements to begin with – Reiman points to no legal tribunal evaluation of the underlying merits and no "exceptional circumstances."

**III.**    **COUNT ONE STATES A CLAIM UNDER RICO § 1961**

     The conduct alleged in the Amended Complaint richly details the illicit activities of Reiman and the Reiman Group's pursuit of various assets, including telecommunications assets,

---

**Footnote continued from previous page**

litigation, but rather to establish the fact of such litigation and related filings"); *A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 388 (S.D.N.Y. 1996) (court may take judicial notice of foreign judgment "for the purpose of recognizing its existence as an official statement" but not for "the truth of the facts and opinions stated in the judgment").

around the world.  While the full extent of the Reiman Group's activities must await discovery, Mr. Rozhetskin has set forth – with names, dates and organizational facts – the manner in which Reiman dispatched the individuals and entities in the Reiman Group to attack, harass, extort, punish, and defame Mr. Rozhetskin in pursuit of the MegaFon Stake.  The Amended Complaint methodically lists and describes the various illicit activities, ranging from mail and wire fraud, to extortion and identity theft, that injured Mr. Rozhetskin and the allegations describe the known activities in the United States and this District.  In other words, the Amended Complaint states a RICO claim against Reiman.

Indeed, Count One of the Amended Complaint alleges that (1) Reiman (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) participated in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce, and that Mr. Rozhetskin was (8) injured in his business or property by reason of these actions.  *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).

A.       **Count One Alleges Multiple Predicate Acts**

Even though, for RICO pleading purposes, only two predicate acts must be alleged, *Town of West Hartford*, 915 F.2d at 100, the Amended Complaint actually alleges far more, specifying multiple predicate acts of mail and wire fraud, extortion, and identity theft.  In his Motion, Reiman completely ignores the merits of the identity theft and state extortion predicate acts.  While Reiman's limited predicate act arguments are off-target, it is important to point out here that even if his arguments had merit, there are more than two predicate acts remaining that are not challenged for failure to state a claim.

1.       **Rozhetskin Has Stated a Claim for Mail and Wire Fraud**

Reiman makes four erroneous arguments challenging the mail and wire fraud claims:

(1) court filings cannot serve as the basis for mail and wire fraud, (2) press releases cannot serve as the basis for mail and wire fraud, (3) the Amended Complaint fails to satisfy the particularity requirements of Rule 9(b), and (4) the claims are insufficient to show that Reiman used the mails or wires to perpetrate fraud.  MTD at 11-14.  We address each argument in turn.

First, court filings may indeed serve as the basis for mail and wire fraud allegations.[8]  The Amended Complaint specifically alleges that Reiman intended to deceive the court with the allegations presented by IPOC in a lawsuit filed last year in this District and that Mr. Rozhetskin was harmed by this intent to deceive.  *See, e.g.*, AC ¶ 102 (identifying deliberate lies and glaring omissions). *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (noting that fraud can arise when "the defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading"). Reiman's case law is inapposite.[9]

Second, as discussed in detail below (*infra* Part III(B)(1)), a plaintiff can recover for lost business opportunities caused by the false press releases and fraudulent court documents.  *See, e.g.*, *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (plaintiff's RICO

---

[8] *See, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002) (suggesting that the submission of perjurious litigation documents may constitute mail fraud as long as there was an intent to deceive); *cf. United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992) (rejecting the argument that "a scheme to deprive an adversary of money by means of a civil lawsuit conducted fraudulently does not constitute mail fraud because there is no deprivation of property").

[9] MTD at 11-12.  *See, e.g.*, *von Bulow by Auersperg v. von Bulow*, 657 F. Supp. 1134, 1142 (S.D.N.Y. 1987) (no independent cause of action for common law fraud when the essence of the stated claim sounded in malicious prosecution and where "the complaint fails to cite any specific interview where [defendant] misrepresented facts related to either criminal trial, or describe the content of any such misrepresentations"); *Nakahara v. Bal*, No. 97-CV-2027, 1998 WL 35123, *11 (S.D.N.Y. Jan. 30, 1998) (no mail and wire fraud claims existed because "[t]his case is not one where allegedly unjustified suits form a part of some more extensive scheme of racketeering activity, such as extortion, but is instead one premised on nothing more than a party's filing of unjustified suits") (internal quotation omitted); *Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp. 2d 1291, 1298 (M.D. Ala. 1998) (no mail or wire fraud claim existed when the alleged fraud was defendant's pursuit of legal theories it knew would ultimately fail); *Gee Chan Choi v. Jeong-Wha Kim*, No. 04-CV-4693, 2006 WL 3535931, *9 (E.D.N.Y. Dec. 7, 2006) (plaintiff could not state a claim for wire fraud based on mailing false court documents because plaintiff "failed to allege how the mailing of these documents was in furtherance of, or incidental to, defendants' scheme").

claims based on defendant's alleged spreading of a Satanism rumor via the mails and wires in order to lure customers from plaintiff are claims on which relief can be granted). Here, the Amended Complaint alleges that Mr. Rozhetskin both suffered damage to his reputation *and* lost business opportunities due to the Reiman-initiated court filings and press releases. AC ¶¶ 116-120, 132(a), 132 (b), 132 (d), 135. Mr. Rozhetskin does not and has not relied on defamation as an independent predicate act.

Third, the Amended Complaint clearly meets the particularity requirements of Rule 9(b) as applied to the mail and wire fraud predicate acts.[10] Notably, the Motion to Dismiss cites no instance where particulars have not been provided, but instead rests on the conclusory assertion that the allegations are deficient.[11] MTD at 13.

With respect to harmful reliance, Reiman's arguments fall short once again.[12] Of course, a plaintiff still must be able to articulate that a third party relied on the fraudulent statements.[13]

---

[10] It should be noted that Mr. Rozhetskin's knowledge of the full extent of Reiman's mail and wire fraud is necessarily limited by the covert nature of the scheme. In such circumstances, information and belief allegations are entirely proper. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129 at *7 (S.D.N.Y. Mar. 15, 1994) ("Allegations [of fraud] may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal citation omitted).

[11] Reiman alleges that "Plaintiff's pleadings fail to give rise to a strong inference of Minister Reiman's fraudulent intent, and in any event fail to plead "fraud" with the particularity required by Rule 9(b)." Yet, Reiman makes no arguments and provides no examples of any failure to satisfy 9(b). Further, this conclusory argument style is improper. *See, e.g.*, *Sharp v. Bivona*, 304 F. Supp. 2d 357, 361-62 (E.D.N.Y. 2004) (noting that Local Rule 7.1 requiring motions to be supported by a memorandum of law setting forth the points and authorities relied upon "must be observed to inform a party of the factual basis of his adversary's arguments" and that a failure to comply with the Rule "places the burden on the Court to construct the legal arguments and to conduct the legal research that is the responsibility of the parties"); *Ascione v. Pfizer, Inc.*, 312 F. Supp. 2d 572, 579 (S.D.N.Y. 2004) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.") (quoting *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999)).

[12] To the extent that Reiman implies that Mr. Rozhetskin must allege that he relied on the false statements, New York law states otherwise. *United States v. Chalmers*, 474 F. Supp. 2d 555, 563, n.3 (S.D.N.Y. 2007) (rejecting convergence requirement for mail and wire fraud claims); *see also Shaw v. Rolex Watch*, 726 F. Supp 969, 973 (S.D.N.Y. 1989) ("[a] plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether he or a *third party* is the one deceived."). Thus, the allegations that business associates of Mr. Rozhetskin, United States Courts, the FBI, and Russian authorities were misled, as opposed to Mr. Rozhetskin himself, does not affect the viability of the allegation.

Mr. Rozhetskin makes such allegations.  He has alleged that he lost employment and business opportunities because his business associates relied on Reiman's fraudulent press releases and fraudulent court filings in terminating their dealings with Rozhetskin.  *See, e.g.*, AC ¶¶ 117, 118, 132(d).  And the Amended Complaint specifically alleges that reliance by these business associates proximately caused Mr. Rozhetskin's injuries.  *Id*.  The press releases were a fraud based on Reiman's intent to seize money and customers that Mr. Rozhetskin might have earned for himself.  *See, e.g.*, *Procter & Gamble*, 242 F.3d at 565 (alleged spreading of Satanism rumor via the mails and wires to lure customers from plaintiff states a RICO claim).

Finally, the Amended Complaint adequately alleges that Reiman "used or caused the use of the mails and interstate wire transmissions" to perpetrate the mail and wire fraud. Specifically, Reiman directed the complaint be filed and the press releases be issued.  AC ¶¶ 104, 107, 111, 115.  It is sufficient to allege that Reiman should have foreseen that the U.S. mails or wires would be used when he directed these actions, and thus can be said to "cause" them to be used.  *See Pereira v. United States*, 347 U.S. 1, 8-9, 74 S. Ct. 358, 363 (1954).

### 2.    Rozhetskin Has Adequately Pled Both Federal and State Extortion

It should come as no surprise – given the detailed allegations in the Amended Complaint surrounding the direct threats made by Reiman to Mr. Rozhetskin – that Mr. Rozhetskin relies on that very same extortionate conduct as predicate acts in his RICO claims.  Indeed, the Amended Complaint relies on both federal and New York state extortion laws for some (but not all) of the

---

**Footnote continued from previous page**

[13] *Benedict v. Amaducci*, No. 92 Civ. 5239, 1995 WL 702444, at *3 (S.D.N.Y. Nov. 28, 1995) ("plaintiffs fail to specify in what way the alleged misrepresentations in the financial statements were relied upon"); *Sterling Interiors Group, Inc. v. Haworth, Inc.*, 1996 WL 537482, at *4 (S.D.N.Y. Sept. 23, 1996) (third party reliance allegations sufficient where the complaint stated that defendant caused false and allegedly competitive bids to be submitted to third party customers and "those customers purchased [defendant's] products at the artificially inflated 'bid' prices set by defendants and their associates").

predicate acts.  Reiman's attack on the extortion claims is three-fold and easily deflected.

