UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LEONID ROZHETSKIN,

                           Plaintiff,

           - against -

LEONID REIMAN and JEFFREY GALMOND,

                        Defendants.
----------------------------------------------------------------x

No. 06 Civ. 7119 (LAK)

ECF CASE

## PLAINTIFF'S SECOND AMENDED COMPLAINT

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP

Douglas W. Baruch, *pro hac vice*
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 639-7000
Fax: (202) 639-7003

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP

Richard Sauber, *pro hac vice*
Daniel R. Walfish
1801 K Street, N.W. Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

Dated: December 19, 2007
      Washington, D.C.

*Attorneys for Plaintiff Leonid Rozhetskin*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................. 2

PARTIES ................................................................................................................................ 5

OVERVIEW OF RICO VIOLATIONS ................................................................................. 6

THE PATTERN OF RACKETEERING ACTIVITY ............................................................ 8

    A.  Criminal Activity Directed at Rozhetskin ................................................................ 9

        *Background:  Rozhetskin and His Associates Develop Sonic Duo and MegaFon* .......... 9

        *Reiman Plots to Seize Control of MegaFon* ................................................................ 10

        *Reiman and His Associates Extort the First Option on LV Finance's Shares in TMI* .... 11

        *Reiman and Galmond Extort Another Option* ............................................................. 15

        *Reiman Brings the Extortion to New York* .................................................................. 17

        *Defendants Send Tainted Funds to New York Banks in Futherance of*
        *Their Extortion and in Violation of the Money-Laundering Statutes* ............................ 17

        *Reiman and His Associates Attempt, in and out of New York, To Extort*
        *the Shares of LV Finance* ........................................................................................... 19

        *In the Face of Extortion, Rozhetskin Is Forced To Sell LV Finance* ............................ 21

        *Continuing His Corrupt Efforts To Gain Control of MegaFon, Reiman Resorts*
        *to Witness-Tampering in New York and Other Reprisals Against Rozhetskin* .............. 22

    B.  Other Extortion and Intimidation ......................................................................... 25

    C.  Money-Laundering and Fraud ............................................................................... 26

        *Overview* .................................................................................................................... 26

        *The Source of the Laundered Funds* ........................................................................... 28

        *Transfers in and out of IPOC* ..................................................................................... 30

        *Schemes to Defraud* ................................................................................................... 32

## TABLE OF CONTENTS – Continued

DAMAGE TO ROZHETSKIN................................................................................34

FIRST CAUSE OF ACTION: RICO....................................................................35
(Conspiracy to Violate § 1962(b))

SECOND CAUSE OF ACTION: RICO.................................................................41
(Violation of § 1962(c))

THIRD CAUSE OF ACTION: RICO ....................................................................43
(Conspiracy to Violate § 1962(c))

FOURTH CAUSE OF ACTION: INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS ..............................................................................44

REQUEST FOR JUDGMENT AND JURY DEMAND ..........................................46

Plaintiff Leonid Rozhetskin, as and for his Second Amended Complaint, alleges as follows[1]:

## INTRODUCTION

1.      This is an action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and in tort. Rozhetskin is the victim of a series of illicit activities by Defendants Leonid Reiman and Jeffrey Galmond, and together with his colleagues has suffered damages of hundreds of millions, possibly billions, of dollars due to Defendants' wrongdoing.

2.      Reiman is a Russian citizen who at this time is the Russian Federation's Minister of Communications and Information Technology. Galmond is a Danish lawyer, and Reiman's long-time friend, business partner, and front man.

3.      Beginning in the 1990s, Reiman, working with Galmond, began to accumulate corruptly for his own personal benefit Russian telecommunications assets – assets, in other words, in the very industry that Reiman oversees. Reiman's corruption, and Galmond's role in it, have been extensively documented by foreign tribunals and reported in the *Wall Street Journal* and the *Financial Times*.

4.      Reiman and Galmond have attempted to conceal their illicit gathering and ownership of these assets through a front company known as IPOC International Growth Fund Limited ("IPOC"). Reiman and Galmond structured IPOC, a registered company in Bermuda, to appear as a legitimate mutual fund, but in actuality IPOC's purported investors were affiliated shell companies controlled by Reiman and Galmond, and the transactions from which IPOC's income supposedly derived were shams. During the relevant period, as governmental and private parties began to question IPOC's activities, Galmond claimed that he owned the company.

---

[1] Rozhetskin submits this Second Amended Complaint pursuant to the Court's Memorandum and Order dated October 31, 2007.

However, foreign tribunals and authorities have concluded that IPOC is a money-laundering vehicle that Galmond runs for Reiman's benefit.

5.      Reiman and Galmond have advanced Reiman's personal business interests through a pattern of racketeering activities in and out of the United States, including extortion, money-laundering, witness-tampering, fraud, and other wrongful acts. Though the criminal activity began in Russia and has been directed largely at the corrupt acquisition of Russian telecommunications companies, the racketeers and co-conspirators have used New York banks and U.S. shell companies for money-laundering, and they have pursued Plaintiff, a U.S. citizen, to the streets of New York in furtherance of their criminal program.

6.      Reiman targeted Rozhetskin because Rozhetskin indirectly controlled a valuable asset – a 25.1% stake in a telecommunications venture now known as OAO MegaFon ("MegaFon") – that Reiman wanted to add to his personal collection. Using physical threats and other corrupt and illicit means, Reiman and Galmond attempted to seize the Rozhetskin-controlled stake in MegaFon, which is now estimated to be worth approximately $3 billion.

7.      Reiman and Galmond have been pursuing Rozhetskin for more than six years in an effort to obtain the Megafon stake. They have used extortion and witness-tampering to hound Rozhetskin in New York and elsewhere.

8.      Defendants' misdeeds have damaged Rozhetskin, who suffered enormous injury when he was forced by the threats and extortion to sell prematurely his control of the Megafon stake.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, in that the RICO claims arise under the laws of the United States, and the non-RICO

claims are so related to the RICO claims that they form part of the same case or controversy. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a United States citizen, Defendants are citizens or subjects of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over the Defendants pursuant to Section 302 of the New York Civil Practice Law and Rules for the following reasons:

(a)     Plaintiff's causes of action have a substantial connection with corrupt business that Defendants, in person and through agents, transacted in New York, including, as set forth below, by laundering money through New York banks; holding numerous meetings in New York, including meetings with Plaintiff, in furtherance of Defendants' racketeering activities; and making frequent visits to New York in furtherance of Defendants' racketeering activities.

(b)     Plaintiff's causes of action arise from, among other things, tortious acts that Defendants, in person and through agents, committed in New York, including repeatedly threatening him and tampering with him as a witness, as set forth below.

(c)     Plaintiff's causes of action arise from, among other things, tortious acts that Defendants, in person and through agents, committed outside New York but that caused injury in New York and that Defendants should have reasonably expected to have consequences in New York. For instance, as set forth throughout this complaint: Defendants threatened Plaintiff by telephone while he was in New York and they were outside New York; Defendants' wrongful stoking of a criminal investigation outside New York caused Plaintiff injury in New York; and Defendants' embezzlements in Russia have injured investors in New York. Defendants, moreover, derive substantial revenue

3

from international commerce in that, among other things, they profit from numerous international ventures, including telecommunications assets the proceeds of which flow through corporations and bank accounts in the United States, Cyprus, and the Caribbean (among other places), as set forth throughout this complaint.

11.     This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(a), because Defendants transact their affairs in New York in that, among other things, they maintain active use of bank accounts in New York and frequently visit New York in furtherance of their international commercial activities and their racketeering activities. Defendants, in other words, have the requisite "minimum contacts" with New York, *see P.T. United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).

12.     Galmond was Reiman's agent, having at all relevant times acted under Reiman's control, pursuant to Reiman's instructions, and for Reiman's benefit. Galmond's acts are Reiman's acts. Moreover, IPOC was the agent of both Galmond and Reiman, and therefore IPOC's acts are also the acts of Galmond and Reiman.

13.     In the alternative, IPOC was an alter ego of Galmond, and therefore IPOC's acts are Galmond's. On information and belief, IPOC was a mere instrumentality that Galmond operated for Reiman's benefit but without observing corporate formalities. In the alternative, IPOC was also an alter ego of Reiman.

14.     As explained below in more detail, Defendants were co-conspirators – they had certain unlawful agreements to engage in a pattern of racketeering activity – and therefore, for purposes of personal jurisdiction, the acts of Reiman committed in furtherance of the conspiracy (for instance, the threats in and out of New York) are also the acts of Galmond. The converse is

also true, and thus Galmond's acts (including his threats in and out of New York) are also Reiman's.

15.    Venue is proper in this District under (i) 28 U.S.C. § 1391(d) in that all Defendants are aliens, (ii) under § 1391(a) and (b) in that, among other things, a substantial part of the events at issue in this lawsuit have taken place here, and (iii) under 18 U.S.C. § 1965(a) because Defendants transact their affairs here.

## PARTIES

16.    Plaintiff Leonid Rozhetskin is a Russian-born United States citizen domiciled in the United States, with an address in New York. Born in St. Petersburg and raised in New York from age 13, Rozhetskin graduated from Columbia University with distinction in 1987. He graduated *cum laude* from Harvard Law School in 1990 and served as a law clerk for a United States District Judge before entering private law practice in New York City. In the mid-1990s, Rozhetskin returned to Russia to pursue business interests. Most of his ventures have been in the telecommunications and mining sectors.

17.    Defendant Leonid Reiman is a Russian citizen residing in Moscow. Prior to 1999, Reiman served on the boards of various Russian telecommunications companies, including OAO Telecominvest ("TCI"). In 1999, Reiman became Chairman of the State Telecommunications Committee. That same year the Committee became a Ministry, and Reiman became Minister of Telecommunications, a position that he continues to hold. It is widely known, in and out of Russia, that Reiman has used his position to enrich himself in violation of Russian law.

18.    Rozhetskin brings this action against Reiman in his individual, non-official capacity. The acts for which Rozhetskin seeks recovery relate to Reiman's personal business affairs and not any actions within the scope of his official duties.

19.     Defendant Jeffrey Galmond is a Danish citizen who on information and belief resides in Denmark and Moscow. Since the early 1990's, Galmond has been Reiman's principal operative and front man. On information and belief Galmond travels frequently to New York, and does so in furtherance of the racketeering activities described herein. Galmond has substance-abuse, or other psychiatric, problems. On the evening of the December 19, 2006, he was staying at the Mandarin Oriental Hotel in New York City. He was arrested and incarcerated at Bellevue Hospital after he damaged the plasma television (by yanking it off the wall) and other objects in his hotel room, and then, dressed only in a bathrobe, staggered to the hotel lobby and engaged in disorderly behavior. Galmond paid $4,400 in restitution and several days after the incident, represented by IPOC's litigation counsel, he pled guilty to a misdemeanor in a proceeding at Bellevue.

## <u>OVERVIEW OF RICO VIOLATIONS</u>

20.     18 U.S.C. § 1962(b) and (d) together make it unlawful to conspire to acquire or maintain, via a pattern of racketeering activity, any interest in or control of any enterprise engaged in or affecting interstate or foreign commerce. Defendants have done exactly that. As set forth in greater detail below, Reiman and Galmond agreed to use, and did use, extortion, witness-tampering, money-laundering, and fraud in a continuing effort to gain control over MegaFon, a prominent and successful Russian telecommunications firm. MegaFon, as well as the holding companies that control it, are enterprises within the meaning of RICO, and each is engaged in foreign commerce.

21.     18 U.S.C. § 1962(c) makes it unlawful to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. This, too, Defendants have done. IPOC, a registered Bermuda company with bank accounts and purported affiliates in numerous

jurisdictions, including the United States, is an enterprise within the meaning of RICO, and it is engaged in or affecting foreign and interstate commerce. As set forth in greater detail below, Reiman and Galmond have used IPOC and its appendages as a front to conceal Reiman's role in the acquisition, as well as his beneficial ownership, of assets that are the proceeds of unlawful activities, including extortion, embezzlement, and misappropriation of public funds. Accordingly, Reiman and Galmond conduct and participate in IPOC's affairs (which include the very extortions and misappropriations that IPOC makes possible) using their pattern of racketeering activity.

22.     Beyond IPOC there exists another enterprise within the meaning of RICO that will be referred to herein as the Galmond Group. The Galmond Group is an association-in-fact consisting of, among others: Reiman himself; Galmond, his close friend and chief front man; Galmond's law partner Maria Kastritsa, who, in addition to being a Russia-based member of Galmond's law firm, is also a director of IPOC and of Com Tel Eastern Limited ("Com Tel"), which has indirect control over TCI, a Russian telecommunications firm connected to Reiman; Galmond's law partner Claus Abildstroem, who has served as a messenger for Galmond; Dmitry Igorevich Novikov, another emissary, who has held himself out as a "representative" of IPOC's principals; Michael Ludwig Rudolph North, Mads Braemer-Jensen, and Rodney Gallagher, who all have served as directors of IPOC and Com Tel; IPOC itself; and Com Tel. The full extent and membership of the Galmond Group is not yet known.