Reiman argues that (1) any federal or state extortion claims are time barred; (2) there is no

allegation of an attempt to obtain property, and (3) the extortion claims improperly are based on

the filing of a lawsuit.  MTD at 14-18.[14]  Each argument is without merit.

First, the applicable statute of limitations is four-years.  The Amended Complaint, the

first to include the RICO counts, was filed on April 16, 2007.   Assuming for the moment that

April 16 is the operative date (as opposed to the initial complaint filing date of September 15,

2006), the claim must have accrued prior to April 16, 2003 in order for it to be time-barred.

With respect to the extortion, Mr. Rozhetskin's claim did not accrue until he sold LV Finance on

July 18, 2003, and realized damages in that fire sale.  All of these dates are set forth in the

Amended Complaint and, assuming their truth as required on a Motion to Dismiss, they are more

than sufficient to defeat a statute of limitations challenge.

The statute of limitations "begins to run when the plaintiff discovers or should have

discovered the RICO injury."  *Nat'l Group for Comm. v. Lucent Tech.*, 420 F. Supp. 2d 253 (2d

Cir. 2006).  Where the injuries complained of are speculative or their amount and nature

unprovable there is no right to sue for damages under Section 1964(c), and until there is a right

to sue under Section 1964(c), a civil RICO action cannot be held to have accrued.  *Cruden v.

Bank of N.Y.*, 957 F.2d 961, 977 (2d Cir. 1992).  The July 2003 fire sale was the first realized and

non-speculative injury to Mr. Rozhetskin and the accrual period begins at that point.

The Second Circuit also employs "a separate accrual rule" under which "a new claim

accrues and the four-year limitation period begins anew each time a plaintiff discovers or should

---

[14]  Reiman also argues that "plaintiff's reputation is not a property interest protected by the RICO statute."  MTD at
16.  We address this errant contention in section III(B)(1), *infra*, and incorporate it by reference here.

have discovered a new and independent injury." *All State Ins. Co. v. Valley Physical and Med. Rehab.*, 475 F. Supp. 2d  213 (E.D.N.Y. 2007) (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998)).  Therefore, even if Mr. Rozhetskin cannot recover for the fire sale injuries, he can recover for injuries later caused by the attempted extortion.  *Bingham v. Zolt*, 66 F.3d 553, 560 (2d Cir. 1995) ("As long as separate and independent injuries flow from the underlying RICO violations-regardless of when those violations occurred-plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year window before suit was filed, together, of course, with any provable future damages.").  Therefore, claims based on the attempted extortion leading to the fire sale injury as well as later business injuries are within the four-year statute of limitations.

Second, as discussed *infra* Part III B and D, the Amended Complaint alleges that following the fire sale, Mr. Rozhetskin continued to be a victim of Reiman's attempt to seize LV Finance, since Reiman believed (erroneously) that by pursuing Mr. Rozhetskin, Reiman could still seize the MegaFon Stake or its monetary equivalent.  *See, e.g.*, AC ¶¶ 11 (attempt to extort Rozhetskin's ownership of LV); 132(b) (attempt to obtain monies paid under the option agreements from Mr. Rozhetskin).  This is a clear allegation of an attempt to obtain property.  Because Reiman to this day pursues Mr. Rozhetskin to seize the MegaFon Stake or monies expended in relation to his acquisition of the Stake (AC ¶ 97), it is irrelevant that Mr. Rozhetskin did not actually have the Stake.  *People v. Slocum*, 97 Misc. 2d 728, 731, 412 N.Y.S.2d 321, 323 (Albany County Ct. 1979) (it is no defense that the crime attempted was, "under the attendant circumstances, factually or legally impossible of commission, if such crime could have been committed had the attendant circumstances been as such person believed them to be").

Third, contrary to Reiman's characterization (MTD at 17-18), the extortion claim is not based solely on the filing of a lawsuit by IPOC. Rather, the Amended Complaint makes clear that the IPOC lawsuit is part of an ongoing extortionate scheme. *See, e.g.*, *Calabrese v. CSC Holdings, Inc.*, No. 2:02 - DV - 5171, 2004 WL 3186787, *6 (E.D.N.Y. July 19, 2004) (denying a motion to dismiss when the Plaintiffs alleged an "ongoing scheme" that "included the wrongful use of fear, in particular the fear of having to defend a lawsuit and the fear of paying a settlement demand").

Finally, the Amended Complaint alleges a *separate* claim for extortion under New York Penal Law §155.05, which defines the crime of "Larceny by Extortion":

> [A] person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor . . . will: Cause physical injury to some person in the future; or Cause damage to property; . . . or Accuse some person of a crime or cause criminal charges to be instituted against him; or Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; . . . or Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

Reiman's Motion never contests the merits of this state extortion claim, the allegations of which track the statutory elements. *E.g.*, AC ¶¶ 15-19, 80-93, 97-120, 132(b). The Amended Complaint sufficiently alleges the attempted extortion as a predicate act supporting Count One.

B.   **Mr. Rozhetskin Has RICO Standing**

Reiman contends that Mr. Rozhetskin lacks RICO standing because (1) he only alleges personal injuries due to reputational harm, (2) he has not adequately alleged proximate cause,

and (3) the alleged injuries are speculative and derivative.[15]  While Reiman suggests that more pleading is required, the Amended Complaint easily satisfies the Rule 8 notice pleading requirements in this regard.  Reiman's attempts to distort the actual allegations must be rejected.

1.  **Mr. Rozhetskin Alleges Injury to His Business or Property**

To recover under RICO, a plaintiff must show injury caused by at least one predicate act or by the pattern of racketeering activity.  *See Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987); *Giuliano v. Everything Yogurt, Inc.,* 819 F. Supp. 240, 243 n.3 (S.D.N.Y. 1993).  The Amended Complaint here specifically and directly alleges injury to Mr. Rozhetskin's property – the sale of LV Finance – caused by the predicate act of extortion.  *E.g.*, AC ¶¶ 92, 94, 116, 132 (a), 135.  It also alleges further injury to business or property – *i.e.*, the severance of an employment relationship in 2005 and loss of a lucrative consulting agreement in 2006 – specifically caused by the Reiman Group's illicit conduct.  AC ¶ 118.  Finally, the Amended Complaint alleges that Mr. Rozhetskin was injured due to the loss of additional business opportunities.  AC ¶¶ 116-120, 132(a), 132(b), 132(d), 135.

While Reiman attempts to repackage these allegations as mere *reputational harm* (MTD at 19), that is not what the Amended Complaint alleges.  Moreover, none of the cases cited by Reiman (MTD at 19) support his argument that lost business opportunities are non-RICO injuries.[16]  In fact, courts routinely recognize lost business and employment opportunities as

---

[15] Reiman also alleges that Mr. Rozhetskin's argument fails because he does not assert an injury stemming from reliance on the fraudulent statements at issue in the case.  This argument is simply a re-hashing of Reiman's reliance argument in the mail and wire fraud section of his motion, and has been adequately refuted in Section III(A).

[16] *Tsipouras v. W&M Props. Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998), stands for the proposition that defamed character and business reputation are not actionable under RICO.  *Frey v. Maloney*, 476 F. Supp. 2d 141, 161 (D. Conn. 2007), states that a plaintiff cannot allege "physical, emotional or reputational harm or any economic aspect of such harm."  *Gee Chan Choi v. Jeong-Wha Kim*, No. 04-CV-4693, 2006 WL 3535931, at *9 (E.D.N.Y. Dec. 7, 2006) identifies non-RICO injuries as those personal injuries caused by loss of liberty and reputation.

injury to business or property.[17]  In due course, Mr. Rozhetskin will be called upon to *prove* his allegations and Reiman can probe the foundation of the claims.  Right now, however, the well-pled allegations themselves control determination of this Motion.

### 2.   Mr. Rozhetskin Has Alleged Causation

The Second Circuit applies a two step analysis when evaluating whether plaintiff has pled proximate causation.  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122-23 (2d Cir. 2003).  First, the plaintiff's injury must be a direct result of the alleged RICO violation.  *OSRecovery, Inc. v. One Groupe Int'l Inc.*, 354 F. Supp. 2d 357, 372 (S.D.N.Y. 2005).  Second, the plaintiff's injury must be reasonably foreseeable, such that the plaintiff must be a target, competitor, or intended victim of the racketeering enterprise.  *Id.*  As part of this second prong, the defendant is liable to those individuals "to whom his acts were 'a substantial factor in the sequence of responsible causation.'"  *Lerner*, 318 F.3d at 123 (internal citation omitted).  The proximate cause pleading standard is neither difficult nor burdensome.  A plaintiff need only plead "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 259, 112 S. Ct. 1311, 1313 (1992); *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1996 (2006).