23.     The Galmond Group is an intricate international money-laundering network. Its primary bases of operations are Moscow, Copenhagen, St. Petersburg, and Bermuda, but it is engaged in transactions throughout the world. The Galmond Group's principal purpose is to corruptly acquire, and then conceal Reiman's beneficial ownership of, Russian

telecommunications assets. The Galmond Group's membership includes certain corporate entities, but it is not a unified corporate structure. On the contrary, the Galmond Group is an informal organization that is overseen by Galmond but whose true chief and ultimate beneficiary is Leonid Reiman. The affairs of the Galmond Group are conducted through the pattern of racketeering activity, and those conducting its affairs include principally Defendants Reiman and Galmond.

24.     18 U.S.C. § 1962(d) and (c) together make it unlawful to conspire to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. Defendants are culpable here as well. As set forth in greater detail below, Defendants agreed to conduct the affairs of IPOC and of the Galmond Group through their pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY

25.     Defendants' pattern of racketeering activity encompasses (potentially among other things) extortion, witness-tampering, money-laundering, and wire and mail fraud. All of these criminal activities are inter-related. Defendants seek to acquire telecommunications assets illegally and corruptly through acts of embezzlement, misappropriation, extortion, and witness-tampering. The revenues generated by these assets (which are proceeds of illegal activity) are routed through off-shore accounts and front companies. The front companies are also used as purchasing vehicles for the assets in order to disguise the true ownership of the underlying assets.

26.     In other words, by concealing Reiman's hand, the money-laundering and fraud make the corruption, extortion, and witness-tampering possible, and the corruption, extortion, and witness-tampering furnish the proceeds used in, and the motive for, the money-laundering and fraud.

27.     As set forth below, Rozhetskin was a major victim – but by no means the only one – of Defendants' conspiracy to acquire an interest in and control over MegaFon and its holding companies, as well as Defendants' conduct of their enterprises' affairs, and conspiracy to conduct their enterprises' affairs, through the pattern of racketeering activity.

## A.  Criminal Activity Directed at Rozhetskin

*Background: Rozhetskin and His Associates Develop Sonic Duo and MegaFon*

28.     In 1998, Rozhetskin co-founded LV Finance Group Limited ("LV Finance"), a company organized under the laws of the British Virgin Islands. Rozhetskin was LV Finance's largest shareholder and served as its Chief Executive Officer until 2003. LV Finance was a venture capital and investment advisory firm. It invested in, among other things, start-up telecommunications ventures. As discussed in the following paragraphs, LV Finance came to control 25.1% of MegaFon.

29.     In 2000, LV Finance, through a wholly-owned Bahamas company named Transcontinental Mobile Investment Limited ("TMI"), acquired the dominant stake in (and would eventually hold virtually 100% of the shares of) OOO CT Mobile ("CT Mobile"), which was jointly owned by TMI and OAO Central Telegraph ("Central Telegraph"). CT Mobile in turn acquired a 65% interest in ZAO Sonic Duo ("Sonic Duo"), a new cellular venture spear-headed by Rozhetskin and his associates. The remaining 35% interest in Sonic Duo was owned by Sonera, a Finnish telecommunications firm. LV Finance thus held indirect control over Sonic Duo, to which LV Finance had contributed the majority of the funding.

30.     Working with Sonera, LV Finance set to work developing Sonic Duo into one of the largest mobile telephone network operators in Russia. In May 2000, Sonic Duo was granted a valuable license to operate a GSM cellular network in Moscow. LV Finance was involved in

9

building Sonic Duo on a daily basis – interviewing and hiring staff; negotiating lease agreements for the location of cellular base stations; concluding agreements for base station construction, transmission build-out, supply, and installation; and arranging financing.

31.     Sonic Duo's development was financed in part by bank loans, the terms of which required the shareholders of Sonic Duo to obtain the lenders' consent for a change of control or ownership structure of Sonic Duo, its parent CT Mobile, and CT Mobile's parent TMI. This point has important implications for these allegations, as discussed below.

32.     By early 2001, discussions were under way to combine Sonic Duo with two other cellular telecommunications businesses, and Rozhetskin and others at LV Finance were working hard to enhance Sonic Duo's value. On July 5, 2001, an agreement was signed under which Sonic Duo would be combined with the other businesses to form MegaFon. As a condition of agreeing to the merger, Sonic Duo's lending banks required that LV Finance's holdings in MegaFon remain subject to the same types of restrictions on changes in control and ownership as applied to LV Finance's holdings in Sonic Duo – in other words, approval was needed for a change of control over CT Mobile and TMI.

33.     The merger closed in 2002, and resulted in the creation of MegaFon, in which LV Finance retained a beneficial 25.1% interest. (LV Finance owned TMI, which owned CT Mobile, which held 25.1% of MegaFon.) Today MegaFon is the third-largest cellular telephone company in Russia, with a market capitalization of approximately $10 billion, and hundreds of millions of dollars of annual profits.

*Reiman Plots to Seize Control of MegaFon*

34.     Leonid Reiman is an extraordinarily corrupt man, and he has made something of a career out of acquiring, through any means necessary, a controlling interest in profitable Russian

telecommunications firms. As early as 2000 or early 2001, Reiman recognized the potential value of what would become MegaFon, and plotted to seize it for himself. Reiman's goal was majority control and domination.

35.     MegaFon's other owners eventually included, apart from LV Finance, TeliaSonera, a Swedish-Finnish telecommunications group controlled by the government of Sweden and listed on the New York Stock Exchange, which through subsidiaries currently holds 35.6% of the shares of MegaFon. Another 31.3% of MegaFon is controlled by the Russian firm TCI, which is associated with Reiman and whose ultimate parent is Galmond Group member Com Tel. Meanwhile, IPOC acquired directly 8% of MegaFon's shares, which on information and belief Defendants obtained through corrupt and illegal activities. Reiman, through IPOC and the Galmond Group, thus controls 39.3% of MegaFon's shares.

36.     Accordingly, if Reiman was to gain majority control of MegaFon, his only option (short of extorting assets from the government of Sweden as the controlling shareholder of TeliaSonera) was to acquire the 25.1% stake controlled by Rozhetskin. Reiman therefore formed an agreement with Galmond and others to seize that stake for themselves using a series of illegal activities.

*Reiman and His Associates Extort the First Option on LV Finance's Shares in TMI*

37.     In early 2001, Reiman summoned Rozhetskin to a private meeting in Moscow at the offices of TCI, a Russian telecommunications firm on whose board Reiman once sat and which Reiman continues to control behind the scenes. Reiman demanded that Rozhetskin turn over the asset that would later become the 25.1% interest in MegaFon, and issued what can only be described as a death threat.

38.     Specifically, Reiman told Rozhetskin that Reiman intended "to take control of Sonic Duo," and that Rozhetskin had better not "stand in his way." Rozhetskin replied that he did not want to sell LV Finance's stake in Sonic Duo, and Reiman replied that he was not talking about a sale. Reiman stated that he intended to take a "controlling package" of shares in Sonic Duo, but would allow LV Finance to retain a stake in the business. When Rozhetskin responded that he needed to think about what Reiman had said, Reiman replied, "Fine, Jeff Galmond whom you know will contact you about the documentation." Reiman ended the conversation on an ominous note: "You must remember Konstantin Kuzovoi. That was a terrible day for our industry."

39.     Kuzovoi was a Russian telecommunications executive who was assassinated in 1999. His murder was never solved. Reiman's mock-pitying reference to that incident was intended by Reiman and interpreted by Rozhetskin as a warning of the consequences that could follow if Rozhetskin did not do as Reiman demanded. Rozhetskin believed he had no choice but to comply with Reiman's demands. Around this time, Rozhetskin received a warning from a friend: "You don't know what these people are capable of. Don't risk your life, give them the damned shares."

40.     Acting at Reiman's direction, Galmond contacted Rozhetskin the next month, and the two met in the lobby bar of the National Hotel in Moscow, which faces the Kremlin and is only steps away from the Ministry of Communications. Galmond said that he understood from Reiman that Rozhetskin would be transferring a controlling stake in Sonic Duo, and asked Rozhetskin to explain the ownership structure of Sonic Duo. After Rozhetskin explained the details and certain transfer restrictions that the various investors had agreed to, Galmond

responded that Reiman normally required a minimum of 51% but under the circumstances would settle for 50.5% of Sonic Duo.

41.    Upon reflection Galmond added that he did not want Reiman to acquire the Sonic Duo shares directly because that would require the approval of the Russian government. Galmond announced that he did not want the shares of either Sonic Duo or its direct parent, CT Mobile (both Russian entities), but instead wanted the shares of TMI, the Bahamas holding company through which LV Finance held its stake in CT Mobile. Galmond specifically said that he wanted the "Bahama mama."

42.    Galmond then explained that Reiman was not ready to take the TMI shares immediately, but would take them in the future at a time of his choosing. In the meantime, Galmond explained, there would be an option structure with a lengthy option period. It was important to Galmond that the option agreement have the semblance of a legitimate commercial deal. The reason for the delay, on information and belief, was that Reiman did not yet have in place a legal structure that would permit a seemingly legitimate person or entity to announce itself as the majority owner of Sonic Duo.

43.    Rozhetskin informed Galmond that LV Finance had certain upcoming funding obligations in connection with its interest in Sonic Duo, and asked Galmond whether he was seriously suggesting that LV Finance fund the commitments associated with a stake that it was being forced to part with. Galmond replied that he would check with "Leonid." (In conversation with Rozhetskin, Galmond typically referred to Reiman as "Leonid," "El Supremo," or "tiozka," a Russian word meaning 'namesake' and alluding to the fact that Rozhetskin and Reiman share the same given name.)

44.     In a subsequent meeting, Galmond reported that Reiman stipulated that in order to preserve the value of the Sonic Duo shares, the option agreement would cover the upcoming funding obligations, and that Reiman would meet the funding commitments with respect to the 50.5% stake in Sonic Duo with which the option agreement was concerned.

45.     In order to create the semblance of an arm's-length commercial agreement, Galmond instructed Rozhetskin to arrange for a lawyer to produce a draft of the option agreement, which Galmond would approve. Galmond instructed Rozhetskin not to reveal to his attorney the behind-the-scenes details of the transaction, or there would be dire consequences.

46.     At this meeting, Galmond also identified the entity that would hold the option that Rozhetskin was being forced to give Reiman, using the name "IPO Capital." Later Rozhetskin learned IPOC's exact name.

47.     An option agreement that satisfied Galmond was signed in April 2001. Prepared under Galmond's supervision, the draft agreement was designed to conceal Reiman's interest and make his expropriation of the controlling stake in Sonic Duo look like a genuine arm's-length commercial transaction. Galmond insisted that the agreement refer to a purchase price of $18 million, but at the same time he required that Rozhetskin execute a separate personal undertaking to pay back $18 million at Galmond's direction. The option agreement, in other words, was a sham; the only consideration purportedly exchanged for the option was flowing right back to Reiman and his associates in a separate side deal.

48.     Galmond also required Rozhetskin to sign a bizarre "Escrow Deposit Agreement" pursuant to which Galmond and Rozhetskin agreed that the option agreement and personal undertaking would be deposited into escrow and not photocopied or given to anyone. In other

words, the documents were to be so confidential that not even the parties were to possess originals or copies of them.

49. Rozhetskin (on behalf of LV Finance) signed the April 2001 option agreement and related documents under duress. He signed only because he had been directed to do so by Reiman, whom Rozhetskin believed had the power to punish or hurt him.

50. The signature of the April 2001 option agreement brought Rozhetskin a temporary respite from Reiman and Galmond's threats. Because the April option agreement left them with a stake in Sonic Duo, Rozhetskin and LV Finance continued working on developing Sonic Duo, and combining it with the other two businesses.

*Reiman and Galmond Extort Another Option*

51. After the MegaFon merger agreement was signed in July 2001, Reiman contacted Rozhetskin on his cellular telephone, and requested another meeting. The two again met at the lobby bar of the National Hotel. When Reiman arrived, he appeared to be in good humor; he was pleased with the news of the MegaFon merger and the increase in value it would generate.

52. Reiman then said that because Sonic Duo would disappear as a separate company, LV Finance's remaining shareholding should disappear with it. Rozhetskin was stunned by this comment, and reminded Reiman of his earlier position that LV Finance could retain the remaining stake in Sonic Duo after the transfer to Reiman of a controlling block. Reiman casually responded that Rozhetskin would be "paid" something for the shares, and Rozhetskin replied that he and others at LV Finance has spent years of their lives and millions of dollars developing Sonic Duo, and that the remaining shares were all they had to show for their work.