The Amended Complaint alleges that the Reiman and the Reiman Group's racketeering activities of attempted extortion of Rozhetskin and fraudulent use of the mails and wires directly caused Mr. Rozhetskin to lose employment and business opportunities.  AC ¶¶ 116-120, 132(a),

---

[17]  *See Schiffels v. Kemper Fin. Servs.*, No. 91 C 1735, 1993 WL 153850, *8 (D. Ill. May 11, 1993), *rev'd and remanded on other grounds*, *Schiffels v. Kemper Fin. Servs.*, 978 F.2d 344 (7th Cir. 1992)) ("Without doubt, termination of employment is injury to business or property."); *Acampora v. Boise Cascade Corp.*, 635 F. Supp. 66, 69 (D.N.J. 1986) ("[I]njury alleged by plaintiff – loss of job – is clearly injury to 'business or property' within the meaning of § 1964."); *McNulty v. Borden, Inc.*, 474 F. Supp. 1111, 1117 (D. Pa. 1979) ("an employee who suffers the loss of his job has been injured in his property").

132(b), 132(d), 135.  As alleged, Reiman's racketeering activity was a "substantial factor in the sequence of responsible causation."  *See Lerner*, 318 F.3d at 122-23.  Mr. Rozhetskin also alleges that Reiman's RICO conduct directly and proximately caused injuries at the time of the LV Finance fire sale.  The Amended Complaint asserts that the attempted extortion was carried out with physical and economic threats (AC ¶ 90) and that these threats directly injured Mr. Rozhetskin.  AC ¶ 11, 90-92, 116, 132(a), 135(a).

Of course, as alleged, it was reasonably foreseeable that Mr. Rozhetskin would be injured as a result of the racketeering activity because he was (1) an intended victim of the mail and wire fraud, and (2) an intended target of the attempted extortion beginning in 2003.  AC ¶¶ 116-120, 132(a), 132(b), 132(d), 135.  Reiman's reliance on the allegations in ¶¶ 80-88 for any contrary conclusion is misguided.  MTD at 21.  Those allegations refer to the attempted extortion of LV Finance in 2001 – an important background fact to these schemes – but not an event from which Mr. Rozhetskin seeks RICO recovery.  Instead, Mr. Rozhetskin focuses on the attempted extortion beginning in 2003, when Reiman specifically targeted Mr. Rozhetskin's property – LV Finance itself.  AC ¶¶ 90-92.  The cause of action therefore satisfies the *Holmes* requirement that Mr. Rozhetskin's injuries bear "some direct relation" to the conduct alleged (503 U.S. at 259, 112 S. Ct. at 1113) and the *Lerner* requirement that his injuries be reasonably foreseeable (318 F.3d at 123).[18]

Reiman threatened to have Mr. Rozhetskin killed if Mr. Rozhetskin did not deliver his company to Reiman's enterprise.  It is classic extortion, direct and undisguised.  The resulting

---

[18]  Reiman similarly misplaces reliance on *Anza*, 126 S. Ct. at 1998, for the proposition that Mr. Rozhetskin's injuries are too indirect because he does not set forth the market conditions at the time of the fire sale or explain why he could have received a better price.  MTD at 21-22.  In *Anza*, the attenuated connections were between the defendant's tax fraud and the defendant's subsequent competitive advantage over plaintiff's business.  *Id.*  Here, there is no such attenuation.

injury, the desperation cashing-in on LV Finance in the face of imminent seizure by Reiman's enforcers, and loss of business opportunities, was real and is now actionable under RICO, as pled in the Amended Complaint.

3.     **The Alleged RICO Damages are Neither Speculative Nor Derivative**

Reiman argues that the alleged RICO damages are not recoverable because they are too speculative and are derivative of LV's injuries.  MTD at 20.  On both points, Reiman is wrong.

First, Rozhetskin's fire sale injuries are not derivative of LV Finance's injuries.  It is undisputed that where a shareholder's injury is derivative of the corporation's injury, the shareholder does not have RICO standing.  *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d. Cir. 1993).  But that is where any common ground exists among Reiman's argument and Mr. Rozhetskin's response.  Indeed, the point is irrelevant to what Mr. Rozhetskin actually alleges. In the 2003 fire sale, Mr. Rozhetskin is not seeking to recover from any loss suffered by LV Finance.  Indeed, LV Finance continued to exist and conduct business following the fire sale. The nature of the injury resulting from the fire sale is to Mr. Rozhetskin himself – not to LV Finance.  Mr. Rozhetskin was forced to sell his company – LV Finance – at a distressed price to avoid Reiman seizing that same company for no compensation.  At the time of the sale, unencumbered by the option agreements and free from Reiman threats, LV Finance was worth hundreds of millions dollars more than what Mr. Rozhetskin could obtain.  Indeed, within weeks of the fire sale, the purchaser flipped LV Finance to a new buyer who paid full value.  These 2003 transactions are alleged in the Amended Complaint at ¶¶ 92-94, 116, 132(a), 135(a).  As alleged, and as in reality, Mr. Rozhetskin (not LV Finance) was directly injured by the fire sale of his entire business – LV Finance.  There is nothing derivative about this claim.

Nor are the alleged injuries speculative.  Reiman cites no cases requiring a complaint to

supply a detailed, quantifiable recitation of the damages suffered.  Indeed, while a plaintiff ultimately must prove some damages, he does not necessarily ever need to prove a specific amount.[19]  Therefore, once the existence of an injury is established, damages need not be demonstrated with precision.  *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1065 -1066 (E.D.N.Y. 2006) *appeal docketed* as *McLaughlin v. American Tobacco Co.*, No. 06-4666-cv (2d Cir. 2006).  "The risk of uncertainty as to the amount of damage is upon the wrongdoer . . . and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount."  *Id.*  Mr. Rozhetskin's damages allegations are legally sufficient.

C.      **The Amended Complaint Properly Alleges Subject Matter Jurisdiction**

There is no doubt that the initial illicit conduct – Reiman's direct threat to have Mr. Rozhetskin killed if he did not facilitate the transfer of the MegaFon Stake to Reiman's secretly-held, Bermuda company – took place in Russia.  And if the conduct ended there, we would not be here today invoking this Court's jurisdiction to recover for Reiman's misdeeds.  But the conduct did not end there, nor did it end with the second option agreement, the fire sale in 2003, or even the Zurich Tribunal findings implicating Reiman in 2006.  With each successive event, the illicit activities expanded in scope and geographic breadth, spilling over into several countries, including the United States, and continuing to this day.  The Amended Complaint tracks the illicit affairs of the Reiman Group enterprise, peels back the onion skin that once hid Reiman's connections to these affairs, and exposes multiple instances of illicit activity in support

---

[19]  *See Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) (noting that § 1964(c) confers RICO standing on "any person injured in his business or property, not any person who can quantify the amount of the injury" and that "[t]he best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount").

of the enterprise in the United States and in this District.  While this may not be the typical RICO case in terms of its origins and players, it is truly typical in terms of its methods and means, and it easily satisfies the subject matter jurisdiction threshold that enables this Court to adjudicate the claims.  Moreover, where the Amended Complaint specifically alleges that Reiman instructed the enterprise's front company (IPOC) to come into this very Court and to initiate a RICO claim against Mr. Rozhetskin – a United States citizen and New York resident – in furtherance of an ongoing extortion attempt (AC ¶¶ 101, 102, 115), it would be odd to say that this Court lacks subject matter jurisdiction over such a claim.

Reiman's Motion makes no argument – nor could it plausibly do so – that the mail and wire fraud predicate offenses are not properly within the province of this Court in terms of subject matter jurisdiction.  Reiman's arguments in this regard center on the extortion and identity theft claims,[20] but those claims, too, set forth specific allegations to invoke subject matter jurisdiction.  With respect to extortion, the Amended Complaint stresses that Reiman was unsuccessful with his attempted initial extortion of the MegaFon Stake and LV Finance in 2001 and 2003, and because of this, he continues – to this day – his attempt to extort the Stake or money related to the Stake through proceedings and other activities around the globe, and in New York, with the hope that pursuing Mr. Rozhetskin ultimately will allow him to seize the Stake or money related thereto.  AC ¶¶ 6, 8, 11-13, 15-17, 19, 97-103.[21]  With respect to identity

---

[20]  Predictably, Reiman ignores the fact that Mr. Rozhetskin's factual allegations are not limited to the activities involving LV Finance in 2001, nor are they limited to Mr. Rozhetskin's forced sale of LV Finance in 2003.  Thus, the cases Reiman cites to and assertions regarding post-sale conduct are irrelevant.  MTD at 25, n.22.  Reiman simply ignores the allegations of an ongoing attempted extortion of Mr. Rozhetskin that began in 2003 and continues to this day.

[21]  Among other allegations, the Amended Complaint notes that, as part of the attempted extortion, Reiman caused the false criminal allegations in Russia to be communicated to the U.S. Federal Bureau of Investigation ("FBI") (AC ¶¶ 5, 100, 117), that the Reiman Group published false and defamatory press releases (on the Dow Jones Newswire and Reuters News) about Mr. Rozhetskin, causing substantial harm to Mr. Rozhetskin's business and causing him to

**Footnote continued**

23

theft, Mr. Rozhetskin specifically alleges numerous instances in which the Reiman Group

perpetrated identity theft against executives and corporate officials of American businesses in

furtherance of the Reiman Group's scheme and to conceal Reiman's control and to hide criminal

proceeds.[22]  AC ¶¶ 41, 132(c).