53. At that point, Reiman leaned in closer to Rozhetskin and said that LV Finance was "just a few guys," and that "it will cost less to put all of you in prison, so don't push me on

the price." Reiman then straightened up and announced that Galmond would tell Rozhetskin the price. Reiman added that he would "hold [Rozhetskin] personally liable" and that Rozhetskin was "at risk" if the bank financing necessary for the MegaFon deal failed for any reason. There was no doubt in Rozhetskin's mind, in light of the two men's previous dealings, that Reiman's reference to "personal liability" was a threat to Rozhetskin's physical welfare and liberty.

54.     In October 2001, Galmond telephoned Rozhetskin in New York. Under the option agreement signed in April, LV Finance was ostensibly required around this time to issue to IPOC, through the escrow agent, a funding call notice, so that IPOC, through the escrow agent, could cover LV Finance's upcoming obligation to provide about $11.5 million of funding to Sonic Duo. Over the telephone, Galmond said that LV Finance should not issue the notice and that he would sort out the funding later. The reason Galmond did not allow the notice was so that an entity other than IPOC could make the payments – in other words, Galmond wanted to route the money in a way that suited his and IPOC's money-laundering activities. The $11.5 million was, on information and belief, wired, via Chase Manhattan Bank, from IPOC to a Cypriot shell named Tanur Ventures Ltd. ("Tanur"), and then through a series of other accounts before reaching LV Finance / Sonic Duo.

55.     Galmond did not require Rozhetskin's signature on the second option agreement until December 2001. The price Galmond dictated for the second option agreement was a fraction of the true value of LV Finance's remaining stake in Sonic Duo. Galmond extracted the same extraordinary secrecy arrangements as were applied to the earlier option and undertaking. The December documents, too, were signed under duress. Like the earlier agreements, they were the result of coercion, not an arm's-length commercial negotiation.

56.    There now existed secret documents that purported to give the Reiman-controlled IPOC the right to acquire 100% of the shares of TMI.

*Reiman Brings the Extortion to New York*

57.    In early 2002, Reiman and Rozhetskin were both at a private meeting in the New York apartment of a prominent investor. The meeting related to another telecommunications investment. After the meeting, as the group was leaving the building, Reiman pulled Rozhetskin aside and, speaking in Russian, told Rozhetskin that he had something he wanted to say.

58.    As the two walked together down Fifth Avenue, Reiman told Rozhetskin that Rozhetskin should not think that his highly-placed friends (meaning the investor whom they had just met with, as well as the chief executive of a major Russian mining company with whom Rozhetskin worked) would keep him safe. Reiman reminded Rozhetskin that he would not be secure in Russia, the United States, or elsewhere unless he followed Reiman's instructions, conveyed either directly or through Galmond, with respect to the implementation of the option agreements. Rozhetskin replied that he knew what Reiman meant.

*Defendants Send Tainted Funds to New York Banks in Furtherance of Their Extortion and in Violation of the Money-Laundering Statutes*

59.    Defendants sent the payments for the options, and the payments intended to cover LV Finance's funding obligations for Sonic Duo, to banks in New York.

60.    Specifically, the following transfers were made:

(a)    on or about April 19, 2001, $5,065,000 was transferred from IPOC's account in Bermuda to Barclays Bank in New York, and on to the account of the escrow agent in Switzerland;

(b)    on or about August 17, 2001, $6,500,000 was transferred from IPOC's account in Bermuda to Barclays Bank in New York, and on to the account of the escrow agent in Switzerland;

(c)    on or about December 21, 2001, $800,000 was transferred from IPOC's account in Bermuda to Barclays Bank in New York, and on to the account of the escrow agent in Switzerland;

(d)    on or about December 20, 2001, $3,070,000 was transferred from Montego Consultants (a Cypriot entity created by the Galmond Group to receive the proceeds of Reiman's corrupt and unlawful activities in Russia) to First Union National Bank in New York, and on to the account of the escrow agent in Switzerland;

(e)    on or about December 27, 2001, $3,130,000 was transferred from Tanur Ventures Ltd. (another Cypriot entity created by the Galmond Group to receive the proceeds of Reiman's corrupt and unlawful activities in Russia) to First Union National Bank in New York, and on to the account of the escrow agent in Switzerland;

(f)    on or about February 28, 2002, $3,000,000 was transferred from IPOC's account in Bermuda to Barclays Bank in New York, and on to the account of the escrow agent in Switzerland;

(g)    on or about August 6, 2002, $5,763,200 was transferred from IPOC's account in Bermuda to Chase Manhattan Bank in New York, and on to the account of the escrow agent in Switzerland.

61.     Each of these transactions was either (i) illusory consideration in connection with the extorted April 2001 option agreement, or (ii) underpayments in connection with the extorted December 2001 option agreement.

62.     In each case, as with the transactions described in paragraph 54 above, the funds were the proceeds of criminal activities (namely embezzlement and misappropriation of public assets by Reiman), and were transferred in furtherance of criminal activities (namely extortion and more embezzlement and misappropriation). All of these transactions violated the federal money-laundering statutes, as set forth below in paragraphs 134 through 136.

*Reiman and His Associates Attempt, in and out of New York, To Extort the Shares of LV Finance*

63.     Late in 2002, Rozhetskin met Galmond at the Copenhagen airport and explained to Galmond that Rozhetskin would have difficulties explaining to the lending banks and the public how a stake in MegaFon, a well-known telecommunications company, could be transferred to an off-shore fund that no one had ever heard of and that had no public face, for amounts that appeared to be a small fraction of the stake's market value. Rozhetskin also explained that the transfer to IPOC would damage his reputation, and asked Galmond if the shares could be transferred to an existing shareholder of MegaFon. Galmond told Rozhetskin that he would do as he was told and transfer the shares to IPOC, when so instructed.

64.     In February 2003, Galmond summoned two of Rozhetskin's fellow shareholders in LV Finance to a meeting at the Moscow office of Galmond's law firm. Galmond Group members Michael North and Maria Kastritsa were both present. Galmond asked Rozhetskin's partners how long it would take to obtain the banks' consent to the transfer of TMI from LV Finance to IPOC. One of Rozhetskin's partners informed Galmond that the banks would require detailed corporate financial information about IPOC, which would present difficulties as IPOC

was an unknown entity without audited financial statements. Moreover, there was no apparent rationale for the transfer of the shares at this time.

65.     Galmond informed Rozhetskin's partners that Galmond could wait no longer and that unless the banks' consent was quickly obtained, the problem would be solved by taking over the whole of LV Finance. Galmond told Rozhetskin's partners that if they did not cooperate, they would join Rozhetskin in the "Gulag" and LV Finance would be taken over while they were in jail. Galmond became extremely agitated and said that "Big L" would not let anything stand in the way of his getting the MegaFon shares.

66.     In February 2003, Galmond telephoned Rozhetskin in New York to tell Rozhetskin that "El Supremo" was extremely unhappy about the continuing delays in the transfer of the MegaFon shares and expected Rozhetskin to do something about it immediately. Otherwise, Galmond said, Reiman would solve the problem by seizing LV Finance, as he had said he would do. (Several weeks earlier, Galmond had called Rozhetskin to a meeting in Moscow and told him that Galmond and Reiman had decided they could avoid the problem presented by the requirement that the bank approve changes in the ownership of MegaFon and some of its holding companies simply by taking over LV Finance directly. The banks' approval was not required for a transfer of the shares of LV Finance. Galmond had made clear that Rozhetskin would face severe repercussions if he refused to comply.)

67.     Galmond added that Reiman had decided to change the escrow agent being used to hold the secret agreements and payments from a Swiss law firm to IPOC's bank in Bermuda. Galmond instructed Rozhetskin to go to Switzerland immediately to change escrow agents. Galmond concluded the telephone call by stating that for the reasons previously given, Rozhetskin had better do as he was told. This was another threat.

68.     This telephone call, like all of his dealings with Reiman and Galmond, caused Rozhetskin nervous and emotional distress.

69.     On information and belief, Galmond placed this telephone call from Moscow. In the alternative, Galmond placed this telephone call from Denmark.

*In the Face of Extortion, Rozhetskin Is Forced To Sell LV Finance*

70.     Of course, at this point LV Finance still held the shares in TMI and therefore still indirectly owned the 25.1% stake in MegaFon. Rozhetskin and his associates concluded that the only way to salvage any value from their work at LV Finance would be to sell LV Finance itself to a third party for whatever price they could get. Rozhetskin and his associates were concerned, in light of the threats, that if they delayed, Reiman would simply seize their shares of LV Finance.

71.     By July 2003, Rozhetskin and his associates had arranged for the sale of LV Finance to Palmer Trading Limited ("Palmer"), after disclosing to Palmer the existence, and circumstances surrounding the creation, of the option agreements and other documents that Reiman and Galmond had forced Rozhetskin to sign. The sale was completed on July 18, 2003, at which point Palmer (through its ownership of LV Finance) gained control of the 25.1% stake in MegaFon.

72.     The sale was a proximate result of Reiman's threats to seize LV Finance. The sale price for Rozhetskin's shares was sharply discounted by hundreds of millions of dollars from the actual value as a result of (a) the need to sell the company quickly, before Reiman could get his hands on it, and (b) the option agreements, and the circumstances in which they had been obtained.

73.     Soon after the sale, but without the knowledge or involvement of Rozhetskin and his associates, Palmer transferred CT Mobile to a company controlled by the Alfa Group, a business conglomerate associated with the Russian billionaire Mikhail Fridman.

74.     Fridman's acquisition of CT Mobile was announced publicly. Almost immediately after the news broke, Rozhetskin met with Galmond, who was very angry and demanded an explanation. Galmond asked whether Rozhetskin "had a death wish, acting so cavalierly with Leonid's shares?" Rozhetskin explained that what he and his associates had transferred were the freely transferable shares in LV Finance.

*Continuing His Corrupt Efforts To Gain Control of MegaFon, Reiman Resorts to Witness-Tampering in New York and Other Reprisals Against Rozhetskin*

75.     Rozhetskin was not involved in the Alfa Group's acquisition of the 25.1% stake in MegaFon, but once it became public, Reiman's response was swift, vengeful, and ruthless. Reiman plotted to wrest control of the stake from Alfa, to punish Rozhetskin, and to coerce Rozhetskin and others to support IPOC's claims to the stake. To this day, Reiman falsely claims that Rozhetskin colluded with the Alfa Group, and pursues Rozhetskin in furtherance of his attempts to reacquire the stake in MegaFon.

76.     As part of their campaign to gain control over MegaFon, Reiman and Galmond caused IPOC to initiate legal proceedings around the world against the Alfa Group and LV Finance and its subsidiaries. Lawsuits and arbitrations unfolded in Zurich, Geneva, the Bahamas, the British Virgin Islands (the "BVI"), Holland, Bermuda, Stockholm, St. Petersburg, and – through an action in this Court captioned *IPOC Int'l Growth Fund, Ltd. v. Rozhetskin, et al.*, No. 06 Civ. 4338 (VM) – New York. To date not a single claim filed by IPOC has succeeded.

77.     But that is not for Defendants' lack of trying. Defendants, having formed an agreement to use a pattern of racketeering activity to gain control of MegaFon and its parents, have deployed threats and witness-tampering in an effort to extract favorable rulings.

78.     For instance, in November 2003, Galmond (in part acting through messengers Claus Abildstroem and Dmitry Igorevich Novikov, both members of the Galmond Group) repeatedly threatened Rozhetskin's partners in Moscow and London, telling them that if they did not provide affidavits for IPOC's use in the BVI proceeding, they would face criminal prosecution and imprisonment in Russia.

79.     Beginning in 2003, moreover, IPOC instigated, and since then has repeatedly stoked, criminal proceedings against Rozhetskin in Russia. Acting in furtherance of his conspiracy with Galmond and IPOC to gain control over MegaFon, Reiman has used those proceedings as part of an attempt to coerce Rozhetskin to give false testimony favorable to Reiman.

80.     In September 2006, an agent of Reiman's contacted Rozhetskin in New York. The two met at the lobby bar of the Four Seasons Hotel in Manhattan. The agent said to Rozhetskin that Reiman needed Rozhetskin, in IPOC's litigation against the Alfa Group, to testify in a way that would implicate Mikhail Fridman in fraud connected with the transfer of the MegaFon stake. The agent said that if Rozhetskin did that, Reiman would be able to take care of Mikhail Fridman "Yukos-style." (Yukos was the enormous Russian petroleum company controlled by, among others, billionaire Mikhail Khodorkovsky, who was imprisoned and sent to Siberia after he crossed the Russian authorities.) On the other hand, if Rozhetskin did not cooperate, the agent said, Reiman would arrange for an arrest warrant to issue against Rozhetskin.

81.     Rozhetskin asked how an arrest warrant could affect him given that he was in the United States and the warrant would be in Russia. The agent said to him, "If I were you I would not feel so secure," and added that Reiman has the power to cause the Russian authorities to intercede so that Rozhetskin would be held in the United States and turned over to Russia. The agent said that the only way to avoid this would be to testify against Fridman and in favor of Reiman.