These extensive allegations satisfy both the "conducts" test and the "effects" test for

extraterritorial application of RICO.  *See North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046,

1051-52 (2d Cir. 1996).  The conduct test is satisfied "where conduct material to the completion

of the [alleged RICO conduct] occurred in the United States" and was "the direct cause of the

alleged injury."  *Id.* at 1053.  The first version of the effects test, the antitrust test, requires that

the conduct was meant to produce and did in fact produce some substantial effect in the U.S.  *Id.*

Under the second version of the effects test, the securities law test, there is jurisdiction over a

foreign person or entity where a predominantly foreign transaction has "substantial effects within

the United States."  *Id.*

Mr. Rozhetskin's allegations satisfy both versions of the effects test.  As noted, Reiman's

orchestration of false and defamatory press releases was aimed at causing Mr. Rozhetskin's

business associates and potential customers (including those in the United States) to discontinue

or refrain from doing business with him.  AC ¶¶ 117-118, 132(d)(i).  Reiman intended and

---

**Footnote continued from previous page**

lose legitimate business and employment opportunities in the U.S. (AC ¶¶ 5, 103-114, 117-118, 132(d)(ii)), and that Reiman and the Reiman Group have initiated and continue to pursue a frivolous racketeering complaint against Mr. Rozhetskin in this Court (AC ¶¶ 5, 101-102, 132(d)(i)).

[22]  The Amended Complaint specifically alleges how these identity thefts led to some of Mr. Rozhetskin's injuries. AC ¶¶ 3, 132(c).  Indeed, the identity thefts were necessary to maintain the facade of IPOC operating as a legitimate business.  Reiman needed IPOC for the option agreements and ultimately to serve as the enterprise's representative in defaming and extorting Mr. Rozhetskin.  Without the identity thefts, IPOC's status as a legitimate business would have been in jeopardy (as alleged in AC ¶¶ 37, 43) and Reiman would have been exposed.  Reiman's Motion simply ignores these allegations in its analysis.

caused an effect on the U.S. market through deceitful communications about Mr. Rozhetskin by causing substantial harm to Mr. Rozhetskin's business. Similarly, Reiman's causing false communications to the FBI about a baseless arrest warrant and initiation of a frivolous RICO lawsuit were intended substantially to harm Mr. Rozhetskin in the U.S. These significant U.S. connections warrant extraterritorial application of RICO.[23]   Of course, as specifically detailed in the Amended Complaint, the identity theft allegations target U.S. persons and entities.

Mr. Rozhetskin's allegations also satisfy the conduct test. The mailing of a frivolous complaint in this district constitutes U.S. conduct material to the completion of the attempted extortion. In addition, the use of U.S. wires to transmit fraudulent and misleading press releases was in furtherance of Reiman's ongoing attempted extortion. The Amended Complaint alleges that this U.S. conduct directly injured Mr. Rozhetskin by causing him to lose legitimate business and employment opportunities.[24]

Beyond these points, Congressional intent weighs in favor of exercising subject matter jurisdiction over RICO claims by Mr. Rozhetskin, a United States citizen and resident who has lost significant business opportunities, and continues to be subjugated by fear from a foreign defendant who continues to abuse the resources and processes of the United States to torment its own citizens. *Al-Turki*, 100 F.3d at 1052.

---

[23]  *See Schwab*, 449 F. Supp. 2d at 1082 (defendant's deceitful marketing and manipulation of public health and government entities constituted an intent to affect the U.S. market while this marketing also affected all sales of "light" cigarettes within the country, satisfying the effects test for subject matter jurisdiction).

[24] The Court should dismiss Reiman's claim that the allegations are vague and conclusory. MTD at 23. Reiman's reliance on *Nasser v. Andersen Worldwide Soceite Coop.*, No 02-Civ-6832, 2003 WL 22179008, at *6 (S.D.N.Y. Sept. 23, 2003) is unavailing because, there, the plaintiff merely alleged that "defendant engaged in a 'pattern of racketeering activity . . . which, upon information and belief, was either directed, controlled, supervised, monitored, or acquiesced in by Andersen senior partners in New York and/or Chicago.'" *Id.* (internal citation omitted). In contrast, the Amended Complaint alleges "specific, supporting facts" that demonstrate conduct in the United States.

D.    **Count One Alleges an Open-Ended Pattern of Racketeering Activity**

The RICO statute defines a "pattern of racketeering activity" as requiring the commission of "at least two predicate acts of racketeering activity" within ten years.  18 U.S.C. § 1961(5). The Supreme Court has stated that the acts must be "related"[25] and "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. NW. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900 (1989).  Mr. Rozhetskin's RICO claim "show[s] that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *First Capital Asset Mgmt. Inc. v. Satinwood*, 385 F.3d 159, 180 (2d Cir. 2004).

The Amended Complaint describes an open-ended pattern of racketeering activity, starting in the 1990s and continuing to the present day, with the general purpose of acquiring various assets – telecommunications assets, fixed line assets, real estate and leasing assets, and banking assets – "while concealing that Reiman, in fact, owned and controlled those assets." *See, e.g.*, AC ¶¶ 2, 27, 72, 127, 131.  The allegations succinctly allege that, as one part of the Reiman Group's common scheme to accumulate various telecommunications assets, Reiman targeted Mr. Rozhetskin to procure the MegaFon Stake.  AC ¶ 3.  However, Reiman's initial attempts to obtain the MegaFon Stake failed.  AC  ¶¶ 96-97.  As a result, Reiman and the Reiman Group, to this day, continue their illicit pursuit of Mr. Rozhetskin and others through racketeering activity, including an ongoing attempted extortion of Mr. Rozhetskin, in order to obtain the MegaFon Stake.  *See, e.g.*, AC ¶¶ 8, 97, 98(f), 99-115, 120.  The complaint allegations that Reiman was "trying to continue to engage in the conduct giving rise to the RICO claim or that the scheme itself was not yet complete" sufficiently plead a threat of continuing criminal

---

[25] Reiman does not dispute that the alleged predicate acts are related.

activity. *See China Trust Bank of N.Y. v. Standard Chartered Bank*, 981 F. Supp. 282, 287 (S.D.N.Y. 1997) (internal citation omitted).[26]

Furthermore, in assessing open-ended continuity, courts examine the nature of the predicate acts or the nature of the enterprise. *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 583-584 (S.D.N.Y. 2002). A threat of continuity automatically exists where "an inherently unlawful act [is] performed at the behest of an enterprise whose business is racketeering activity." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) (citing *United States v. Auliciano*, 44 F.3d 1102, 1111 (2d Cir. 1995)). Mr. Rozhetskin sufficiently alleges that the Reiman Group has engaged in inherently unlawful acts of attempted extortion and identity theft. AC ¶¶ 9-19, 41-42, 80-115, 132(a), 132(b), 132(c). *See Auliciano*, 44 F.3d at 1111-13 (citing a case where a defendant committed multiple predicate acts of extortion as an example of inherently unlawful acts sufficient to establish a threat of ongoing criminal activity). Mr. Rozhetskin alleges that the Reiman Group is an enterprise whose business is racketeering activity, amassing assets (including telecommunication assets) through illicit means while hiding the true ownership of those assets through money laundering and other unlawful conduct. *See*, *e.g.*, AC ¶ 2, 6, 18, 19, 24, 27, 57-66, 67, 72, 76. These actions are inherently unlawful and automatically threaten continued racketeering activity. *See United States v. Indelicato*, 865 F.3d 1370, 1383-84 (2d Cir. 1989) ("Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business

---

[26] While Mr. Rozhetskin has no current interest in LV Finance, a threat of future conduct against him remains. AC ¶ 97 ("To this day Reiman falsely claims that Mr. Rozhetskin colluded with Alfa and subsequent buyers, and claims that pursuing Mr. Rozhetkskin could lead to his reacquisition of the MegaFon Stake."). Reiman continues to orchestrate the issuance of misleading and false press releases about Mr. Rozhetskin. AC ¶¶ 103-114. As recently as March 2007, Reiman announced that he plans to focus on recovering the MegaFon Stake through the pursuit of criminal charges against Rozhetskin – charges that Mr. Rozhetskin alleges are baseless and false. AC ¶¶ 98(f), 100. Moreover, the fact that the Reiman Group continues to pursue the frivolous racketeering complaint against Mr. Rozhetskin in New York demonstrates the ongoing threat of continued criminal activity. AC ¶¶ 101, 115, 120.

automatically carries with it the threat of continued racketeering activity.").

Reiman's suggestion that the allegations amount to an "inherently terminable" scheme because the entire purpose of the scheme is to acquire the MegaFon Stake and Mr. Rozhetskin no longer has any interest in the MegaFon Stake is mistaken.  MTD at 26-27.  As discussed *supra* note 26, the Reiman Group's attempted extortion and continued pursuit of Mr. Rozhetskin is far from complete.  Thus, the scheme is not "inherently terminable."[27]  Moreover, control of the MegaFon Stake is but one part of the Reiman Group's common purpose of acquiring various assets.  Even if Reiman obtained the MegaFon Stake, the Reiman Group's racketeering acts would not end, as Reiman would continue to engage in unlawful conduct as part of the Reiman Group's broad scheme to amass various assets and hide Reiman's ownership of those assets. *See, e.g.*, AC ¶ 2, 18, 24, 27, 57-66, 67, 72, 76.[28]

E. **Count One Alleges a RICO Enterprise**

The Amended Complaint alleges all that is necessary, and more, in describing the RICO enterprise.  Indeed, only bare minimum language is required for pleading purposes.[29]  The enterprise requirement should be construed liberally, and a court's interpretation of what

---

[27]  It is a bit strange and contradictory for Reiman to contend that the scheme to seize the MegaFon Stake ended in 2003, when Reiman orchestrated the IPOC RICO claim in 2006, and other proceedings around the world since 2003, in pursuit of that very Stake.