82.     Rozhetskin did not cooperate, and the very next month an arrest warrant issued in Russia. The warrant was soon sent to Interpol, which issued a "Red notice" for Rozhetskin – essentially an internationally distributed request that he be arrested and extradited to Russia. The arrest warrant and red notice were obviously designed to intimidate Rozhetskin, and to interfere with his efforts to get on with his life and business affairs.

83.     In the first week of March 2007, the same Reiman emissary contacted Rozhetskin in New York and demanded another meeting, which again took place at New York's Four Seasons Hotel. The agent said, in effect, "Let's cut to the chase; the last time we spoke I told you what we needed and things worked out exactly as I said they would. We still need your testimony. You can still escape the worst outcome if you provide evidence against Fridman, and if you don't, the screws will be tightened even further." The agent asked Rozhetskin to write down a version of a case against Fridman. Rozhetskin said that he had already given truthful testimony in the Zurich arbitration and would not contradict what he had said there.

84.     Later in March 2007 Rozhetskin drafted a statement consistent with his Zurich testimony, but the agent called him back to say it was not good enough.

**B.  Other Extortion and Intimidation**

85.    The extortion and intimidation directed against Rozhetskin and his colleagues at LV Finance were not unique. On the contrary, those acts were part of a pervasive pattern in which Defendants have acquired or sought to acquire telecommunications assets through threats of force and other illegal and improper means.

86.    For instance, in 2000, the head of Rostelecom, a telecommunications company listed on the New York Stock Exchange and indirectly controlled by the Russian government, was coming under pressure from persons acting on behalf of Reiman to transfer control of Rostelecom's subsidiary OAO RTK Leasing ("RTK Leasing") to Reiman. In September 2001, it was announced in the press that a consortium of investors led by "Gamma Group" (which is a member of the Galmond Group) had acquired control of RTK Leasing by buying its shares for what amounted to trivial consideration. This caused a direct and immediate loss to the U.S. investing public, which holds shares of Rostelecom.

87.    Similarly, in 2000 the owner of a satellite telephony company known as TM-SAT was told to transfer 51% of TM-SAT to a Reiman-controlled company in exchange for permission to stay in business.

88.    In March 2002, a journalist for one of Russia's leading business newspapers was warned not to run a story about Reiman's propensity to distribute GSM licenses to TCI, a company linked to Reiman. The journalist ran the story anyway, and subsequently was accosted one evening by a member of a well-known criminal gang in St. Petersburg.

89.    The incidents of extortion, witness-tampering, and intimidation described in this complaint are not intended to be exhaustive. They are, rather, just examples of the pervasive pattern of illegal activities through which Defendants conduct their business.

## C.  Money-Laundering and Fraud

*Overview*

90.     Defendants' pattern of racketeering activity includes extensive money-laundering and fraud. Reiman would corruptly and illegitimately acquire Russian telecommunications assets, and then transmit the proceeds from those assets to shell companies based in Cyprus, Lichtenstein, Latvia, and Switzerland. From there, on information and belief often using the New York office of Barclays Bank, the funds were sent to IPOC and affiliates in Bermuda. Next, the laundered funds were transmitted from IPOC and its affiliates through Barclays in New York, and used (as with the payments connected with the options on TMI shares described in paragraphs 54 and 59-61 above) to purchase additional Russian telecommunications assets. This scheme entailed the extensive use of sham contracts, as well as the falsification of books and records to deceive the authorities in numerous jurisdictions.

91.     According to IPOC's records, a number of corporations purportedly registered in American jurisdictions such as Kentucky and Delaware are part of the scheme, having paid affiliates of IPOC many millions of dollars for non-existent "consulting" services as part of sham transactions with IPOC and its affiliates. For instance, a Kentucky company named Euro Resources LLC has paid, according to IPOC's own records, at least $24 million to IPOC subsidiaries for supposed real-estate and consulting services. Many of the payments are from a St. Petersburg bank, and some of them were made even before Euro Resources was incorporated or the supposed consulting agreements were signed. Euro Resources' payments passed though the New York offices of Barclays Bank and J.P. Morgan Chase as part of a circuitous route that took them through Cyprus, Nevada, and other conduits.

92.     In 2006, the arbitral tribunal convened in Zurich to adjudicate claims asserted by IPOC against LV Finance concluded, after an extensive review of mountains of evidence, that Reiman sought to and did carry out several criminal schemes, including misappropriation of state assets and money-laundering, that his conduct amounted to a punishable offence, and that the IPOC money-laundering facility was a key tool by which Reiman pursued his criminal objectives. As the *Wall Street Journal* later put it, the Zurich tribunal found that "Reiman had engaged in corrupt and illegal acts during his government tenure in order to build and protect his secret telecom empire."

93.     Numerous governments have launched criminal probes into the Galmond Group. In March 2004, the Bermudan government initiated an investigation into IPOC and some of its affiliates on suspicion of money-laundering. On the basis of this investigation, which included a confidential report prepared by accounting firm KPMG at the request of the Bermudan authorities, the Bermuda government revoked IPOC's registration as a mutual investment fund, and moved in the Supreme Court of Bermuda to liquidate IPOC and eight of its affiliates.

94.     On August 21, 2007, the British Virgin Islands' Director of Public Prosecutions sent the U.S. Justice Department a formal request for assistance with a criminal investigation. The BVI government has determined that IPOC and other corporate members of the Galmond Group "are being used by Mr. Galmond and Mr. [Michael] North and others as vehicles for laundering the proceeds of fraud, theft and corruption." According to the BVI government's request, which is attached hereto as Exhibit A and the allegations of which are hereby adopted by reference, there is "overwhelming evidence that Mr. Reiman is the true beneficial owner of IPOC and its group of companies," and that "IPOC and its group of companies are corporate shams or facades designed to conceal the true facts about the source of the revenues in IPOC's groups."

*The Source of the Laundered Funds*

95.     The funds laundered through IPOC were generated through Reiman's corrupt and illegal activities in the Russian telecommunications sector, including extortion, embezzlement, and misappropriation of public assets. Following are several examples of that unlawful activity. This list is intended to be illustrative, not exhaustive. On information and belief, Reiman has acquired de facto control, and substantial beneficial ownership, of a large number of Russian telecommunications firms.

### a.  RTK Leasing

96.     RTK Leasing, having been appropriated by Reiman to the detriment of the U.S. investing public through extortion as described in paragraph 86 above, has become a source of significant cash flow for IPOC and the Galmond Group. Reiman has used his position as chairman of the 100% state-owned telecommunications company OAO Svyazinvest ("Svyazinvest") to cause companies and individuals within the Svyazinvest organization to lease equipment from RTK Leasing rather than purchase it directly from a manufacturer on better terms. Reiman also has taken advantage of his role as the secret owner of RTK Leasing in other ways, including causing RTK Leasing to over-charge Svyazinvest companies and require them to pay for non-existent consulting services.

### b.  Telecom XXI

97.     Telecom XXI was a start-up Russian telecommunications company with limited assets. In November 1999 and April 2000, Reiman and Galmond arranged for two Bermudan shell companies linked to the Galmond Group, Comitas Investments Ltd. ("Comitas") and Honestas Investments Ltd. ("Honestas"), to purchase a controlling interest in Telecom XXI for a comparatively small price – about $3 million dollars.

98.     Reiman then saw to it that Telecom XXI received a rare and valuable GSM 900 license, and in January 2001, the Reiman-controlled interest in Telecom XXI was sold for $40 million to affiliates of OAO Mobile Telesystems ("MTS"), Russia's leading mobile telephony operator. Notably, MTS had repeatedly applied unsuccessfully for a GSM 900 license; Reiman had ensured that MTS's applications would not be granted in order to prod MTS to purchase Telecom XXI at a substantial premium.

99.     Of the proceeds from the sale of the interest in Telecom XXI, which on information and belief passed through the New York office of Barclays Bank, $30.5 million was transferred in February 2001 from Comitas to Augmentation Investment Ltd. ("Augmentation"), another Bermuda company controlled by Reiman and the Galmond Group. And in March 2001 Augmentation relayed the same amount on to IPOC. In other words, the corrupt proceeds from the sale of Telecom XXI were invested in IPOC. A month later, Defendants caused Comitas to dissolve, and Augmentation to change its name.

### c.  TCI

100.    In the mid-1990s, while Reiman was a senior officer with the St. Petersburg Telephone Network ("PTN"), he founded TCI to hold the joint assets of PTN and another state-owned firm, St. Petersburg Intercity and International Telephone ("SPMMT"). Reiman then caused PTN to grant a 5% interest in TCI to Wasa, a Danish company that was created by Galmond and is part of the Galmond Group. Having gained a private commercial foothold in his own state-run organization, Reiman subsequently abused his position to increase Wasa's stake to 51%, leaving 49% for PTN and SPMMT. Next Wasa transferred its holding to First National Holdings ("FNH"), a Luxembourg company that is also part of the Galmond Group.

101.    The result of these actions is that Reiman managed to acquire for himself roughly $7 million worth of TCI's assets for a payment of only $1.8 million.

102.    These actions constituted the misappropriation by Reiman of public funds for his own personal enrichment, in violation of Russian law.

*Transfers in and out of IPOC*

103.    Reiman and Galmond used IPOC and a web of offshore shell companies to conceal the profits from the types of specified unlawful activity described above. Specifically, Reiman and his co-conspirators sent a constant stream of funds, which on information and belief derived from Reiman's corrupt activities in the Russian telecommunications sector, into the accounts of numerous offshore companies. The money was then typically channeled through one of several special-purpose vehicles, and from there to IPOC and other purported investment funds. See Exhibit A at 2.

104.    For instance, IPOC was initially funded by a capital infusion of $6 million by Riversand Holding, Ltd., a Cypriot company owned by Complus, which on information and belief passed through Barclays Bank in New York. The majority stake in Complus, in turn, is owned by Alpine Strategic Marketing, Ltd. ("Alpine"), which is incorporated in Washington, D.C. This transaction was critical to Defendants' scheme because it permitted IPOC to maintain its status as an investment fund under Bermuda law.

105.    Subsequently, Augmentation contributed $30.5 million to IPOC. This money represented proceeds from Reiman's corrupt and illegal activities in relation to Telecom XXI, as described in paragraph 99 above. It is a crime under Russian and Swiss law to obtain money from an abuse of power, and the channeling of the funds to IPOC was clearly designed to protect

them from confiscation. Accordingly, the Zurich tribunal specifically found that these acts constituted money-laundering.

106.    IPOC has also reported to the BVI authorities that it and its affiliates have received many millions of dollars in funding from a number of U.S. companies, including: Euro Resources LLC (located in Kentucky and with headquarters in Oregon), Neofund, LLC (located in Washington D.C.), Castle Ventures, Ltd. (located in Connecticut), Netmax LLC (located in Michigan as part of Cybernet Systems Corporation), Fortans, LLC (located in Oregon, at the same supposed address as Euro Resources), Sierra Global LLC (located in Oregon), Norbury Technologies (located in Delaware), General Group LLC (located in Utah), Unicross LLC (located in Utah), and Dragon Club LLC (located in Oregon).

107.    In most of these cases, IPOC has been unable to explain where the money really comes from. IPOC has tried to demonstrate that these funds were paid under "consulting" or "loan" agreements. But to Plaintiff's knowledge no loans were ever extended, and no consulting services were ever furnished. A number of these so-called "investors" are demonstrably fictitious. On information and belief, the funds in fact are the proceeds of Reiman's corrupt activities, via bank accounts in Cyprus and other jurisdictions.

108.    A money-laundering expert who has evaluated books and records submitted by IPOC in the BVI litigation concluded that the transactions that were the supposed source of IPOC's funds lacked a commercial rationale, and were marked by other internationally accepted signs of money-laundering, including: funds having been loaned prior to the source's date of incorporation; funds flowing before agreements were signed; companies having contracted before they existed; false or duplicative corporate addresses; repeated use of nearly identical templates; lack of commercial terms in the agreements (e.g. no security for multi-million dollar

loans, no interest charged, no warranties and covenants); poor drafting; and incomplete documentation for loans.

109.    The money-laundering expert concluded that in some instances, the related IPOC companies had used the names of legitimate United States companies or their corporate executives or officials in connection with fictitious transactions designed to conceal the true source of IPOC funds. At least four of the U.S. companies listed in paragraph 106 above have denied knowledge of any transaction with IPOC.

110.    After the money was deposited with IPOC, it would typically be reinvested in furtherance of Defendants' program to gain control over Russian telecommunications assets. See Exhibit A at 2. For instance, the payments identified in paragraph 60 above, which were in furtherance of Reiman's program to acquire control over Sonic Duo and then MegaFon, have been specifically traced to funds that derived from the sale of Telecom XXI, as set forth in paragraphs 97 to 99 and 105 above. IPOC funds were also used to acquire a direct 8% interest in MegaFon.