[28]  *See also H.J. Inc.*, 492 U.S. at 241, 109 S. Ct. at 2902 (the "pattern of racketeering activity" element  does not require proof that the defendant engaged in more than one scheme, instead "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter*"); *United States v. Indelicato*, 865 F.3d 1370, 1383 (2d Cir. 1989) (Congress did not intend "to exclude from the reach of RICO multiple acts of racketeering simply because . . . they further but a single scheme").

[29]  *See Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1144-45 (S.D.N.Y. 1995) (plaintiff sufficiently pleads an enterprise under Rule 8 by simply alleging "that all of the defendants together constituted an [association-in-fact] enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962").

constitutes an enterprise should be broad.[30]

### 1.   Count One Alleges An Association-in-Fact Enterprise

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981). The Amended Complaint clearly and concisely alleges that Reiman, Galmond, IPOC, and identified investors of IPOC came together "for the common purpose of amassing – through misdeeds – various assets including Russian telecommunications assets," fixed telecom assets, real estate and leasing assets, and banking assets. AC ¶¶ 27, 72, and 127.

Moreover, the allegations demonstrate that the enterprise's members function as a unit by articulating facts showing "the hierarchy, organization, and activities" of the enterprise.  *See United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991).  Reiman, Galmond, IPOC, and IPOC investors are members of the Reiman Group, and Reiman, as "kingpin" stands at "the top of the hierarchy" of the enterprise and participates in the Group's operation and management. AC ¶¶ 26, 27, 127, 130, and 131.  Furthermore, the Amended Complaint specifically describes the actions of other enterprise members, such as Galmond, who take direction from Reiman, and IPOC, which plays an integral role in the particular schemes that targeted Mr. Rozhetskin and the MegaFon Stake.  *See, e.g.*, AC ¶¶ 26-43, 77-88.  Admittedly, the full scope of the Reiman Group affairs remain hidden and must await discovery (AC ¶ 67), but there is no requirement to plead

---

[30]  *See SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006) ("The Second Circuit has construed the Enterprise element liberally and has held that an enterprise is properly pled even if the pleading reveals that the group exists solely for the commission of the fraudulent acts alleged in the complaint."); *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) ("the language and the history [of RICO] suggest that Congress sought to define that term [enterprise] as broadly as possible").

all such details.  The level of detail in the Amended Complaint, including descriptions of the

affairs of Reiman Group entities and how they are used to disguise the true ownership of the

unlawfully obtained assets of the Reiman Group, is more than sufficient.  AC ¶¶ 67-73.

Reiman cites cases wholly inapplicable to the type of association-in-fact enterprise

alleged here.[31]  For example, in *Cedar Swamp Holdings, Inc.*, 487 F. Supp. 2d. 444, 448-52

(S.D.N.Y. 2007), plaintiffs alleged a "hub-and-spokes" scheme where a common defendant

engaged in several independent frauds with the assistance of a different co-defendant in each

fraud.  *Id.* at 450-51.  Nowhere in the Amended Complaint does Mr. Rozhetskin suggest that

Reiman perpetrated independent frauds with the assistance of different individuals, and Reiman

points to no such allegation.  MTD at 28.  Reiman simply ignores specific allegations that

Reiman, Galmond and IPOC are members of the Reiman Group, and are "associated in fact for

the common purposes of amassing – through misdeeds – various assets . . . ."  AC ¶ 27.

To the extent that Reiman has attempted to argue that there must be allegations of

enterprise activities that are distinct from the alleged predicate acts, the argument fails.  In

*United States v. Mazzei*, 700 F.2d 85, 88 (2d Cir. 1983), the Second Circuit explained that while

a plaintiff must prove both the existence of an enterprise and a pattern of racketeering activity,

"proof of these separate elements" does not need to "be distinct and independent, as long as the

proof offered is sufficient to satisfy both elements."[32]  Reiman's reliance on *First Capital Asset*

---

[31] *See* MTD at 29.  The Court should give no credit to Reiman's conclusory "argument" that Mr. Rozhetskin's "allegations are insufficient as a matter of law."  MTD at 29.  Reiman merely offers three cites with no explanation of how they would support an argument that the allegations are insufficient.  Such conclusory, unsupported assertions are easily outweighed and overruled by the enterprise allegations in the Amended Complaint.  *See e.g.,* AC ¶¶ 26-43, 67-73, 77-88, and 130-31.

[32] *See also United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006) (citing *Mazzei* and noting that "the overlapping of evidence that occurs when establishing that the predicate acts are related to each other and to the enterprise is a familiar phenomenon in RICO cases"); *United States v. Indelicato*, 865 F.2d 1370, 1375 (2d Cir. 1989) (the Second Circuit does not adhere to the proposition that "no RICO violation [is] shown [when] the alleged

**Footnote continued**

*Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), for the proposition that RICO contains a distinctiveness requirement is misplaced, as the court in *First Capital* did not review the sufficiency of plaintiff's RICO enterprise allegations.  *Id.* at 164; *see also World Wide Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 500-01 (S.D.N.Y. 2006) (nothing that all three district court decisions on appeal in *First Capital* did not dismiss the complaint for failure to plead that the enterprise was distinct from the racketeering acts, and declining to read *First Capital* as overruling *Mazzei*).

Even if *First Capital* overruled *Mazzei* and instituted a distinctiveness requirement, Mr. Rozhetskin alleges activities of the Reiman Group that are distinct from the predicate acts.  The predicate acts of mail and wire fraud and attempted extortion stated in the Amended Complaint targeted Mr. Rozhetskin as the victim.  AC ¶ 132(a), (b), (d).  Contrary to Reiman's contentions, Mr. Rozhetskin does *not* allege that the sole purpose of the racketeering scheme was to obtain the MegaFon Stake.  The Reiman Group's elaborate scheme that involved efforts to accumulate assets (of which the MegaFon Stake was only one) and hide Reiman's true ownership of those assets, reaches far beyond Mr. Rozhetskin and constitutes fraudulent activity that is separate and distinct from the predicate acts targeting him.  AC ¶¶ 2, 18, 30, 36, 57-64, 67-73, 75.

2.     **Count One Identifies a "Person" Distinct From the Alleged RICO Enterprise**

Reiman simply misrepresents the factual allegations in the Amended Complaint in order to advance his contention that Mr. Rozhetskin has not alleged an enterprise distinct from the

---

**Footnote continued from previous page**

enterprise [is] indistinguishable from the alleged pattern of racketeering activity."); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 22 (2d Cir. 1983) ("[W]e expressly rejected the Eighth Circuit's view that the evidence offered to prove the 'enterprise' and 'pattern of racketeering' must necessarily be distinct."); *Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 400 (E.D.N.Y. 2005) ("The Second Circuit has construed the enterprise element liberally and has held that an enterprise is properly pled even if the pleading reveals that the group exists solely for the commission of the fraudulent acts alleged in the complaint.").

person.  MTD at 29.  Mr. Rozhetskin expressly identifies Reiman as a RICO "person," and

Reiman, Galmond, IPOC, and corporate investors of IPOC as members of the enterprise.  *See,*

*e.g.*, AC ¶¶ 26, 67, 69, 123.  There are no "alter ego" allegations in the Amended Complaint, as

Reiman suggests.  MTD at 29.  Instead, Reiman cites to allegations describing how Reiman, as

the "kingpin" of the enterprise, directed Galmond and IPOC to conduct certain racketeering

activities as part of the Reiman Group.  Further, the cases Reiman relies upon to show that alter

egos do not constitute distinct persons involve inapposite situations where the RICO enterprise is

solely comprised of a corporation.[33]

Reiman also cites *In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 346 (S.D.N.Y. 2007),

for the assertion that an enterprise cannot simply be the same person referred to by a different

name.  However, in *Parmalat,* the court noted that where agents or employees of a corporation

are identified as members of the enterprise, and those employees are acting to carry out the

affairs of the corporation when committing a pattern of racketeering activity, the RICO person is

not distinct from the enterprise.  *Id.*  The Reiman Group enterprise allegations describe the

opposite situation where the RICO person is an individual operating at the top of hierarchy,

directing and working with Galmond and IPOC (and others).  *Parmalat's* reasoning does not

extend to all hierarchical RICO organizations where some members are acting on behalf of or at

the direction of the member at the hierarchical top.

IV.    **COUNT TWO STATES A RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d)**

Reiman relegates his arguments challenging the RICO conspiracy alleged in Count Two

to the bald assertion – in a footnote – that "conclusory conspiracy allegations are insufficient" as

---

[33] MTD at 29-30 (citing *Moses v. Martin*, 360 F. Supp. 2d 533, 546 (S.D.N.Y. 2004); and *Moy v. Terranova*, No. 87-Cv-1578, 1999 WL 118773, at *4 (E.D.N.Y. Mar. 2, 1999)).

a matter of law.  MTD at 30 n.25.  Reiman's argument deserves little attention.  In *Am. Buying Ins. Servs. Inc. v. S. Kornreich*, 944 F. Supp 240, 247 (S.D.N.Y. 1996) (Kaplan, J.), this Court held that the Plaintiffs had alleged enough to survive a motion to dismiss when Plaintiffs pled that "each of the corporate defendants . . . knowingly and intentionally agreed and conspired to commit . . . at least two of the predicate acts . . . and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering."  *Id.*  In Count Two, Mr. Rozhetskin makes even more detailed allegations and, incorporating previously stated facts, easily satisfies this pleading standard.  AC ¶¶ 139-140.  The Count Two conspiracy cause of action stands with Count One.  Both properly allege RICO causes of action and Reiman's attempt to dismiss them must be rejected.