111.    Most or all of the funds entering and leaving IPOC were the proceeds of unlawful activity. As a civil servant, Reiman was prohibited by Russian law from using his position to assist others for remuneration, and from participating in the management of business entities. Reiman also was precluded by law from using his powers for personal gain, whether by action or by inaction. Reiman repeatedly and knowingly violated these prohibitions.

*Schemes to Defraud*

112.    The money-laundering required that Defendants engage in various schemes to defraud. Defendants caused the mailing of false documents to Departments of State in various jurisdictions (including on information and belief Kentucky, Delaware, Washington, D.C., and

Utah) so as to establish front companies in those jurisdictions and thereby conceal the true source of the ill-gotten gains of IPOC and its affiliates from the authorities of Bermuda and the BVI.

113.    Defendants repeatedly wired funds to and from New York and other locations within the United States as part of their plan to conceal the true source of the ill-gotten gains of IPOC and its affiliates from the authorities of Bermuda and the BVI.

114.    Defendants falsely identified American companies and executives as investors as part of their plan to conceal the true source of the ill-gotten gains of IPOC and its affiliates from the authorities of Bermuda and the BVI.

115.    Defendants falsified numerous "loan" and "consulting" agreements as part of their plan to conceal the true source of the ill-gotten gains of IPOC and its affiliates from the authorities of Bermuda and the BVI.

116.    For instance, when IPOC initiated litigation in the BVI against the Alfa Group, IPOC or its affiliates paid $40 million into court as security for the costs of the case. The money was paid in cash, not (as the judge had directed) by bank guarantee. To refute the allegation that these funds were the proceeds of crime (and therefore could not serve as security), IPOC produced affidavits from Galmond and Michael North, and a report on its operations prepared by Ernst & Young ("E&Y"). See Exhibit A at 2-6.

117.    IPOC defrauded the BVI court and E&Y. The E&Y report was prepared pursuant to procedures agreed upon with IPOC, and E&Y's engagement did not extend to verifying the information that Galmond, North, and others at IPOC gave it. E&Y's report was based on the explicit (and highly incorrect) assumption that the agreements said to generate the money were negotiated at arm's length and that the services in question had actually been provided.

118.    Among the materials that IPOC furnished to E&Y were: (i) various agreements between BVI shell company Albany Invest Ltd. ("Albany") and Euro Resources in Kentucky; (ii) a 9/11/03 consultancy agreement between Albany and Sierra Global LLC in Oregon; (iii) a 1/28/03 software agreement between Albany and Advanta Corporation; (iv) a 03/31/03 consultancy agreement between Albany and Gamma Bank; (v) a consultancy agreement of 9/17/03 between BVI shell Lapal Limited ("Lapal") and Manwood Limited; (vi) a consultancy agreement of 8/11/03 between Lapal and Lemex LLC; (vii) a consultancy agreement of 8/1/03 between Lapal and Netmax LLC in Michigan; (viii) two consultancy agreements, dated 8/1/03 and 10/15/03, between Lapal and Azija Universal SA; and (ix) two incomplete contracts dated November 2003 and 1/15/03, as well as an unsigned contract between Albany and Sekom Finland OYAB, dated 1/15/03.

119.    These documents all were false and designed to deceive. The agreements were not negotiated at arm's length, and no services were ever rendered under these agreements. The arrangements existed only on paper and were designed to conceal from E&Y, the court, and the authorities that IPOC was transacting in the proceeds of crime.

## DAMAGE TO ROZHETSKIN

120.    Rozhetskin has been severely harmed by Defendants' having conspired to acquire and maintain an interest in LV Finance and control over MegaFon, as well as having conducted and participated in, and conspired to conduct and participate in, the affairs of IPOC and the broader Galmond Group through a pattern of racketeering activity.

121.    First and foremost, Reiman and Galmond's threats, extortion, and intimidation in furtherance of their acquisition of MegaFon and its parents – all of which included substantial conduct in or directed at New York, and all of which were linked to money-laundering and wire

fraud in part committed in New York – caused Rozhetskin and his business partners to unload their interests in LV Finance at a distressed price.

122.    Rozhetskin has suffered additional damage as a result of Defendants' actions. As detailed above, following the LV Finance sale, Reiman has sought to punish, coerce, and retaliate against Rozhetskin. The punishment, coercion, and retaliation have been in furtherance of the conspiracy to acquire an interest in MegaFon and its parents. The punishment, coercion, and retaliation are part of the same pattern of racketeering activity through which Defendants conducted and participated in the affairs of IPOC and the Galmond Group, and conspired to do so.

123.    Rozhetskin has been damaged from this post-July 2003 punishment, coercion, and retaliation. The criminal proceedings against him have caused the termination of a consulting relationship with a mining firm that generated substantial income for Rozhetskin in New York (by making payments to Rozhetskin's New York bank account). Moreover, by limiting Rozhetskin's freedom of movement, the criminal proceedings against him have proximately and foreseeably deprived him of numerous specific business opportunities, including the opportunity to serve on the boards of directors of various mining companies. But for the criminal proceedings against him, Rozhetskin would have had these opportunities.

124.    The repeated threats and intimidations, much of which took place while Rozhetskin was in New York, have proximately and foreseeably caused Rozhetskin nervous and emotional distress. Indeed, Defendants specifically intended that Rozhetskin experience such distress in New York order to cow him into doing their bidding.

### FIRST CAUSE OF ACTION: RICO
**(Conspiracy to Violate § 1962(b))**

125.    Each of the foregoing allegations is hereby incorporated herein by reference.

126.    Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3). Defendants each are "persons" within the meaning of §§ 1961(3) and § 1964(d) and (b).

127.    MegaFon, CT Mobile, TMI, and LV Finance each are enterprises within the meaning of § 1961(4) engaged in, and whose activities affect, foreign commerce.

128.    Defendants, in violation of 18 U.S.C. § 1962(d), formed an unlawful agreement to acquire and maintain, directly or indirectly, through a pattern of racketeering activity, an interest in and control over each of the enterprises referred to in the preceding paragraph.

129.    Defendants willingly advanced the conspiracy by knowingly and deliberately carrying out predicate acts of racketeering detailed herein. Defendants knew that these predicate acts were part of a pattern of racketeering activity and agreed to the commission of these acts to further the programs described above. These acts were performed pursuant to and in furtherance of the conspiracies.

130.    Each Defendant has intentionally conspired and agreed to acquire and maintain an interest in and control of the aforementioned enterprises through a pattern of racketeering activity as described herein.

131.    The § 1961(5) pattern of racketeering activity through which Defendants planned to implement their program, and in which they actually engaged, includes acts of extortion and attempted extortion in violation of 18 U.S.C. § 1951. For example:

(a)    Reiman and Galmond attempted to, and did, affect commerce by extortion, and threatened physical violence to Rozhetskin in furtherance of their plan or purpose, in that Reiman and Galmond: threatened Rozhetskin with punishment or harm if he did not transfer his shares in LV Finance to themselves; threatened Rozhetskin with punishment or harm if he did not cause the transfer of Sonic Duo and a 25.1% interest in

36

MegaFon to themselves and IPOC; and thus attempted to obtain property from Rozhetskin, with his consent, through the wrongful use of threatened force, violence, and fear, and did obtain property from LV Finance, with its and Rozhetskin's consent, through the wrongful use of threatened force, violence, and fear.

      (b)      On information and belief, Reiman and Galmond attempted to, and did, affect commerce by extortion, and threatened physical violence to the chief executive of Rostelecom in furtherance of their plan or purpose, in that Reiman: threatened the chief executive of Rostelecom with punishment or harm if he did not cause the transfer of RTK Leasing to himself and the Galmond Group; and thus obtained property, or attempted to obtain property, from Rostelecom, the shares of which are traded on the New York Stock Exchange, with its consent, through the wrongful use of threatened force, violence, and fear.

132.    The aforementioned pattern of racketeering activity includes acts of attempted grand larceny through extortion in violation of N.Y. Penal Law §§ 155.40, 155.42, and 110.00. Reiman and Galmond willfully attempted to obtain for Reiman Rozhetskin's interests in MegaFon and LV Finance, the value of each of which exceeded $1 million, by deliberately instilling in Rozhetskin a fear that if he did not transfer those interests to the Defendants, Reiman or another would (i) cause physical injury to Rozhetskin at some point in the future, or (ii) cause criminal proceedings to be instituted against Rozhetskin.

133.    The aforementioned pattern of racketeering activity includes witness-tampering in violation of 18 U.S.C. § 1512. Reiman knowingly used in New York threats against Rozhetskin (including threats of physical force) and intimidation, or attempted to do so, to influence Rozhetskin's potential testimony in a legal proceeding.

134.     The aforementioned pattern of racketeering activity includes numerous violations of 18 U.S.C. § 1956(a)(2) (prohibiting international money-laundering), including, among other transactions, the payments described above in paragraphs 54, 59 to 61, 99, 104, and 105 in that:

(a)     Defendants transferred and transmitted to New York from places outside the United States funds with the intent to promote the carrying on of specified unlawful activity within the meaning of § 1956(c)(7), to wit extortion, and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official; and

(b)     Defendants transferred and transmitted to New York from places outside the United States funds, both (i) knowing, within the meaning of § 1956(c)(1), that those funds were the proceeds of some form of unlawful activity in that they stemmed from activities that are felonies under U.S. and foreign law, and (ii) knowing that the transfers and transmissions were designed at least in part to conceal or disguise the true source of, as well as Reiman and Galmond's actual ownership and control over, the proceeds of specified unlawful activity within the meaning of § 1956(c)(7), to wit, among other enumerated offenses, extortion and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official.

135.     The aforementioned pattern of racketeering activity includes numerous violations of 18 U.S.C. § 1956(a)(1) (prohibiting laundering illicit proceeds), including, among other transactions, the payments described above in paragraphs 54, 59 to 61, 99, 104, and 105 in that:

(a)     Each of these wire transfers was a "financial transaction" within the meaning of 1956(c)(4);

(b)     Defendants knew within the meaning of § 1956(c)(1) that the property involved in the transactions were proceeds of some form of unlawful activity in that (i) the funds wired to New York stemmed from activities that are felonies under U.S. and foreign law; and (ii) the options on the shares of TMI were obtained through extortion;

(c)     The transactions in fact involved the proceeds of specified unlawful activity within the meaning of § 1956(c)(7) because (i) the funds transferred were obtained through, among other enumerated offenses, extortion and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official, and (ii) the options on the shares of TMI were obtained through extortion; and

(d)     Defendants conducted the transactions with the intent to promote specified unlawful activity within the meaning of § 1956(c)(7), to wit, among other enumerated offenses, extortion and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official; and

(e)     Defendants knew that the transactions were designed at least in part to conceal or disguise the true source of, as well as Reiman and Galmond's actual ownership and control over, the proceeds of specified unlawful activity within the meaning of § 1956(c)(7), to wit, among other enumerated offenses, extortion and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official.

136.    The aforementioned pattern of racketeering activity includes numerous violations of 18 U.S.C. § 1957 (prohibiting knowingly transacting in the proceeds of unlawful activity),

including, among other transactions, the payments described above in paragraphs 54, 59 to 61, 99, 104, and 105 in that:

(a)    The wire transfers were monetary transactions within the meaning of § 1957(f) occurring within the United States;

(b)    Defendants engaged in these transactions knowing that they concerned more than $10,000 worth of criminally derived property within the meaning of § 1957(f)(2) in that (i) the options on the shares of TMI constituted proceeds obtained from extortion; and (ii) the funds transferred constituted or were derived from the proceeds of criminal offenses, including among other things extortion, and, in violation of Russian law, bribery, misappropriation, theft, and embezzlement of public funds for the benefit of a public official; and

(c)    The property involved in these transactions in fact derived from specified unlawful activity within the meanings of §§ 1957(f)(3) and 1956(c)(7) to wit, among other enumerated offenses, extortion and, in violation of Russian law, misappropriation, theft, and embezzlement of public funds for the benefit of a public official.

137.    The aforementioned pattern of racketeering activity includes violations of 18 U.S.C. § 1341 (mail fraud) in that Defendants devised a scheme to defraud the anti-money-laundering authorities of Bermuda and the BVI by using money transfers to and from bogus shell companies to conceal the proceeds of their illicit activities, and, for the purpose of executing their scheme, on information and belief made use of the interstate mails, to wit, Defendants knowingly transmitted numerous documents on behalf of bogus companies to the Departments of State of Kentucky, Delaware, Washington, D.C., and Utah, as set forth in paragraph 112 above.

138.    The aforementioned pattern of racketeering activity includes violation of 18 U.S.C. § 1343 (wire fraud) in that Defendants devised a scheme to defraud the anti-money-laundering authorities of Bermuda and the BVI, as well as E&Y and the courts of the BVI, by using money transfers to and from bogus shell companies to conceal the proceeds of their illicit activities, and, for the purpose of executing their scheme have caused to be transmitted by wire writings, signs, and signals, to wit, Defendants have knowingly communicated (or caused to be communicated) wire instructions to foreign banks on behalf of bogus companies registered in the United States, and sent (or caused to be sent) funds by wire to and from banks in New York, all as set forth in paragraphs 113 to 119 above.