## V.    <u>THE TORT CAUSES OF ACTION IN COUNTS THREE THROUGH ELEVEN STATE CLAIMS UNDER NEW YORK LAW</u>

Each of the tort causes of action in Counts Three through Eleven for defamation, tortious interference, abuse of process, intentional infliction of emotional distress and prima facie tort, properly state claims for relief.  Because Mr. Rozhetskin invokes both federal question and diversity jurisdiction, these counts will remain viable whether or not the Court entertains dismissal of the RICO Counts (One and Two).  As shown below, however, Reiman's attacks on the New York causes of action do not withstand scrutiny and must be rejected.

### A.    <u>Counts Three Through Five State Claims For Defamation</u>

The Amended Complaint alleges three counts of defamation.  Two arise out of statements Reiman caused to be published defaming Mr. Rozhetskin following Reiman's defeat before the Zurich Tribunal and in connection with the Reiman-initiated RICO case filed in this Court last year.  The third count is based on further defamatory statements Reiman caused to be published against Mr. Rozhetskin arising out of the same underlying facts.  The causes of action are basic

defamation counts, setting forth the specifics of each defamatory statement, Reiman's responsibility for them, and the injuries suffered as a result.  Nothing more is required of a plaintiff in these circumstances.

Yet Reiman claims that the defamation counts are deficient because (1) Reiman is not responsible for the statements, (2) the statements are non-actionable opinion, and (3) the statements are protected by New York's Law of Privilege.  None of these arguments are properly considered on a motion to dismiss, where all factual inferences must be for the plaintiff's benefit. Reiman wants to argue facts.  The legal standard precludes that type of inquiry by the Court at this juncture and the arguments must therefore be rejected.

First, under New York law, "all who take part in the procurement, composition and publication of a libel are responsible in law and equally so." *Brown v. Mack*, 185 Misc. 368, 373, 56 N.Y.S.2d 910, 916 (Kings County Ct. 1945) (citation omitted).  The Amended Complaint specifically alleges that *Reiman* procured the defamation when he maliciously *directed* the press releases, knowing they were false. AC at ¶¶ 104, 107, 110, 111.  While courts can and do dismiss defamation cases for failure to meet this standard, they do so only when there is no allegation that the defendant directed the statements be made.  *See, e.g.*, *Mahoney v. Staffa*, 256 A.D.2d 827, 828, 681 N.Y.S.2d 816, 818 (3rd Dep't 1998) (affirming the dismissal of defamation claim because there was no evidence at trial that the defendant exercised control over declarant or directed the statement to be made).  Here, the Amended Complaint repeatedly asserts that Reiman owns and controls IPOC.  Indeed, one of the defamatory releases came no less than a month after the Zurich Tribunal exposed Reiman as IPOC's owner, a devastating ruling against Reiman that served as the catalyst for the defamatory statements.

Second, the defamatory statements go far beyond comments on judicial proceedings and

statements of "opinion."  *See, e.g.*, AC ¶ 105 (Mr. Rozhetskin and Fridman "colluded in an

attempt to defraud IPOC of the MegaFon Stake"); ¶ 108 (Mr. Rozhetskin "engaged in a vast

international money laundering and fraud scheme in an attempt to take control of the Russian

cellular industry"); ¶ 112 ("[A]fter a three year investigation the Russian authorities have found

there are grounds to prosecute Leonid Rozhetskin, a key architect of the fraud to deprive IPOC

of its MegaFon Stake.").  The Amended Complaint specifically alleges that the press release

statements are false and misleading.  For example, ¶ 104 describes how the May press release

conclusively accuses Mr. Rozhetskin of crimes, including fraud.  There is no attempt to preface

the statements with language such as "IPOC started an arbitration alleging the following."

    Nor should this Court be distracted by Reiman's attempt to have this Court consider

unauthenticated and inadmissible submissions by Reiman in an effort to suggest that the

statements at issue were somehow accurate.  *See supra* II(B).  Indeed, Reiman's attempt to

excuse his defamatory statements by claiming that they merely repeat other false accusations that

he procured is improper, circular and hypocritical.

    Finally, even for those statements that are related to judicial proceedings, the Law of

Privilege does not apply when the statements at issue are not "substantially true" or a "fair and

true report."  *See, e.g.*, N.Y. Civ. Rights Law § 74; *Caplan v. Winslett*, 218 A.D.2d 148, 151-52,

637 N.Y.S.2d 967, 969-70 (1st Dep't 1996).  If the publication suggests more serious conduct

than that actually suggested in the official proceeding, the privilege does not attach.  *Procter &*

*Gamble Co. v. Quality King Distrib.*, 974 F. Supp. 190, 196 (E.D.N.Y. 1997).  Here, the

Amended Complaint specifically alleges that the statements are not substantially accurate and

that they suggest more egregious conduct than alleged in the judicial proceeding.  *See* AC ¶ 108

("The June press release, among other defamatory accusations, accuses Mr. Rozhetskin of an

assortment of crimes, including fraud, money laundering, and tax evasion, and implies more wrongful conduct than even alleged in the Complaint.").[34]

The Law of Privilege also does not apply when the action was initiated in order to be shielded from making defamatory accusations.[35]  In ¶¶ 16 and 103 of the Amended Complaint, Rozhetskin specifically alleges that IPOC's RICO suit was "simply a cover" for a malicious, defamatory, retaliatory, and extortionate purpose.  If Reiman wants to establish some other motive for the statements, he will have his opportunity to explain them in discovery.  On a motion to dismiss, however, the controlling allegations are those alleged by Mr. Rozhetskin in his complaint.  The defamation counts are properly alleged under New York law.  None of Reiman's protests has merit.  The motion to dismiss these counts must be rejected.

> B.   **Counts Six and Seven State Claims for Tortious Interference**

Counts Six and Seven sound in tort.  In them, Mr. Rozhetskin seeks to hold Reiman accountable for intentional interference with Mr. Rozhetskin's business and contractual relationships.  Although little is required in terms of pleading these causes of action, the Amended Complaint presents extensive details of the tortious interference, easily satisfying the New York pleading standards.

Reiman nevertheless launches a half-hearted attack, claiming variously that, under *Reiman's* reading of the Amended Complaint, Counts Six and Seven (1) do not identify the

---

[34]  Reiman mistakenly contends that no such allegation appears in the Amended Complaint.  MTD at 33 n.30 ("[t]he Amended Complaint makes no such allegation" that the June 2006 statement implied more wrongful conduct than alleged in the complaint).  This is a blatant example of Reiman recasting the actual complaint allegations to his own liking, and ignoring what actually is alleged.

[35]  *Cordell-Reeh v. Nannies of St. James, Inc.*, 13 A.D. 3d 140, 141, 785 N.Y.S.2d 694, 694 (N.Y. 2004) (no privilege when plaintiff alleges that defendant instituted the action solely to avoid liability for defamation); *Hughes Training, Inc., Link Div. v. Pegasus Real-Time Inc.*, 255 A.D.2d 729, 730, 680 N.Y.S.2d 721, 723 (3rd Dep't 1998) (defendants "tendered no proof that the action was commenced solely as a shield against liability for the dissemination of defamatory accusations").

contract or business relationships at issue, (2) do not allege any breach of an employment agreement, (3) have not asserted facts to demonstrate that Reiman's actions were the "but for cause" of the lost business opportunities, and (4) have not sufficiently alleged that Reiman intended to tortiously interfere with Mr. Rozhetskin's contracts or business relations.

Not so on each point.  For example, ¶ 118 of the Amended Complaint alleges that in January 2005, Rozhetskin was forced to sever his employment relationship with a prominent company and, in early 2006, Mr. Rozhetskin lost the opportunity to extend or renew a lucrative consulting agreement with a prominent business.  In ¶¶ 174-75 and 180-81, the Amended Complaint alleges that Reiman knew of these business relationships and intentionally interfered with them relationships.  And in ¶¶ 176 and 182 of the Amended Complaint, Mr. Rozhetskin alleges that Reiman caused the termination or failure or these business relationships.[36]  Hence, the Amended Complaint contains the very allegations that Reiman claims are missing, completely undermining Reiman's arguments, and credibility.  Also, contrary to what Reiman appears to suggest (MTD at 38-40) there is no heightened pleading standard for a tortious interference claim.[37]  The tortious interference claims are properly alleged.

---

[36] Count Six specifically alleges a breach.  In ¶ 176, Mr. Rozhetskin alleges that "Reiman's wrongful activities caused the termination of Mr. Rozhetskin's employment and consulting agreement with his employer, as Reiman intended."  In this context, termination equates with breach.  In a case involving statutory interpretation of the term "termination of employment", termination was defined as "'ending' or 'concluding' and, when applied to employment, implies either a voluntary quitting by the employee or a discharge by the employer." Burns v. Stento, 9 N.Y.S.2d 736, 742 (Broome County Ct. 1939).  According to BLACK'S LAW DICTIONARY 1482-83 (7th ed. 1999) "termination" means "the act of ending something", and "termination of employment" means "the complete severance of an employer-employee relationship."  The term does not specify that the 'ending' or 'concluding' is or is not justifiable, and therefore the word "termination" could be used to encompass or imply a breach, as a breach can come as the result of the defendant's lawful conduct.  NBT Bancorp v.Fleet/Norstar Fin. Group Inc., 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 585 (1996).  This analysis is irrelevant to Count Seven, as a breach is not required for a tortious interference with business relations claim.  Id.