139.    As a direct, proximate, and foreseeable result of Defendants' conspiracy to acquire an interest in and control over the aforementioned enterprises through a pattern of racketeering activities, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in that he was forced to sell his shares in LV Finance at a distressed price, and has subsequently seen the termination and deprivation of business relationships.

140.    As a direct, proximate, and foreseeable result of the overt acts taken by Defendants in furtherance of their conspiracy, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in that he was forced to sell his shares in LV Finance at a distressed price, and has subsequently seen the termination and deprivation of business relationships.

## SECOND CAUSE OF ACTION: RICO
### (Violation of 18 U.S.C. § 1962(c))

141.    Each of the foregoing allegations is hereby incorporated herein by reference.

142.   IPOC and the Galmond Group each are enterprises within the meaning of § 1961(4) engaged in, and whose activities affect, interstate and foreign commerce. Each enterprise is distinct from the Defendant "persons."

143.   Reiman and Galmond are associated with IPOC, and conducted and participated, directly and indirectly, in the conduct of IPOC's affairs through a pattern of racketeering activity within the meaning of § 1961(5).

144.   Reiman and Galmond are associated with the Galmond Group, and each conducted, and participated in the conduct of, the Galmond Group's affairs through a pattern of racketeering activity within the meaning of § 1961(5).

145.   The aforementioned pattern of racketeering activity includes acts of extortion and attempted extortion committed by Defendants in violation of 18 U.S.C. § 1951, as explained in paragraph 131 above.

146.   The aforementioned pattern of racketeering activity includes acts of attempted grand larceny through extortion committed by Defendants in violation of New York Penal Law §§ 155.40, 155.42, and 110.00, as explained in paragraph 132 above.

147.   The aforementioned pattern of racketeering activity includes acts of witness-tampering committed by Defendants in violation of 18 U.S.C. § 1512, as explained in paragraph 133 above.

148.   The aforementioned pattern of racketeering activity includes numerous acts committed by Defendants in violation of 18 U.S.C. §§ 1956(a)(2), 1956(a)(1), and 1957, as explained in paragraphs 134 to 136 above.

149.   The aforementioned pattern of racketeering activity includes numerous acts committed by Defendants in violation of 18 U.S.C. § 1341, as explained in paragraph 137 above.

150.    The aforementioned pattern of racketeering activity includes numerous acts committed by Defendants in violation of 18 U.S.C. § 1343, as explained in paragraph 138 above.

151.    As a direct, proximate, and foreseeable result of Defendants' conducting and participating in the affairs of IPOC and the Galmond Group through the above-described pattern of racketeering activity, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in that he was forced to sell his shares in LV Finance at a distressed price, and has subsequently seen the termination and deprivation of business relationships.

### THIRD CAUSE OF ACTION: RICO
#### (Conspiracy to Violate § 1962(c))

152.    Each of the foregoing allegations is hereby incorporated herein by reference.

153.    Reiman and Galmond, in violation of 18 U.S.C. § 1962(d), formed an unlawful agreement to conduct, and participate in the conduct of, the affairs of IPOC through a pattern of racketeering activity.

154.    Reiman and Galmond, in violation of 18 U.S.C. § 1962(d), formed an unlawful agreement to conduct, and participate in the conduct of, the affairs of the Galmond Group through a pattern of racketeering activity.

155.    Each Defendant willingly advanced the conspiracies described in paragraphs 153 and 154 above by knowingly and deliberately carrying out predicate acts of racketeering detailed herein. Defendants knew that these predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further these conspiracies. These acts were performed pursuant to and in furtherance of the conspiracies.

156.    It was the object of the conspiracies to conduct of the affairs of the respective enterprises through a § 1961(5) pattern of racketeering activity.

157.    The aforementioned pattern of racketeering activity includes the acts referred to in paragraphs 145 to 150 above.

158.    As a direct, proximate, and foreseeable result of Defendants' conspiracy to conduct, and participate in the conduct of, the affairs of the respective enterprises through a pattern of racketeering activities, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in that he was forced to sell his shares in LV Finance at a distressed price, and has subsequently been deprived of business opportunities.

159.    As a direct, proximate, and foreseeable result of the overt acts taken by Defendants in furtherance of the conspiracies, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in that he was forced to sell his shares in LV Finance at a distressed price, and has subsequently seen the termination and deprivation of business relationships.

**FOURTH CAUSE OF ACTION:**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**

160.    Each of the foregoing allegations is hereby incorporated herein by reference.

161.    Reiman and Galmond have willfully and knowingly engaged in a deliberate and malicious campaign of harassment and intimidation, including repeated threats to Rozhetskin's life and liberty, many of which have been delivered to Rozhetskin in New York.

162.    Reiman and Galmond have willfully, maliciously, and knowingly engaged in a pattern of outrageous conduct intolerable in a civilized society, including repeated threats to Rozhetskin's life and liberty, many of which have been delivered to Rozhetskin in New York.

163.    Reiman and Galmond have engaged in this conduct with the intent of causing Rozhetskin severe distress.

164.    As a result of Reiman and Galmond's tortious conduct, Rozhetskin suffered severe anguish and nervous distress both in and out of New York.

165.    Russian law recognizes liability for "moral harm" where a defendant intentionally causes emotional suffering.

166.    Galmond's February 2003 telephone call to Rozhetskin, referred to in paragraphs 66 to 69 above, was intended to, and did, cause nervous and emotional distress to Rozhetskin in New York.

167.    To the extent Russian law applies, then as a matter of Russian law, Defendants are liable to Rozhetskin for the injury associated with this telephone call.

168.    Danish tort law awards compensation where a defendant's intentional conduct proximately causes injury to the plaintiff.

169.    Galmond's February 2003 telephone call to Rozhetskin was intended to, and did, cause nervous and emotional injury to Rozhetskin in New York.

170.    To the extent Danish law applies, then as a matter of Danish law, Defendants are liable to Rozhetskin for the injury associated with this telephone call.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendants, as follows:

a.  On the First, Second, and Third Causes of Action, damages in excess of $500 million or such other amount as may be proven, trebled according to law;

b.  On the Fourth and Fifth Causes of Action, all compensatory damages and punitive damages as permitted by law;

c.  Attorneys' fees, costs, and disbursements in this action;

d.  Prejudgment and post-judgment interest; and

e.  Such other and further relief as the Court may deem just and proper

## JURY DEMAND

Plaintiff prays for a jury trial in this matter.

Dated: December 19, 2007          ROBBINS, RUSSELL, ENGLERT, ORSECK,
      Washington, D.C.          UNTEREINER & SAUBER LLP

By: _Daniel R. Walfish_

Richard Sauber, *pro hac vice*
Daniel R. Walfish
1801 K Street, N.W. Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

Douglas W. Baruch, *pro hac vice*
FRIED, FRANK, HARRIS, SHRIVER &
    JACOBSON LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 639-7000
Fax: (202) 639-7003

*Attorneys for Plaintiff Leonid Rozhetskin*

46

# Exhibit A

THE OFFICE OF THE
# DIRECTOR OF PUBLIC PROSECUTIONS
TERRITORY OF THE VIRGIN ISLANDS

*Our Ref:  AG/27/041*

*Your Ref:*

21st August, 2007

**TO:**   Lystra Blake, Esq.
Associate Director
United States Department of Justice
Office of International Affairs
Criminal Division
1-301 New York Avenue
8th Floor
Washington, D.C. 20005
USA

### Re: Request For Assistance In The Investigation Of IPOC International Growth Fund Limited And Ipoc Group, Mr. Jeffrey Galmond And Mr. Michael North

**I.       INTRODUCTION**

The Government of the British Virgin Islands ("BVI") requests the assistance of the Central Authority of the United States of America pursuant to the Treaty between the Government of the British Virgin Islands and the Government of the United States of America on Mutual Legal Assistance in Criminal Matters.

The Royal Virgin Islands Police Force is investigating money laundering activities and other offences (*described at Part IV below*) allegedly committed by IPOC International Growth Fund ("IPOC"), a Bermuda registered mutual investment fund and a number of related entities and individuals.  These include entities registered in the BVI (Lapal Limited, Albany Invest Limited and Mercury Import Limited), Mr. Jeffrey Galmond, a Danish lawyer and alleged beneficial owner of IPOC and Mr. Michael North, a German banker and Director of IPOC.

**II.      RELEVANT FACTS**

**Factual background**

Description of Parties involved in the Investigations

IPOC is a mutual fund incorporated in Bermuda in August, 2000 and is the owner of:  Albany Invest Limited, Mercury Import Limited, Leasing Telecom Ltd., Convergence Capital Ltd, and Com Tel Eastern Ltd.  Investigations have revealed that Mr. Leonid Reiman (Reiman) has a private beneficial interest in IPOC and its group entities.  Mr. Reiman is the Minister of

Telecommunications in Russia since November, 1999.  Prior to this he held public office with responsibility for Russian telecommunications.

Mr. Jeffrey Galmond claimed in an affidavit to be the beneficial owner of IPOC.  He is a Director of and actively controls IPOC and its related entities.

Mr. Michael Ludgwig Rudolf North is a Director of and actively controls IPOC and its related entities.

The Lapal Limited is a Company registered in the British Virgin Islands (BVI) and it is alleged that the beneficial owner is Mr. Jeffrey Galmond.

Albany Invest Limited and Mercury Import Limited are members of the IPOC Group and are both registered companies in the BVI.

The investigations have revealed that IPOC, Lapal Limited, Albany Invest Limited and Mercury Import Limited and other entities are being used by Mr. Galmond and Mr. North and others as vehicles for laundering the proceeds of fraud, theft and corruption as described below.

<u>The BVI Civil Proceedings</u>

In September 2003, IPOC issued civil proceedings in the BVI in Suit No. 140 of 2003 against Alfa Group, a Russian conglomerate, claiming a 25% stake in Megafon, Russia's third largest mobile phone operator.  During these proceedings the BVI High Court ordered IPOC to pay a total of US$40 million into court as security for costs.  Instead of paying the funds into the court by way of bank guarantee as directed by the Judge, IPOC paid cash, by way of direct transfer. The money was paid in three tranches by IPOC's BVI solicitors, Smith Hughes and Raworth (SHR), now Maples and Calder as follows:

First the sum of US$23 million was paid by IPOC to SHR on October 7 2003, second the sum of US$7 million was paid to SHR by Russian Telecom Development Corporation (RTDC) on behalf of IPOC on 7 October 2003 and a final sum of US$10,092,000 was paid to SHR by Augmentation Holdings Limited on 18th June 2004.

During the proceedings, a former senior employee and director of IPOC approached the Defendants and offered to explain to them the true nature of IPOC and its operations. *Inter alia*, he explained how he would be given instructions on a weekly basis concerning huge sums of money flowing out of Russia which he would channel through a network of off-shore companies.

In due course, these monies would find their way into one of four Bermudian investment funds (of which IPOC was one), to be returned to the legitimate economy in Russia by the purchase of corporate assets, mainly in the telecommunications sector.  He says he created sham loan and consultancy agreements to disguise the true source of the monies that were passing through the IPOC Group companies.  A similar mechanism was used in the generation of at least some of the $40 million paid into the BVI Court.



As a result of that information, Alfa and the other Defendants pleaded that the funds paid into the Court by or on behalf of IPOC were the proceeds of crime and that therefore they could not properly have recourse to it should a costs order be made in their favour. In summary, their allegations were that IPOC was beneficially owned by Reiman, who corruptly used his official position to the benefit of IPOC and its related entities.

In answer to these allegations during the Proceedings, IPOC asserted that the funds paid into the Court, and all its operations were legitimate and that it was not involved in money laundering. IPOC produced several affidavits by Mr. Galmond and Mr. North as well as a report produced in August 2004 on their operations from Ernst & Young ('E&Y'), an Accounting Firm.

It is significant to note that this report took the form of an 'agreed-upon procedures' report. The evidence has shown that E&Y did not take any steps to verify the information provided to it by IPOC, Mr. Galmond and Mr. North. E&Y did acknowledge in their report that they accepted at face value the claims made by Mr. Galmond and Mr. North, for example, that Mr. Galmond was the owner of all of the companies within IPOC's Group. <u>They also accepted the evidence of these two individuals that all of the various agreements that generated much of the money flowing into IPOC's group were the product of arm's length arrangements with third parties and that the relevant services had actually been provided.</u>

The evidence gathered thus far has shown that the E&Y Report was facile and dependent upon documents, which is believed to be false and were produced by IPOC, Mr. Galmond and Mr. North. E&Y did not carry out an independent assessment of the key issues, namely beneficial ownership of the assets and whether the transactions concerning them were genuine, or cover for a money laundering scheme. The report was responded to in the BVI proceedings by a report compiled by Mr. Jonathan Philips of Price Waterhouse Coopers (dated 18th October 2004) which found on the basis of the information provided and a limited review that: "I am unable to conclude that the funds that have been paid into the Court as security by IPOC are not as a result of a money laundering scheme as alleged".