[37] See, e.g., Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) (refusing to require plaintiffs to plead a tortious interference claim with specificity); see also Amerol Corp. v. Am. Chemie-Pharma, Inc., No. CV 04-0940, 2006 WL 721319, *15 (E.D.N.Y. Mar. 17, 2006) ("[W]hile conspicuously

**Footnote continued**

C.     **Counts Eight and Nine State Claims for Abuse of Process**

The Amended Complaint alleges two counts of abuse of process; one arising out of the filing of the IPOC RICO complaint against Mr. Rozhetskin in this District just three weeks after Mr. Rozhetskin helped thwart Reiman's efforts in front of the Zurich Tribunal, and the other arising out of Reiman's efforts to generate the Russian criminal investigation and arrest warrant. Each count meets the New York pleading standards and each states a claim.

In response, Reiman argues that abuse of process claims cannot be based on the issuance of process itself, and asserts that the claims are premised only on the issuance of process. However, the law on whether an abuse of process claim can be based on improper collateral objectives underlying the issuance of process is not settled and Mr. Rozhetskin relies on the authority that supports his claim.[38]

In *Hernandez v. Wells*, No. 01 Civ. 4376MBM, 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 24, 2003), the defendant, a prison employee, had a record of disciplinary problems.  He used the criminal process for the purpose of saving his own job, accusing plaintiff, a prison visitor, of violating prison weapon rules and causing a felony assault charge against the plaintiff.

---

**Footnote continued from previous page**

lacking in factual details, the pleadings sufficiently state a claim for tortious interference with prospective business relations, and dismissal would not be warranted on the pleadings alone.").

[38]  *See Parkin v. Cornell Univ.*, 78 N.Y.2d 523, 530, 577 N.Y.S.2d 227, 231 (1991) ("[N]othing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself."); *see also Bd. of Ed. of Farmingdale Union Free School Dist. v Farmingdale Classroom Teachers Assoc., Inc., Local 1889, AFT, AFL-CIO*, 38 N.Y.2d 397, 404, 380 N.Y.S.2d 635, 643 (1975) ("Where process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party."); *Hauser v. Bartow*, 273 N.Y. 370, 373-74 (1937) ("But the moment [defendant] attempts to attain some collateral objective, outside the scope of the operation of the process employed, a tort has been consummated. . . . As soon as the actor uses the process of the court, not to effect its proper function, but to accomplish through it some collateral object, he commits this tort."); *Dean v. Kochendorfer*, 237 N.Y. 384, 390 (1924) (issuance of a warrant to effectuate a preferred behavior is an abuse of process).

*Id.*  The court reasoned that defendant's actions constituted an abuse of process because defendant's preserving his own job lay "outside the scope of the legitimate goal of criminal process."  *Id.*  Similarly, a court denied a motion to dismiss an abuse of process claim where the defendants caused the issuance of grand jury subpoenas, indictments, and arrest warrants for the improper collateral purpose of influencing the defendants' civil proceedings pending against plaintiffs, with the result that one defendant won a tainted and incorrect judgment based on inadmissible evidence.  *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 627 (S.D.N.Y. 1999).

Reiman's pursuit of the New York RICO action, and Reiman's role in prompting an FBI investigation (which resulted in a warrant being issued against Mr. Rozhetskin), are similar to the defendant's behavior in *Hernandez* and *Coakley*.  The Amended Complaint alleges that the New York RICO action was in direct response to Mr. Rozhetskin's thwarting of Reiman's efforts in the Zurich arbitration and that the Russian warrant was procured based on allegations made for an improper purpose.  Extorting and coercing Mr. Rozhetskin certainly is not a legitimate goal when seeking a warrant or civil or criminal process.[39]  These allegations properly state abuse of process claims under New York law.[40]

---

[39] *See, e.g.*, AC ¶ 15 (noting that the RICO complaint was filed only three weeks after Reiman and IPOC's defeat in Zurich, predicated in part on Rozhetskin's testimony); ¶ 100 (alleging that Reiman's actions in connection with the Russian warrant were "to intimidate Mr. Rozhetskin from pursuing and testifying in the New York actions, and in furtherance of his extortion and overall scheme"); ¶ 101 (describing Reiman's NY RICO action as part of the scheme to extort, intimidate, threaten and retaliate detailed in ¶ 99); and ¶¶ 190 and 195 (alleging that Reiman caused the Russian warrant to be issued and filed the New York RICO action "for the unlawful collateral objective of intimidating and coercing Mr. Rozhetskin to stop testifying about Reiman's illegal activities . . . [and] for the unlawful collateral objectives of punishing Mr. Rozhetskin . . . and continuing [his] attempted extortion of Mr. Rozhetskin").

[40] Reiman improperly contends that the Supreme Court of Bermuda rejected similar New York abuse of process claims due in part to an affidavit from former Chief Judge Mukasey.  MTD at 6, n.10.  In addition to the obvious fact that the Bermuda Supreme Court was not ruling on claims made by Mr. Rozhetskin, the decision actually does *not* hold that a New York abuse of process claim has no merit.  Instead, the Bermuda Supreme Court simply declined to exercise jurisdiction noting that "Bermuda is not the appropriate forum for determining" whether a New York abuse of process occurred.  MTD at Ex. I, ¶ 55.

D.     **<u>Count Ten States a Claim for Intentional Infliction of Emotional Distress</u>**

Reiman argues that Mr. Rozhetskin's intentional infliction of emotional distress claim should be dismissed because the initiation of litigation cannot support a such a claim and because the allegations supporting this claim also support several other causes of action.  These general claims do not withstand scrutiny.

First, a relentless campaign of harassment that includes lawsuits or the threat of unjustified charges – such as the campaign alleged in the Amended Complaint – can easily support a claim for intentional infliction of emotional distress.[41]  In *Green*, the court refused to grant summary judgment on an emotional distress claim where (i) a court had previously concluded that defendants had brought baseless eviction proceedings and other actions against plaintiff over a multi-year period; (ii) the proceedings were without legal cause or justification; (iii) the proceedings were intended solely to injure plaintiff; and (iv) the plaintiff alleged severe interruption or discontinuance of services, the drastic deterioration of plaintiff's living conditions, the interference with his mail and the verbal abuse of plaintiff and his guests.  *Id.*

Like the *Green* case, Mr. Rozhetskin has alleged that: (i) the threats and initiation of the Russian criminal investigation and proceedings against Rozhetskin were baseless (AC ¶¶ 12, 99, 100); (ii) the New York RICO action was similarly frivolous and baseless (AC ¶¶ 15, 101, 102); (iii) the Russian criminal investigation and the New York RICO action were intended to injure Mr. Rozhetskin (AC ¶¶ 16, 117, 118, 132(a), 132(b), 199); and (iv) due to Reiman's baseless

---

[41]   *See, e.g., Green v. Fischbein, Olivieri, Rozenholc & Badillo*, 135 A.D.2d 415, 419, 522 N.Y.S.2d 529, 532 (1st Dep't 1987); *see also Vasarhelyi v. New Sch. for Soc. Research*, 230 A.D.2d 658, 661, 646 N.Y.S.2d 795, 797 (1st Dep't 1996) ("The engagement of criminal attorneys to conduct the investigation sufficiently intimated the threat of prosecution to bring this matter within the ambit of cases construing, as outrageous, threats of unjustified criminal charges or groundless litigation.").

initiation of the Russian and NY RICO actions, Mr. Rozhetskin suffered damages (AC ¶ 200).[42]

Second, Rozhetskin's emotional distress claim is not duplicative of the other counts in the Amended Complaint, as Reiman's actions, *taken together*, are what constitute the offense.[43] Reiman has subjected Mr. Rozhetskin to a 6-year, relentless campaign of extreme and outrageous conduct.  The collective actions of Reiman, not viewed in isolation as individual causes of action, amount to a cognizable claim for intentional infliction of emotional distress. Reiman's attempt to dismiss this count must be denied.

E.    **Count Eleven States a Claim for Prima Facie Tort**

Reiman argues that Mr. Rozhetskin's prima facie tort claim is "facially invalid" because it is "fundamentally inconsistent" with Mr. Rozhetskin's other allegations, because the ultimate goal of Reiman's actions was not malevolence, and because Mr. Rozhetskin failed to plead special damages.  MTD at 41.  These arguments are baseless.

While it is true that the prima facie tort "should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs," *Belsky v. Lowenthal*, 62 A.D.2d 319, 323, 405 N.Y.S.2d 62, 65 (1st Dep't 1978), "there may be instances where the traditional tort cause of action will fail and plaintiff should be permitted to assert this alternative claim," *Bd. of Ed. of Farmingdale Union Free School Dist.,* 38 N.Y.2d at 406, 380 N.Y.S.2d at 645.  As Mr. Rozhetskin does here, a plaintiff can plead prima facie tort as an "in the alternative" claim.

---

[42] As noted in ¶ 98 of the Amended Complaint, the Reiman Group has not prevailed in *any* of the multitude of proceedings it initiated around the world.