Further, in a fourth affidavit of Mr. Galmond dated July, 2004, which was sworn for the purposes of the BVI Civil Proceedings, he explained that he is the beneficial owner of IPOC and its group. In paragraph 97 he deposed, *"The Group belongs to me and the equity contributions that have funded it were mine...."* He sets out how over ten years he secretly amassed a fortune of over US$2 billion in the Russian telecoms market through his covert ownership of a number of companies, which participated in numerous transactions in that market and through which he owns highly valuable stakes in many of the best known companies in Russian telecoms. He deposed that he is a close personal friend of Reiman and that Reiman had no ownership interest in the group and had not improperly used his influence in the development of the group.

These allegations were reported to the BVI Authorities by the Alfa Group and other Defendants. On the basis of these allegations, an investigation was launched into the provenance of the monies deposited in the BVI Court as security for costs and into uncovering whether or not IPOC is simply a front for the laundering of the proceeds of crime of, amongst others, the Russian Telecommunications Minister Mr Leonid Reiman.

3



### The Zurich Arbitration Proceedings

Upon investigations it was found that the parties' dispute went before the Zurich Arbitral Tribunal. The findings of the Arbitral Tribunal in its Second Partial Award dated 16th May 2006 was that:

    (i)     IPOC was a money laundering vehicle;

    (ii)    That IPOC was a company set up on behalf of and beneficially owned entirely by a serving Russian Minister responsible for telecommunications;

    (iii)   That the said Russian Minister engaged in criminal activity including the taking of bribes and the improper appropriation of State's assets in order to generate the funds which IPOC subsequently used.

### The BVI Investigations

Further documents have been acquired, a number of these being consultancy agreements between, *inter alia,* the BVI companies identified above under the heading 'Description of potential Defendants' and companies around the world, among those were companies incorporated in the USA. The funds that were generated by IPOC for the payment of the US$40 million was purportedly generated by the provision of consultancy services, such agreements involved certain US entities such as those set out in **Appendix 1,** annexed hereto. These agreements show a direct link to the potential defendants in this matter. There is substantial evidence to suggest that these agreements are shams.

Also, investigations revealed that on 11th September, 2003 IPOC's bank account number 068/00/38782 with the Bermuda Commercial Bank (BCB) had a balance of $70.71, but within a 25-day period $27,050,000. were deposited into the said account from a number of corporate sources namely:

| Entity | Country of incorporation | Date of payment | Payment $ |
|---|---|---|---|
| Mercury Import Ltd | BVI | 12/09/2003 | 600,000 |
| Albany Invest Ltd | BVI | 12/09/2003 | 1,200,000 |
| Lapal Ltd | BVI | 30/09/2003 | 4,050,000 |
| Renaissance Advisory | Bermuda | 02/10/2003 | 7,000,000 |
| Leasing Telecom Ltd | Bermuda | 06/10/2003 | 6,200,000 |
| Convergence Capital Ltd | Bermuda | 06/10/2003 | 3,000,000 |
| Com Tel Eastern Ltd | Bermuda | 07/10/2003 | 5,000,000 |
|  |  |  | **27,050,000** |

IPOC, Mr. Galmond and Mr. North explained these deposits, by way of the E&Y report in the following way:



| Entity | Reason for payment |
|---|---|
| Mercury Import Limited | Subscription for shares |
| Albany Invest Limited | Subscription for shares |
| Lapal Limited | Inter-company settlement subsequently converted to subscription for shares |
| Convergence Capital Limited | Loan |
| Leasing Telecom Limited | Subscription for shares |
| Com Tel Eastern Limited | Loan |

The documents provided by IPOC, Mr. Galmond and Mr. North purported to explain the movement of these funds to IPOC in its Bermuda bank account and then onward transmission to SHR in its BVI bank account at First Caribbean International Bank, for IPOC's purposes. It is notable that the movement of the funds is coincidental with the security for costs application and order. It is an irresistible inference that the funds were moved to satisfy the order.

The agreements were provided by IPOC to E&Y to explain the origin of very substantial cash flows. The counterparties to the agreements, including those incorporated in the USA, have been described variously as *"third parties"*, *"non Group entities"* and *"non-affiliated companies"*. In essence, they are understood to be unconnected with IPOC or its affiliates.

However, the results of various enquiries have given reason to doubt the authenticity of many of these agreements. *For example, certain purported signatories to them have sworn testimony stating that their signatures were forged.* Moreover, it appears at first sight that a number of other signatures may have been forged. The BVI authorities are obtaining the expert opinion of a handwriting expert on this point.

Furthermore, online searches at the registries of Delaware, Kentucky and Oregon show that a number of these *"third party"* companies have registered agents and/or addresses in common, indicating that they may in fact be connected in some way. See **Appendix 1**, annexed hereto.

Thus the BVI Authorities are seeking the assistance of the US Authorities to establish the connection of the US entities in relation to IPOC, by way of conducting interviews and recording of statements regarding the information as requested at 'Part III – Assistance Requested' of this request.

At present, the sum of US$40 million is presently being held in a special account by the BVI High Court.

A restraint order is being sought in relation to the sum presently held by the BVI High Court, with a view to obtaining convictions and, consequently, a confiscation order. It is believed that the movement of money among IPOC and its group of companies and the consultancy agreements which appear to be illegitimate but which were attested to by Mr. Galmond and Mr.



North for the purpose of the E&Y report; the assertions by witnesses that their signatures have been forged on certain agreements, the fact that Mr. Galmond initially swore evidence on behalf of IPOC before the BVI Court that he is the beneficial owner, a position from which IPOC has since recanted from by way of sworn evidence of Mr. David Hauenstein; the overwhelming evidence that Mr. Reiman is the true beneficial owner of IPOC and its group of companies; are evidence that IPOC and its group of companies are corporate shams or façades designed to conceal the true facts about the source of the revenues in IPOC's groups and its true beneficial owner, may justify a Court of competent jurisdiction to lift the corporate veil. Thus the decision to institute criminal charges in the BVI against the potential defendants as identified above.

<u>Preliminary Charges</u>

The charges are preliminarily drafted as of 26th April, 2007 as follows:

**(a) Statement of Offence**

Perjury contrary to section 95 (1) of the Criminal Code

**Particulars of Offence**

Jeffrey Galmond in July of 2004 having been lawfully sworn as a witness in a judicial proceeding, namely Civil Suit No. 140 of 2003 in the Eastern Caribbean Supreme Court holden in the British Virgin Islands wilfully made a material statement in that proceeding which he knew to be false, namely that he beneficially owned IPOC International Growth Fund and its related entities and that Leonid Reiman had no interest in IPOC International Growth Fund.

**(b) Statement of Offence**

Perverting the Course of Justice contrary to section 93 of the Criminal Code

**Particulars of Offence**

IPOC International Growth Fund Ltd., Jeffrey Galmond, Michael Ludwig Rudolf North, Lapal Limited, Albany Invest Limited and Mercury Import Limited in August of 2004, with intent to pervert the course of public justice did a series of acts which had a tendency to pervert the course of public justice in that they produced, or caused to be produced, in Civil Suit No. 140 of 2003 in the Eastern Caribbean Supreme Court, holden in the British Virgin Islands, documents that purported to show that Lapal Limited, Albany Invest

6



Limited,  and Mercury Import Limited received payments from third parties for services rendered when in fact they had not received payments from these third parties and or provided the said services namely:

(i)     Agreements between Albany Invest Ltd. and Euro Resources Ltd.;

(ii)    A consultancy agreement dated 11th September 2003 between Albany Invest Ltd. and Sierra Global LLC;

(iii)   A software agreement dated 28th January, 2003 between Albany Invest Ltd. and Advanta Corporation Ltd.;

(iv)    A consultancy agreement dated 31st March, 2003 between Albany Invest Ltd. and Gamma Bank;

(v)     Two incomplete contracts dated November 2003 and 15th January 2003 and a complete but unsigned contract dated 15th January 2003 between Albany Invest Ltd and Sekom Finland OYAB;

(vi)    A consultancy agreement dated 17th September 2003 between Lapal Limited and Manwood Limited;

(vii)   A consultancy agreement dated 11th August, 2003 between Lapal Limited and Lemex LLC;

(viii)  A consultancy agreement dated 1st August, 2003 between Lapal Ltd. and Netmax LLC;

(ix)    Two consultancy agreements dated 1st August, 2003 and 15th October, 2003 between Lapal Ltd. And Azija Universal SA.



**(c) Statement of Offence**

Furnishing False Information contrary to section 221(1)(b) of the Criminal Code

**Particulars of Offences**

IPOC International Growth Fund Limited, Jeffrey Galmond, Michael Ludwig North, Lapal Limited, Albany Invest Limited and Mercury Import Limited in August of 2004 in furnishing information for an accounting report by the Accounting Firm of Ernst and Young intended to be tendered in the Eastern Caribbean Supreme Court holden in the British Virgin Islands dishonestly and with a view to gain for IPOC International Growth Fund Limited produced to Ernst and Young documents made for an accounting purpose which was or might to their knowledge be misleading, false or deceptive in a material particular in that they purported to show that Lapal Ltd., Albany Invest Ltd. and Mercury Import Limited received payments from third parties for services purportedly rendered when in fact they had not received these payments from third parties namely:

(j)      Agreements between Albany Invest Ltd. Ltd. and Euro Resources Ltd.;

(ii)     A consultancy agreement dated 11th September 2003 between Albany Invest Ltd. and Sierra Global LLC;

(iii)    A software agreement dated 28th January, 2003 between Albany Invest Ltd. and Advanta Corporation;

(iv)    A consultancy agreement dated 31st March, 2003 between Albany Invest Ltd. and Gamma Bank;

(v)     Two incomplete contracts dated November 2003 and 15th January 2003 and a complete but unsigned contract dated 15th January 2003 between Albany Invest Ltd and Sekom Finland OYAB;



(vi)     A consultancy agreement dated 17th September 2003 between Lapal Limited and Manwood Limited;

(vii)    A consultancy agreement dated 11th August, 2003 between Lapal Limited and Lemex LLC;

(viii)   A consultancy agreement dated 1st August, 2003 between Lapal Ltd. and Netmax LLC;

(ix)     Two consultancy agreements dated 1st August, 2003 and 15th October, 2003 between Lapal Ltd. And Azija Universal SA.

(d)   **Statement of Offence**

Furnishing False Information contrary to section 221(1)(b) of the Criminal Code

**Particulars of Offences**

IPOC International Growth Fund Limited, Jeffrey Galmond, Michael Ludwig North, Lapal Limited, Albany Invest Limited and Mercury Import Limited on a date or dates unknown in August 2004 in furnishing information for Civil Suit No 140 of 2003 in the Eastern Caribbean Supreme Court holden in the British Virgin Islands dishonestly and with a view to gain for IPOC International Growth Fund Limited produced documents made for an accounting purpose which was or might to their knowledge be misleading, false or deceptive in a material particular in that they purported to show that Lapal Ltd., Albany Invest Ltd. and Mercury Import Limited received payments from third parties for services purportedly rendered when in fact they had not received these payments from third parties namely:

(i)      Agreements between Albany Invest Ltd. and Euro Resources Ltd.;

(ii)     A consultancy agreement dated 11th September 2003 between Albany Invest Ltd. and Sierra Global LLC;



(iii)   A software agreement dated 28th January, 2003 between Albany Invest Ltd. and Advanta Corporation Ltd.;

(iv)   A consultancy agreement dated 31st March, 2003 between Albany Invest Ltd. and Gamma Bank;

(v)   Two incomplete contracts dated November 2003 and 15th January 2003 and a complete but unsigned contract dated 15th January 2003 between Albany Invest Ltd and Sekom Finland OYAB;

(vi)   A consultancy agreement dated 17th September 2003 between Lapal Limited and Manwood Limited;

(vii)   A consultancy agreement dated 11th August, 2003 between Lapal Limited and Lemex LLC;

(viii)   A consultancy agreement dated 1st August, 2003 between Lapal Ltd. and Netmax LLC;

(ix)   Two consultancy agreements dated 1st August, 2003 and 15th October, 2003 between Lapal Ltd. And Azija Universal SA.

(e)   **Statement of Offence**

Acquisition, Possession or Use of the Proceeds of Criminal Conduct contrary to section 28(1) of the Proceeds of Criminal Conduct Act.

**Particulars of Offence**

IPOC International Growth Fund, Jeffrey Galmond and Michael Ludwig Rudolf North on or about 7th October 2003 knowing that the sum of united states eight million two hundred



and thirty three thousand and five hundred dollars in whole or in part directly or indirectly represented Lapal Limited's proceeds of criminal conduct acquired or used that property.

(f)   **Statement of Offence**

Acquisition, Possession or Use of the Proceeds of Criminal Conduct contrary to section 28(1) of the Proceeds of Criminal Conduct Act.