[43]  *Mitchell v. Giambruno*, 35 A.D.3d 1040, 1042, 826 N.Y.S.2d 788, 790 (3rd Dep't 2006) ("Although insulting language intended to denigrate a person may not, in and of itself, rise to the required level of extreme and outrageous conduct, liability may be premised on such expressions where, as here, defendants' campaign of harassment and intimidation is constant."); *Levine v. Gurney*, 149 A.D.2d 473, 539 N.Y.S.2d 967 (2nd Dep't 1989) ("[G]iven the possible threat of imprisonment as a result of the charges filed by the defendant . . . [the defendant's] conduct may rise to the level of outrageous conduct if she were guilty of falsely accusing the plaintiff.").

*Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 (1984) ("While prima facie tort may be pleaded in the alternative with a traditional tort, once a traditional tort is established, the cause of action for prima facie tort disappears.").

In addition, as acknowledged by Reiman, Mr. Rozhetskin specifically pleads that "Reiman was motivated solely by malevolence." AC ¶ 205. The complaint allegations describe no lawful or social justification for Reiman's acts of misconduct against Mr. Rozhetskin and, instead, repeatedly allege that Reiman's acts of misconduct were specifically targeted to harm Mr. Rozhetskin and others in their business and property. These allegations are sufficient to state a cause of action for prima facie tort. *See, e.g.*, *Mahoney v. Temporary Com'n of Investigation of State of N.Y.*, 165 A.D. 2d 233, 239, 565 N.Y.S.2d 870, 874 (3rd Dep't 1991) ("While a legitimate excuse may develop for [defendant's actions] . . . this argument ignores the fact that the justification may not excuse the specific acts of misconduct alleged to have been committed by . . . [defendant]").

Finally, Mr. Rozhetskin has adequately pled special damages. Paragraph 207 of the Amended Complaint alleges that:

> As a direct and proximate result of Reiman's interference with Mr. Rozhetskin's business relations, Mr. Rozhetskin has suffered special injury in the form of lost business relationships and business opportunities. Mr. Rozhetskin's injuries include the loss of employment and employment opportunities.

The damages to Mr. Rozhetskin's business are further detailed in ¶¶ 117-18 of the Amended Complaint. At the motion to dismiss stage, these allegations are all that is required of Mr. Rozhetskin.

## VI.   THE COURT HAS PERSONAL JURISDICTION OVER REIMAN

Near the end of his motion, Reiman finally trots out the argument that this Court somehow lacks personal jurisdiction over him under New York's long arm statute, N.Y. C.P.L.R.

§ 302(a).  MTD at 42.  Yet, Reiman again ignores the language of the Amended Complaint.
There, among other assertions, Mr. Rozhetskin specifically alleges that Reiman directed
Galmond to travel around the world, including to New York, in furtherance of the alleged
racketeering activity (AC ¶¶ 31-32), caused the Russian arrest warrant to be sent to the FBI in
New York (AC ¶ 100), directed the filing of IPOC's RICO and New York common law
complaint in S.D.N.Y. (AC ¶ 101), and directed that the press releases be issued in New York
and elsewhere (AC ¶ 104, 107, 110).  These facts serve as the basis for the RICO causes of
action – supporting jurisdiction under 18 U.S.C. 1965(a) – and for several tort causes of action
that either were committed in New York or were committed outside of New York causing injury
in the state – supporting jurisdiction under N.Y. C.P.L.R. §§ 302(a)(2) and (3).  While one of Mr.
Rozhetskin's tort causes of action, defamation, is exempted under §§ 302(a)(2) and (3), this
exemption does not cover the torts of abuse or process, tortious interference, infliction of
emotional distress, or prima facie tort.

Reiman is also subject to jurisdiction under N.Y. C.P.L.R. § 302(a)(1), as Reiman,
through IPOC and Galmond, transacts business within New York.[44]  Section 302(a)(1), if
satisfied, would confer jurisdiction over all of the claims, including his defamation claim.  *Best*

---

[44]  It is of no import that the Amended Complaint describes a situation where Reiman directed IPOC and Galmond
to carry out the goals of the enterprise, as Reiman can be haled into New York courts to answer for Galmond or
IPOC's actions.  *Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc.*, 2005 N.Y. Slip Op. 52312 (U), 2005
WL 4441899, *19 (N.Y. Sup. Ct. 2005) ("The court cannot detect anything offensive to 'traditional notions of fair
play and substantial justice' in the idea that the majority owners of such a business could possibly be haled into
court in New York.").  The relationship between Reiman and IPOC and Galmond is akin to that of an agency
relationship.  *See Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 611 (S.D.N.Y. 1980) ("To constitute an agent for
jurisdictional purposes the alleged agent must have acted in this state for the benefit of and with the knowledge and
consent of the non-resident and the non-resident must exercise some element of control over the agent.") (internal
quotation omitted).  New York courts have held that Section 302(a)(1) does not require a formal agency relationship,
and instead look to the realities of the relationship in question to determine whether the agent acted in New York for
the benefit of, and with the knowledge and consent of, the non-resident principal.  *Anderson v. Indiana Black Expo,
Inc.*, 81 F. Supp. 2d 494, 503 (S.D.N.Y. 2000).

*Van Lines, Inc. v. Walker*, --- F.3d ----, No. 04-3924, 2007 WL 1815511, *4 (2d Cir. Jun. 26,

2007).  As established above, Reiman's actions in New York (through IPOC and Galmond) are

directly related to Mr. Rozhetskin's underlying cause of action.[45]  If there is a substantial

relationship between the transaction and the claim asserted, a single transaction in New York

may suffice to invoke personal jurisdiction even if the defendant never entered New York.  *See*

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir.1997).

Here, we have far more than a single transaction alleged in the Amended Complaint.  For

example, Mr. Rozhetskin alleges that Reiman directed IPOC to file suit in New York and then

directed a press release bylined "New York."  AC ¶¶ 101, 107, 115.  In a similar case, *Sovik v.*

*Healing Network*, 244 A.D.2d 985, 987, 665 N.Y.S.2d 997, 999 (4th Dep't 1997), the Appellate

Division concluded that one allegedly defamatory letter sent by defendants could provide the

basis for jurisdiction because the defendants had "drafted the letter and either distributed or

authorized the distribution of the letter in the Buffalo area," thereby showing "active

involvement and personal control over the writing and distribution of the allegedly defamatory

statements."  Thus, any of Mr. Rozhetskin's claims confer jurisdiction over Reiman.  Taken

together, the propriety of exercising jurisdiction is compelling.

VII.    **IN THE EVENT THAT ANY ASPECT OF REIMAN'S MOTION IS GRANTED,
        PLAINTIFF SEEKS LEAVE TO AMEND HIS COMPLAINT**

For the reasons set forth above, the Amended Complaint properly alleges causes of action

under RICO, defamation, tortious interference with contract, tortious interference with business

---

[45] *Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd.*  956 F. Supp. 1131, 1137 (S.D.N.Y. 1997) (filing a lawsuit in New York is irrelevant to establish jurisdiction only because "these contacts are not related in any way to the underlying cause of action"); *Bankers Trust Co. v. Nordheimer*, 746 F. Supp. 363, 367 (S.D.N.Y. 1990) (plaintiff need only show that its agent engaged in purposeful activity in the state that related to the transaction underlying the lawsuit, that was taken for the benefit and with the knowledge of the defendant, and over which the defendant exercised some control).

relations, abuse of process, intentional infliction of emotional distress, and prima facie tort. However, to the extent that the Court is inclined to dismiss any or all causes of action for failure to state a claim or failure to provide requisite specificity, Mr. Rozhetskin respectfully requests that such dismissal be without prejudice and with leave to amend.  As the Court is aware, leave to amend should be freely granted where, as here, there is no undue delay, bad faith, futility of amendment, or prejudice to Reiman.[46]  Fed. R. Civ. P. 15(a).  Of course, many of the allegations and causes of action set forth in the Amended Complaint are pled for the first time here and there has been no previous dismissals or grants of leave to amend.

## CONCLUSION

For the reasons set forth herein, this Court should deny Defendant's Motion to Dismiss.


Dated: July 20, 2007                          Respectfully Submitted,

                                              By:     _____s/_____
                                              Douglas W. Baruch, *pro hac vice*
                                              Richard A. Sauber, *pro hac vice*
                                              FRIED FRANK HARRIS SHRIVER
                                              & JACOBSON LLP
                                              1001 Pennsylvania Avenue, NW
                                              Washington, D.C.  20004
                                              (202) 639-7000


                                              *Attorneys for Plaintiff Leonid Rozhetskin*

---

[46] *See, e.g., Nat'l Council of Young Israel v. Wolf*, 963 F. Supp. 276, 282 (S.D.N.Y. 1997) (Kaplan, J.) (granting dismissal with leave to amend RICO claim where some fraud allegations were sufficient and others were not); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 643 (S.D.N.Y. 1995) (granting leave to amend RICO claims despite the fact that "[t]he pleadings in this case . . . have been thoroughly deficient"); *Executive Photo, Inc. v. Norrell*, 756 F. Supp. 798, 805 (S.D.N.Y. 1991) (granting leave to amend where closed or open ended continuity was not sufficiently alleged); *see also Dana Corp. v. Blue Cross & Blue Shield Mut. of Northern Ohio*, 900 F.2d 882, 887 (6th Cir. 1990) (reversing the district court's denial of motion to amend Racketeer Influenced and Corrupt Organizations Act (RICO) complaint to reallege predicate act of mail fraud with greater specificity); *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (generally, a "Court should not dismiss without granting leave to amend at least once when a liberal reading of the Complaint gives any indication that a valid claim might be stated") (internal quotation omitted).