**Particulars of Offence**

IPOC International Growth Fund, Jeffrey Galmond and Michael Ludwig Rudolf North on or about 7th October 2003 knowing that the sum of united states four million two hundred and eighty thousand in whole or in part directly or indirectly represented Albany Invest Limited's proceeds of criminal conduct acquired or used that property.

(g)   **Statement of Offence**

Acquisition, Possession or Use of the Proceeds of Criminal Conduct contrary to section 28(1) of the Proceeds of Criminal Conduct Act.

**Particulars of Offence**

IPOC International Growth Fund, Jeffrey Galmond and Michael Ludwig Rudolf North on or about the 7th October 2003  knowing that the sum of united states thirty million dollars in whole or in part directly or indirectly represented Leonid Reiman's proceeds of criminal conduct acquired or used that property.

(h)   **Statement of Offence**

Acquisition, Possession or Use of the Proceeds of Criminal Conduct contrary to section 28(1) of the Proceeds of Criminal Conduct Act.

**Particulars of Offence**

IPOC International Growth Fund, Jeffrey Galmond and Michael Ludwig Rudolf North on or about 18th June 2004 knowing that the sum of united states ten million and ninety two



thousand dollars in whole or in part directly or indirectly represented Leonid Reiman's proceeds of criminal conduct acquired or used that property.

Further investigations have revealed even more entities are involved however, at this time we humbly request the assistance of the US Authorities urgently as set out in Part III of this Request.

On 25th June 2007 the BVI Court ordered that the Director of Public Prosecutions' evidence in the restraint proceedings against IPOC be served on 14th September 2007, with a view to a substantive hearing in early 2008. Owing to the approaching deadline, we would be grateful if the information requested is made available to us as soon as it is identified, rather than waiting for it all to be collated.

## III.   ASSISTANCE REQUESTED

1.    In light of the information set out above, the BVI Authorities request assistance from the US Department of Justice in obtaining the following information by way of interview and recording of witness statements *(A sample of witness statement is attached and annexed hereto as Appendix 2)*:

    (1)    in respect of each of the registered agents identified in **Appendix 1**:

        (i)    the identity of the individual from whom it took its instructions to incorporate the companies identified in **Appendix 1**;

        (ii)    details of any other companies it has incorporated on the instructions of the same individual;

        (iii)    the identity of the ultimate beneficial owner or owners of the companies identified in the **Appendix 1**;

        (iv)    whether it has had any business dealings or entered into any contracts with IPOC or any of the BVI companies described above as a representative of the companies identified in **Appendix 1**; and

        (v)    whether the agent has ever acted in a business capacity, as a Power of Attorney, or signed an agreement on behalf of any of the companies identified in the **Appendix 1** and, if so, request details thereof; and

    (2)    in the event that these enquiries lead to any other officer or adviser of the companies identified in the **Appendix 1**, the same information as identified above, is also requested.

2.    Please arrange for Goldstein Golub Kessler & Company International, a US based entity and the auditors of IPOC International Growth Fund Limited, to provide the following information, confirmed by witness statements in respect of each audit it undertook in respect of this entity, and all other related entities :



(i)     copies of all audit working papers;

(ii)    details of the individual(s) from whom they received instructions;

(iii)   copies of the trial balance and underlying accounting records, whether in hard copy or electronic form;

(iv)    copies of all documents provided by the client;

(v)     details of any outstanding audit matters;

(vi)    details of any false / misleading documentation or information provided to them;

(vii)   copies of all correspondence with the client;

(viii)  a copy of the Management Letter; and

(ix)    notes of the audit clearance meeting.

2)    For each of the US-registered companies listed below, please provide the following information:

*Information requested*

a)      details of all bank accounts held in their name;

b)      bank statements for all accounts, from their inception to the present;

c)      all vouchers, or other documentation that identifies the source or destination of the funds, including transfer/payment instructions;

d)      details of the information provided, and copies of the forms completed, to open the accounts;

e)      details of signatories to the accounts;

f)      details of their director(s);

g)      details of their power of attorney(s);

h)      details of their beneficial owner(s);

i)      details of any other companies owned by the beneficial owner;

j)      details of any involvement of or connection with Mr Leonid Reiman;



k)      copies of all correspondence, whether in hard copy or electronic form, between:

     i.   the companies identified above;

     ii.  those companies and Mr Jeffrey Galmond; and

     iii. the companies and Mr Reiman; and

l)      a statement from the directors of the companies in respect of whether they:

     i.   entered into a contract with companies by the name of Albany Invest Limited, Lapal Limited, Mercury Import Limited, Montego Consultants Limited or Riversand Holdings Limited; and, if so,

     ii.  whether an agreement was signed to that effect and, if so, by whom.

*Companies*

i)      Brandcom LLC;
ii)     Castle Ventures Limited;
iii)    Collins Trading Limited;
iv)     Credger Alliance LLC;
v)      Euro Resources LLC;
vi)     Fortrans LLC;
vii)    Fortrans L.L.C;
viii)   INMAX LLC;
ix)     Intelligence Monetary Service Inc;
x)      King Financial Group LLC;
xi)     Kortem Group GmbH;
xii)    MCT Corporation;
xiii)   Neofund LLC;
xiv)    Netmax LLC;
xv)     Norbury Technologies Inc;
xvi)    Portlex Limited;
xvii)   Pretaler Limited;
xviii)  Russian Telecommunications Development Corporation Inc (RTDC);
xix)    Russian Telecommunications Development Corporation Holdings;
xx)     Rostelecomleasing SA;
xxi)    Sierra Global LLC;
xxii)   Unicross LLC;
xxiii)  Concordia LLC;
xxiv)   Dan River LLC;
xxv)    Logic Continental LLC;
xxvi)   Pac-Media Communications LLC, and
xxvii)  Wimpey Ltd.

Finally, the BVI Authorities understand that a corruption suit was filed in 2006 in the New York South District Court by Mr Rozhetskin, the founder of Megafon, against Mr Reiman. Megafon was the same company that was in issue during the original Civil Suit in the BVI between IPOC and Alfa Group and the other Defendants. The BVI Authorities would be very grateful if a copy of this document could be provided to us.

We humbly request that all information received is collected in the form of witness statements and ask that persons be informed that this statement may be tendered in evidence and they would be liable to prosecution if they wilfully state anything which they know to be false or did not believe to be true in the statement. See **Appendix 2** which sets out the required format for statements admissible in BVI Court.

The assistance of the US Department of Justice in obtaining this information, which is not currently in the possession of the BVI authorities, would be greatly appreciated.

## IV.    LAWS OF THE BRITISH VIRGIN ISLANDS

The relevant BVI laws are set out below. Extracts from the statute books are also included.

### Under the Criminal Code, 1997 of the Virgin Islands, section 95 provides:

"95.   (1)   *Any person lawfully sworn as a witness, or as an interpreter, in a judicial proceeding who wilfully makes a statement, material in that proceeding, which he knows to be false or does not believe to be true, commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years.*

(2)   *Where a statement made for the purpose of a judicial proceeding is not made before the court or tribunal itself but is made on oath before a person authorised by law to administer an oath to the person who makes a statement and to record or authenticate the statement it shall, for the purpose of this section, be treated as having been made in a judicial proceeding.*

(3)   *For the purpose of this section, it is immaterial whether*

(a)   *the person making the statement is or is not competent to be a witness and whether or not his evidence is admissible; and*

(b)   *the false testimony is given orally or in writing.*

(4)   *The question whether a statement, in respect of which a charge of perjury is made, was material is a question of law to be determined by the court of trial.*

(5)   *A person shall not be liable to be convicted of an offence under this section, or of any offences declared by any law to be perjury, solely upon the evidence of one witness as to the falsity of any statement alleged to be false.*

(6)   *For the purpose of this section, proceedings before any statutory body or tribunal which is empowered to take evidence on oath shall be deemed to be judicial proceedings.*"



Under the Criminal Code, 1997 of the Virgin Islands, section 93 provides:

"93.   A person commits an offence and is liable on conviction to imprisonment for a term not exceeding five years, if he

(a)   conspires with any person to accuse any person falsely of any offence or to do anything to obstruct, prevent, pervert or defeat the course of justice;

(b)   in order to obstruct the due course of justice, dissuades, hinders or prevents any person lawfully bound to appear and give evidence as a witness from so appearing and giving evidence, or endeavours so to do; or

(c)   obstructs or in any way interferes with or knowingly prevents the execution of any legal process, civil or criminal."

Under the Criminal Code, 1997 of the Virgin Islands, section 221 provides:

"221.  (1)   Any person who dishonestly, with a view to gain for himself or another or with intent to cause loss to another,

(a)   destroys, defaces, conceals or falsifies any account or any record or document made or required for an accounting purpose, or

(b)   in furnishing information for any purpose, produces or makes use of any account or any such record or document, which to his knowledge is or may be misleading, false or deceptive in a material particular,

commits an offence and is liable on conviction to imprisonment for a term not exceeding seven years."

Under the Proceeds of Criminal Conduct Act 1997, section 29 provides:

"29   (1)   A person commits an offence if, knowing that any property is, or in whole or in part directly or indirectly represents, another persons proceeds of criminal conduct, he acquires or uses that property or has possession of it.

(2)   It is a defence to a charge of committing an offence under this section that the person charged acquired or used the property or had possession of it for adequate consideration.

(3)   For the purposes of subsection (2),

(a)   a person acquires property for inadequate consideration if the value of the consideration is significantly less than the value of the property; and

(b)   a person uses or has possession of property for inadequate consideration if the value of the consideration is significantly less than the value of his use or possession of the property.

(4)   The provision for any person of services or goods which are of assistance to him in criminal conduct shall not be treated as consideration for the purposes of subsection (2).

...



(11)   A person who commits an offence under this section is liable

   (a)    on summary conviction, to imprisonment for a term not exceeding six months or to a fine not exceeding three thousand dollars, or both; or

   (b)    on conviction on indictment, to imprisonment for a term not exceeding fourteen years or to a fine not exceeding twenty thousand dollars, or both.

...

(13)   For the purposes of this section, having possession of any property shall be taken to be doing an act in relation to it."

**Under the Proceeds of Criminal Conduct Act 1997, section 30 provides:**

"30   (1)   A person commits an offence if he

   (a)    conceals or disguises any criminal conduct property which is, or in whole or in part directly or indirectly represents, his proceeds of criminal conduct, or

   (b)    converts or transfers that property or removes it from the Territory, for the purpose of avoiding prosecution for an offence to which this Act applies or the making or enforcement in his case of a confiscation order.

The information that we seek will not be used except in relation to the matters detailed herein without your consent.

This request is made pursuant to the Mutual Legal Assistance Treaty between the United States of America and United Kingdom extended to the British Virgin Islands. Further in the spirit of reciprocity the United States authorities are kindly asked to give effect to this request.

Thank you for your assistance in this important matter.

Dated this 21st day of August, 2007

BY: TERRENCE F. WILLIAMS
DIRECTOR OF PUBLIC PROSECUTIONS

US Request

Appendix 1



| Registered agent | Registered agent address | Entity | Company No. |
|---|---|---|---|
| Anglo Management (USA) Inc | 62 Rockford Road, Wilmington, New Castle, Delaware 19806 | Neofund LLC | 3747969 |
| | | Unicross LLC | 3556484 |
| | | Brandcom LLC | 3577837 |
| American Incorporators Ltd | 1220 N Market Street, Suite 808, New Castle, Wilmington, Delaware 19801 | Norbury Technologies Inc | 3408999 |
| | | Collins Trading Ltd | 2696764 |
| | | Kortem Group GmbH | 3287572 |
| | | Portex Ltd | 3535193 |
| | | Wimpey Ltd | 3304906 |
| IOS Group Inc | 1220 N Market Street, Suite 808, New Castle, Wilmington, Delaware 19801 | INMAX LLC | 3058156 |
| Registered Agents Ltd | 1220 N Market Street, Suite 808, New Castle, Wilmington, Delaware 19801 | Intelligence Monetary Service Inc | 2495145 |
| Data Research Inc | 8130 SW Beaverton-Hillsdale Hwy, Portland, Oregon 97225 | Fortrans L.L.C. | 017735-97 |
| Incorporating Services Ltd | 8130 SW Beaverton-Hillsdale Hwy, Portland, Oregon 97225 | King Financial Group LLC | 079257-95 |
| Charles Mathias | 942 Windermere Drive NW, Salem, Oregon 97304 | Logic Continental LLC | 159070-90 |
| Unitrust Management Ltd | 942 Windermere Drive NW, Salem, Oregon 97304 | Sierra Global LLC | 108718-95 |
| Pacific Registered Agents Inc | 128 S Baxter Blvd, Lexington, KY 40515 | Fortrans LLC | 208815-95 |
| Unitrust Management LLC | 828 Lane Allen, 219 Lexington, KY 40504 | Euro Resources LLC | 0528833 |
| | | Credger Alliance LLC | 0566538 |

18